# EXHIBIT 1

Approved, SCAO

| | Original - Court<br>1st copy - Defendant | 2nd copy - Plaintiff<br>3rd copy - Return |
|---|---|---|

| STATE OF MICHIGAN<br>37th    JUDICIAL DISTRICT<br>JUDICIAL CIRCUIT<br>COUNTY PROBATE | SUMMONS<br>JOHN HALLACY | CASE NO.<br>19- *391* -CZ |
|---|---|---|

Court address | Court telephone no.

| Plaintiff's name(s), address(es), and telephone no(s).<br>Carrie Smith<br>10464 Wildwood Drive<br>Richland, MI 49083 | v | Defendant's name(s), address(es), and telephone no(s).<br>Kellogg Community College<br>450 North Avenue<br>Battle Creek, MI 49017 |
|---|---|---|
| Plaintiff's attorney, bar no., address, and telephone no.<br>Mark E. Kreter (P35475)<br>Daniel W. Boocher (P81550)<br>Kreis, Enderle, Hudgins & Borsos, P.C.<br>One West Michigan Avenue<br>Battle Creek, MI 49017<br>269-966-3000 | | |

**Instructions:** Check the items below that apply to you and provide any required information. Submit this form to the court clerk along with your complaint and, if necessary, a case inventory addendum (form MC 21). The summons section will be completed by the court clerk.

**Domestic Relations Case**

☐ There are no pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

☐ There is one or more pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint. Attached is a completed case inventory (form MC 21) listing those cases.

☐ It is unknown if there are pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

**Civil Case**

☐ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.

☐ MDHHS and a contracted health plan may have a right to recover expenses in this case. I certify that notice and a copy of the complaint will be provided to MDHHS and (if applicable) the contracted health plan in accordance with MCL 400.106(4).

☒ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.

☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has

been previously filed in  ☐ this court,  ☐ _____ Court, where

it was given case number _____ and assigned to Judge _____.

The action  ☐ remains  ☐ is no longer  pending.

Summons section completed by court clerk.    | **SUMMONS** |

**NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:

1. You are being sued.

2. **YOU HAVE 21 DAYS** after receiving this summons and a copy of the complaint to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state).

3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.

4. If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

| Issue date<br>*2-20-19* | Expiration date *<br>*5-22-19* | Court clerk<br>ANNE B. NORLANDER |
|---|---|---|

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

MC 01   (1/19)   **SUMMONS**    MCR 1.109(D), MCR 2.102(B), MCR 2.104, MCR 2.105

| PROOF OF SERVICE | SUMMONS |
| | Case No.   19-**391**-CZ |

TO PROCESS SERVER:  You are to serve the summons and complaint not later than 91 days from the date of filing or the date of expiration on the order for second summons.  You must make and file your return with the court clerk.  If you are unable to complete service you must return this original and all copies to the court clerk.

### CERTIFICATE / AFFIDAVIT OF SERVICE / NONSERVICE

☐ **OFFICER CERTIFICATE**
I certify that I am a sheriff, deputy sheriff, bailiff, appointed court officer, or attorney for a party (MCR 2.104[A][2]), and that:     (notarization not required)

OR

☐ **AFFIDAVIT OF PROCESS SERVER**
Being first duly sworn, I state that I am a legally competent adult who is not a party or an officer of a corporate party, and that:     (notarization required)

☐ I served personally a copy of the summons and complaint,
☐ I served by registered or certified mail (copy of return receipt attached) a copy of the summons and complaint,

together with   Plaintiff's Motion for an Ex Parte Temporary Restraining Order, Show Cause Order, Preliminary Injunction, and for Expedited Discovery, Brief in Support of Plaintiff's Motion for an Ex Parte Temporary Restraining Order, Show Cause Order, Preliminary Injunction, and for Expedited Discovery, and Temporary Restraining Order and Order to Show Cause
List all documents served with the summons and complaint

_____ on the defendant(s):

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| | | |
| | | |
| | | |

☐ I have personally attempted to serve the summons and complaint, together with any attachments, on the following defendant(s) and have been unable to complete service.

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| | | |
| | | |

I declare under the penalties of perjury that this proof of service has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

| Service fee $ | Miles traveled | Fee $ | |
|---|---|---|---|
| Incorrect address fee $ | Miles traveled | Fee $ | TOTAL FEE $ |

Signature _____
Name (type or print) _____
Title _____

Subscribed and sworn to before me on _____, _____ County, Michigan.
                                          Date
My commission expires: _____   Signature: _____
                         Date                         Deputy court clerk/Notary public
Notary public, State of Michigan, County of _____

### ACKNOWLEDGMENT OF SERVICE

I acknowledge that I have received service of the summons and complaint, together with _____
                                                                                    Attachments

_____ on _____
Signature          Day, date, time   on behalf of _____

STATE OF MICHIGAN

IN THE 37TH CIRCUIT COURT FOR THE COUNTY OF CALHOUN

CARRIE SMITH,

      Plaintiff,

v.

KELLOGG COMMUNITY COLLEGE,

      Defendant.

Case No. 19- **391** - CZ

Hon.

JOHN HALLACY

---

MARK E. KRETER (P35475)
DANIEL W. BOOCHER (P81550)
KREIS, ENDERLE, HUDGINS & BORSOS, P.C.
Attorneys for Plaintiff
One West Michigan Avenue
Battle Creek, MI 49017
269-966-3000
269-966-3022
mkreter@kehb.com
dboocher@kehb.com

---

## VERIFIED COMPLAINT

    Plaintiff, Carrie Smith ("Plaintiff" or "Ms. Smith"), by and through her attorneys, Kreis, Enderle, Hudgins & Borsos, PC, and for her Complaint against Defendant, Kellogg Community College ("Defendant" or "Kellogg"), states as follows:

### JURISDICTION AND VENUE

1.     Plaintiff is an individual residing in Richland, Michigan.

2.     Plaintiff is a student at Kellogg Community College.

3.     Defendant is either a "public entity" for the purposes of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131, or alternatively, "public accommodations and services operated by a private entity" for the purposes of the ADA, 42 U.S.C. § 12181.

1

4.      Defendant is an *educational institution*, as that term is defined in MCL 37.1401, and is located in Battle Creek, Michigan.

5.      This claim arises out of acts undertaken and injuries suffered in Calhoun County.

6.      The amount in controversy exceeds $25,000.00, and Plaintiff seeks equitable and injunctive relief, over which this Court has jurisdiction.

7.      Jurisdiction and venue are proper in this Court.

## GENERAL ALLEGATIONS

8.      Ms. Smith was enrolled in the nursing program at Kellogg Community College from January 2016 through her involuntary dismissal occurring in December 2018.

9.      Unfortunately, prior to beginning her Fall 2018 semester, Ms. Smith's father passed away on or about July 22, 2018, in his home after having gone through extensive surgery.

10.     Ms. Smith was working when she learned of her father's death, was excused from the work, and proceeded to locate her father's body at his residence, which was estimated to have been there for three days.

11.     Soon thereafter, Ms. Smith began experiencing insomnia as a result of her father's passing, and she began seeing her father's face every time she would try to sleep.

12.     Likewise, Ms. Smith began experiencing anxiety, which neither meditation nor exercise would relieve.

13.     On August 5, 2018, Ms. Smith went to the emergency room at Bronson Methodist Hospital ("Bronson") to address her increased insomnia and anxiety.

14.     Doctor Jeremiah J. Ledesma, M.D., of Bronson diagnosed Ms. Smith with insomnia and prescribed her Lorazepam (ATIVAN).

15.     ATIVAN is a sedative used to treat anxiety and insomnia.

16.    On August 10, Ms. Smith followed up with Dr. Kurt P. Helgerson, M.D., and Annalise Betker, PA-C, of ProMed Family Practice in Richland, Michigan, who diagnosed her with grief reaction and adjustment disorder.

17.    On August 15, Ms. Smith again presented to ProMed Family Practice in Richland, Michigan, with adjustment disorder, anxiety, depression, and chronic back pain.

18.    In accordance with Kellogg's nursing program guidelines, Ms. Smith was required to obtain clinical experience through a course entitled "NURS 281."

19.    On September 5, 2018, Ms. Smith began NURS 281, which involved clinical experience at Bronson Methodist Hospital, located in Kalamazoo, Michigan.

20.    Ms. Michelle Colyer, a Kellogg clinical instructor, provided the clinical students with a letter dated September 3, 2018, which stated that "Nursing school is one of the most stressful times in our lives, my goal is to partner with you and keep stress at bay. Please know that I am here to help you this semester! Let me know how I can help."

21.    Ms. Smith experienced additional anxiety in her course work and discussed with her professors the issues surrounding her father's death and her subsequent anxiety and sleep disorder.

22.    On September 19, 2018, Ms. Smith approached Ms. Colyer pursuant to her September 3, 2018, letter about the challenges she was having and expressed concern about the possibility of needing additional help.

23.    No such help was provided or recommended.

24.    Ms. Colyer neither informed Ms. Smith about the availability of Student Services to request accommodations for her disability nor did Ms. Colyer refer the matter to Student Services.

3

25.     On October 16, 2018, Ms. Smith again followed up with ProMed Family Practice, which again confirmed her diagnoses of insomnia and adjustment disorder, and her ATIVAN prescription was affirmed.

26.     On November 7, 2018, Ms. Colyer administered to Ms. Smith a first violation of Kellogg's attendance policy.

27.     On that date, Ms. Smith's insomnia, anxiety, and other medical conditions had been particularly disabling as she was unable to get to sleep until approximately 5:00 a.m. that morning.

28.     As a result of her disability on that date, Ms. Smith was 18 minutes late to her clinical and was issued a first violation of the attendance policy for tardiness.

29.     Later on November 7, 2018, Ms. Smith was seen again at Bronson, where her diagnoses of anxiety, depression, and adjustment disorder were confirmed.

30.     On November 14, 2018, Ms. Smith again spoke with Ms. Colyer about her continued struggles and concerns about her medical diagnoses and medical prescriptions affecting her clinical performance.

31.     On November 28, 2018, Ms. Smith was four minutes late to another clinical due to her medications causing her to sleep through her alarm, and she was given a second attendance violation by Ms. Colyer.

32.     On the morning of December 5, 2018, Ms. Smith had awoken to find her rental home completely covered in snow and ice.

33.     On that date, travel was slow-going for Ms. Smith and the rest of the clinical students, some of which had to call in stating that they could not make it given the weather.

4

34.     Ms. Smith, however, arrived promptly at Bronson's parking ramp at approximately 6:50 a.m. and noticed the time as 6:55 a.m. before entering the building.

35.     Ms. Smith had arrived by 7:00 a.m. to the clinical, sat down in the classroom before class had begun and before clinical assignments had been handed out, but Michelle Colyer pulled her aside and stated that she had arrived at 7:02 a.m., two minutes late.

36.     Ms. Colyer cited Ms. Smith with a third attendance violation and was expelled from the clinical course as a failure and subsequently dismissed from Kellogg's nursing program.

37.     Kellogg has an attendance policy stating that if a student is tardy three times in a semester, she is not allowed to take the final examination and shall be expelled from the clinical course and the nursing program as a clinical failure.

38.     Given Kellogg's attendance policy, Ms. Smith was asked by Ms. Colyer to leave Bronson on December 5, 2018.

39.     Later on December 5, 2018, Ms. Smith emailed Ms. Liz Fluty, Kellogg's Director of Nursing Education, and requested a meeting to seek resolution of the issue.

40.     On December 6, 2018, Ms. Smith met with Ms. Fluty and described to her the medical issues which caused her to be late on the two given dates and that she was not late for the third date, despite the harsh weather conditions.

41.     Originally, Ms. Fluty stated to Ms. Smith that she was on her side and that if it were up to her, she would look past the absences.

42.     However, Ms. Fluty further stated that the decision was within Ms. Karen Kulhanek's, a nursing professor at Kellogg, discretion and that Ms. Smith should have sought Student Service's assistance with any medical problems, although this information had not been previously conveyed to Ms. Smith.

5

43.   Ms. Fluty discouraged Ms. Smith from making an issue of her diagnoses and encouraged her to pursue the school's due process policy, which is unrelated to her medical explanations.

44.   On December 17, 2018, Ms. Smith received an email from Ms. Kulhanek, stating that she could come take her final examination the next day.

45.   The next day, Ms. Smith showed up ready to take the final examination, only to find that Ms. Kulhanek had misrepresented to her that she would be allowed to take the examination.

46.   Instead, Ms. Kulhanek had Ms. Smith fill out a final evaluation form for the course.

47.   Ms. Smith sought an appeal from Kellogg's Dean, Ms. Jan Karazim, who met with Ms. Smith on January 15, 2019.

48.   In the meeting, Ms. Smith explained the side effects of her prescribed medications and that they had caused her to sleep through her alarms as well as explaining that she had not been late on December 5, 2018, despite the abhorrent weather conditions.

49.   Ms. Karazim denied Ms. Smith's appeal and cited no weather-related issues.

50.   However, Ms. Smith provided the results of the Kalamazoo County Dispatch Logs for a seven-day period that showed on December 5, 2018, there were 47 crashes reported in Kalamazoo alone, whereas a "normal" day sees an average of less than ten crashes.   This information was not taken into consideration.

51.   Ms. Smith sought further appeal to Kellogg's Vice President for Instruction, Dr. Paul R. Watson II, and in a letter dated February 8, 2019, Dr. Watson denied Ms. Smith's appeal, upholding Dr. Karazim's decision and that she should have sought accommodation from Student

6

Services, which again had not been previously conveyed to Ms. Smith despite her discussions with professors and supervisors regarding her medical issues and disabilities.

52.     To date, Ms. Smith has yet to take the final examination for NURS 281, which is required for May 2019 graduation, and has been unable to enroll in the required subsequent course, NURS 285-04.

53.     Ms. Smith was accepted into a highly competitive nurse externship program in May 2018 at Bronson, where she earns $18/hour.

54.     Although not required for graduation, her externship is highly coveted and acts as a year-long interview process, leading to a transition to a fulltime position upon graduation.

55.     As a part of her nurse externship program, she not only received a pay increase, but also placement upon graduation with an expected starting salary of between $58,240–$63,276.

56.     However, Ms. Smith's externship requires that she be enrolled in a nursing program.

57.     Having been expelled from Kellogg's nursing program, she now risks losing her position with Bronson.

58.     As a result of her dismissal from the nursing program, Ms. Smith may not re-enroll in the nursing program until June 2020.

59.     As a result of Kellogg's discriminatory conduct towards Ms. Smith, Ms. Smith's graduation as a registered nurse, and any earnings therefrom, may now be delayed as much as two years, and she stands to lose both her current job, expected job, and health benefits for her herself and her two young children.

## COUNT I
## VIOLATION OF TITLE II, 42 U.S.C. § 12131–12133,
## DISCRIMINATION IN PUBLIC SERVICES

60.     Plaintiff incorporates by reference the paragraphs 1 through 59 above.

61.     Plaintiff is a qualified individual with disabilities for purposes of the ADA. 42 U.S.C. § 12131(2).

62.     Plaintiff's above-described medical conditions substantially limits one or more of her major life activities, including but not limited to sleeping, learning, concentrating, thinking, communicating, and working.

63.     Defendant is a public entity for purposes of the ADA. 42 U.S.C. § 12131(1).

64.     Alternatively, Defendant is a public accommodation operated by a private entity for purposes of the ADA. 42 U.S.C. § 12181.

65.     Defendant has denied Plaintiff the benefit of Defendant's services, programs, and activities, solely by reason of Plaintiff's disabilities, in violation of 42 U.S.C. § 12132, 12182 and, by refusing to excuse Plaintiff's tardiness due to her medical conditions and prescriptions and by purposefully marking her tardy as a result of her disability on December 5, 2018, has violated the ADA by refusing to make reasonable accommodation for Plaintiff's disability.

66.     Accommodations for Plaintiff's disability would not change the overall academic requirements of Kellogg's nursing program as she would still be required to take and pass her examinations and complete her required course and clinical work.

67.     Upon information and belief, Defendant has the capability of accommodating Plaintiff by allowing her to take her final examination for NURS 281 within seven days and in allowing her to enroll in NURS 285-04 and to make up any missed clinical time as required by the curriculum.

8

68.     Defendant has directly and proximately caused, and continues to cause, Plaintiff to suffer irreparable harm for which she has no adequate remedy at law, including, without limitation, the deprivation of her rights as an individual with disabilities.

WHEREFORE, Plaintiff requests that the Court grant the following relief:

A.      Immediately issue a temporary restraining order restraining Defendant from taking any action to prevent Plaintiff from taking the final examination for NURS 281 within 7 days, enrolling in any subsequent classes to which she is entitled, including NURS 285-04, and attending clinicals at Bronson Methodist Hospital.

B.      Order an expedited hearing on Plaintiff's request for a preliminary injunction.

C.      After a hearing, issue a preliminary injunction restraining Defendant from taking any action to prevent Plaintiff from taking the final examination for NURS 281, enrolling in any subsequent classes to which she is entitled, including NURS 285-05, and attending clinicals at Bronson Methodist Hospital.

D.      Issue a declaratory judgment that any determination by Defendant to the effect that Plaintiff is ineligible to take the final examination for NURS 281 or participating in subsequent coursework, including NURS 285-05 and attending clinicals at Bronson Methodist Hospital is in violation of the ADA and thus void and without effect.

E.      After a trial, issue a permanent injunction restraining Defendant from taking any action to prevent Plaintiff from taking the final examination for NURS 281, enrolling in any subsequent classes to which she is entitled, including NURS 285-05, and attending clinicals at Bronson Methodist Hospital.

F.      Award Plaintiff a Judgment in excess of $25,000.00.

9

G.   Award to Plaintiff her reasonable attorney fees, expenses, and costs pursuant to 42 U.S.C. § 12205.

H.   Order other and further relief that the Court deems just and proper.

## COUNT II
## VIOLATION OF THE PERSONS WITH DISABILITIES CIVIL RIGHTS ACT ("PDCRA"), MCL 37.1401 *et seq.*,

69.   Plaintiff incorporates by reference the paragraphs 1 through 68 above.

70.   Plaintiff is a person with a *disability* as that term is defined in the Persons with Disabilities Civil Rights Act because she has a determinable physical characteristic (anxiety, grief reaction, adjustment disorder, and insomnia) that substantially limits one or more of her life activities and is unrelated to her ability to use and benefit from educational activities, programs, and facilities at an education institution.

71.   Plaintiff's above-described medical conditions substantially limits one or more of her major life activities, including but not limited to sleeping, learning, concentrating, thinking, communicating, and working.

72.   Accommodations for Plaintiff's disability would not change the overall academic requirements of Kellogg's nursing program.

73.   Defendant is an *educational institution*, as that term is defined in MCL 37.1401.

74.   Given Plaintiff's medical conditions and prescriptions, she was prematurely dismissed from NURS 281, not given permission to take the final examination, and was expelled from the nursing program.

75.   Defendant did not offer any reasonable accommodations for Plaintiff's disability.

76.   Upon information and belief, Defendant has the capability of accommodating Plaintiff by allowing her to take her final examination for NURS 281 within seven days and in

10

allowing her to enroll in NURS 285-05 and to make up any missed clinical time as required by the curriculum.

77.     Plaintiff is qualified to take the final examination for NURS 281 and to proceed with additional coursework in Kellogg's nursing program, and her disability is unrelated to her ability to use and benefit from the program at the college.

78.     Defendant denied Plaintiff the chance to take her final examination because of her disability.

79.     Defendant has denied Plaintiff equal opportunity.

80.     Pursuant to MCL 37.1402, Defendant is prohibited from discriminating against Plaintiff in any manner in the full utilization of or benefit from the institution, or the services provided and rendered by the institution to Plaintiff because of a disability that is unrelated to the Plaintiff's ability to utilize and benefit from the institution or its services.

81.     Likewise, MCL 37.1402 prohibits Defendant from excluding, expelling, limiting, or otherwise discriminating against Plaintiff, as a student, in the terms, conditions, and privileges of the institution, because of a disability that is unrelated to Plaintiff's ability to utilize and benefit from the institution.

82.     Defendant is in violation of MCL 37.1402.

83.     As a direct and proximate result of Defendant's unlawful discrimination, Plaintiff has been damages in an amount exceeding $25,000.00 and that requires equitable, injunctive relief.

84.     Plaintiff will be irreparably harmed if she is not granted injunctive relief along with monetary damages.

WHEREFORE, Plaintiff requests that this Court grant her the following relief:

A.    Immediately issue a temporary restraining order restraining Defendant from taking any action to prevent Plaintiff from taking the final examination for NURS 281 within 7 days, enrolling in any subsequent classes to which she is entitled, including NURS 285-05, and attending clinicals at Bronson Methodist Hospital.

B.    Order an expedited hearing on Plaintiff's request for a preliminary injunction.

C.    After a hearing, issue a preliminary injunction restraining Defendant from taking any action to prevent Plaintiff from taking the final examination for NURS 281, enrolling in any subsequent classes to which she is entitled, including NURS 285-05, and attending clinicals at Bronson Methodist.

D.    Issue a declaratory judgment that any determination by Defendant to the effect that Plaintiff is ineligible to take the final examination for NURS 281 or participating in subsequent coursework, including NURS 285-05 and attending clinicals at Bronson Methodist Hospital is in violation of the PDCRA and thus void and without effect.

E.    After a trial, issue a permanent injunction restraining Defendant from taking any action to prevent Plaintiff from taking the final examination for NURS 281, enrolling in any subsequent classes to which she is entitled, including NURS 285-05, and attending clinicals at Bronson Methodist Hospital.

F.    Grant Plaintiff damages in an amount to be decided at trial plus costs and attorney fees as permitted under the Persons with Disabilities Civil Rights Act.

G.    Order other and further relief that the Court deems just and proper.

## COUNT III
## VIOLATION OF THE REHABILITATION ACT, 29 U.S.C. § 794

85.     Plaintiff incorporates by reference the paragraphs 1 through 84 above.

86.     Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, provides that:

> No otherwise qualified individual with a disability in the United
> States, as defined in section 705(20) of this title, shall, solely by
> reason of her or his disability, be excluded from the participation
> in, be denied the benefits of, or be subjected to discrimination
> under any program or activity receiving Federal financial
> assistance or under any program or activity conducted by any
> Executive agency or by the United States Postal Service.

87.     Because Plaintiff's medical conditions substantially limits at least one of her major life activities, Plaintiff is an individual with a disability under the Rehabilitation Act.

88.     Plaintiff is fully qualified for Kellogg's nursing program and is able to perform all the essential functions of the program.

89.     Defendant receives Federal financial assistance and/or runs programs or activities conducted by an Executive agency.

90.     Defendant has been excluded from the participation in, denied the benefits of, and subjected to discrimination under a program receiving Federal financial assistance and/or program or activity conducted by an Executive agency, in violation of 29 U.S.C. § 794 and, by refusing to excuse Plaintiff's tardiness due to her medical prescriptions and by purposefully marking her tardy as a result of her disability on December 5, 2018, has violated the Rehabilitation Act by refusing to make reasonable accommodations for Plaintiff's disability.

91.     Accommodations for Plaintiff's disability would not change the overall academic requirements of Kellogg's nursing program.

92.     Upon information and belief, Defendant has the capability of accommodating Plaintiff by allowing her to take her final examination for NURS 281 within seven days and in

13

allowing her to enroll in NURS 285-05 and to make up any missed clinical time as required by the curriculum.

93. Defendant has directly and proximately caused, and continues to cause, Plaintiff to suffer irreparable harm for which she has no adequate remedy at law, including, without limitation, the deprivation of her rights as an individual with disabilities.

WHEREFORE, Plaintiff requests that the Court grant the following relief:

A. Immediately issue a temporary restraining order restraining Defendant from taking any action to prevent Plaintiff from taking the final examination for NURS 281, enrolling in any subsequent classes to which she is entitled, including NURS 285-05, and attending clinicals at Bronson Methodist Hospital.

B. Order an expedited hearing on Plaintiff's request for a preliminary injunction.

C. After a hearing, issue a preliminary injunction restraining Defendant from taking any action to prevent Plaintiff from taking the final examination for NURS 281, enrolling in any subsequent classes to which she is entitled, including NURS 285-05, and attending clinicals at Bronson Methodist Hospital.

D. Issue a declaratory judgment that any determination by Defendant to the effect that Plaintiff is ineligible to take the final examination for NURS 281 or participating in subsequent coursework, including NURS 285-05 and attending clinicals at Bronson Methodist Hospital is in violation of the ADA and thus void and without effect.

E. After a trial, issue a permanent injunction restraining Defendant from taking any action to prevent Plaintiff from taking the final examination for NURS 281,

enrolling in any subsequent classes to which she is entitled, including NURS 285-05, and attending clinicals at Bronson Methodist Hospital.

F.      Award to Plaintiff her reasonable attorney fees, expenses, and costs pursuant to 42 U.S.C. § 12205.

G.      Order other and further relief that the Court deems just and proper.

*I declare that the statements above are true to the best of my information, knowledge, and belief.*

Date: February 20, 2019

_____
Carrie Smith, Plaintiff

Date: February 20, 2019          Respectfully Submitted,

KREIS, ENDERLE, HUDGINS & BORSOS, P.C.

_____
MARK E. KRETER (P33475)
DANIEL W. BOOCHER (P81550)
KREIS, ENDERLE, HUDGINS & BORSOS, P.C.
Attorneys for Plaintiff
One West Michigan Avenue
Battle Creek, MI 49017
269-966-3000
269-966-3022
mkreter@kehb.com
dboocher@kehb.com

15

STATE OF MICHIGAN

IN THE 37TH CIRCUIT COURT FOR THE COUNTY OF CALHOUN

CARRIE SMITH,

Case No. 19- *391* - CZ

   Plaintiff,

Hon. JOHN HALLACY

v.

KELLOGG COMMUNITY COLLEGE,

   Defendant.

---

MARK E. KRETER (P35475)
DANIEL W. BOOCHER (P81550)
KREIS, ENDERLE, HUDGINS & BORSOS, P.C.
Attorneys for Plaintiff
One West Michigan Avenue
Battle Creek, MI 49017
269-966-3000
269-966-3022
mkreter@kehb.com
dboocher@kehb.com

---

## PLAINTIFF'S MOTION FOR AN EX PARTE TEMPORARY RESTRAINING ORDER, SHOW CAUSE ORDER, PRELIMINARY INJUNCTION, AND FOR EXPEDITED DISCOVERY

Plaintiff, CARRIE SMITH, ("Plaintiff" or "Ms. Smith"), by her attorneys Kreis Enderle Hudgins & Borsos, P.C., moves this Court pursuant to Michigan Court Rule 3.310 for the entry of a Temporary Restraining Order and a Preliminary Injunction restraining and enjoining Defendant and granting expedited discovery regarding the claims alleged in Plaintiff's Verified Complaint. This Motion is supported by Plaintiff's Verified Complaint, accompanying Brief, and other supporting documents filed with the Verified Complaint and Brief, all of which are incorporated herein by reference.

WHEREFORE, Plaintiff requests that the Court enter an Order as follows:

1

A.   Enter a Temporary Restraining Order, Preliminary Injunction Order, and Permanent Injunction Order immediately restraining and enjoining Defendants, and all persons acting in concert with Defendants as follows:

   1.   Restraining Defendant from taking any action to prevent Plaintiff from taking the final examination for NURS 281 within 7 days from the issuance of the Order;

   2.   Restraining Defendant taking any action to prevent Plaintiff from enrolling in any subsequent classes to which she is entitled, including NURS 285-05, and from allowing to make up any missed lecture or clinical hours; and

   3.   Restraining Defendant from taking any action to prevent Plaintiff from attending clinicals at Bronson Methodist Hospital in conformity with her coursework.

B.   Continue the Temporary Restraining Order in full force and effect through and including a hearing before this Court on Plaintiff's request for the entry of a preliminary injunction, and set such a hearing at a date convenient for the Court; and

C.   Following the hearing on the request for a preliminary injunction, convert the Temporary Restraining Order into a Preliminary Injunction, to remain in effect until the merits of the parties' dispute are resolved by this Court; and

D.   Allow expedited discovery, as time is of the essence in this action; and

E.   Grant Plaintiff such other and further relief as the Court deems to be just and equitable under the circumstances.

Respectfully submitted,

KREIS, ENDERLE, HUDGINS & BORSOS, P.C.

Dated: February 20, 2019

Mark E. Kreter (P75475)
Daniel W. Boocher (P81550)
Attorneys for Plaintiff

2

STATE OF MICHIGAN

IN THE 37TH CIRCUIT COURT FOR THE COUNTY OF CALHOUN

CARRIE SMITH,

                 Plaintiff,

v.

KELLOGG COMMUNITY COLLEGE,

                 Defendant.

Case No. 19- *391* - CZ

Hon.



JOHN HALLACY

---

MARK E. KRETER (P35475)
DANIEL W. BOOCHER (P81550)
KREIS, ENDERLE, HUDGINS & BORSOS, P.C.
Attorneys for Plaintiff
One West Michigan Avenue
Battle Creek, MI 49017
269-966-3000
269-966-3022
mkreter@kehb.com
dboocher@kehb.com

**FILED**

FEB 20 2019

~~THE CIRCUIT COURT CLERK~~

---

## BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR AN EX PARTE TEMPORARY RESTRAINING ORDER, SHOW CAUSE ORDER, PRELIMINARY INJUNCTION, AND FOR EXPEDITED DISCOVERY

Plaintiff Carrie Smith ("Plaintiff" or "Ms. Smith") hereby moves for an ex parte temporary restraining order, show cause order, preliminary injunction, and for expedited discovery for the reasons set forth herein:

**I.**    **FACTUAL SUMMARY:**

Ms. Smith is a student at Kellogg Community College. Ms. Smith was enrolled in Kellogg's nursing program from January 2016 to her dismissal from the program in December 2018.

Unfortunately, prior to beginning her Fall 2018 semester, Ms. Smith's father passed away in his home on or about July 22, 2018, after having gone through extensive surgery. Ms. Smith was attending a clinical[1] when she learned of her father's death, was excused from the clinical, and proceeded to locate her father's body at his residence, which was estimated to have been there for three days.

Soon after her father's death, Ms. Smith began experiencing insomnia as a result of her father's passing. She began seeing her father's face every time she would try to sleep. Likewise, Ms. Smith began experiencing anxiety, which neither meditation nor exercise would relieve.

On August 5, 2018, Ms. Smith went to the emergency room at Bronson Methodist Hospital ("Bronson") to address her increased insomnia and anxiety. Doctor Jeremiah J. Ledesma, M.D., of Bronson diagnosed Ms. Smith with insomnia and prescribed her Lorazepam (ATIVAN) (see medical records attached as **Exhibit A**). ATIVAN is a sedative used to treat anxiety and insomnia.

On August 10, Ms. Smith followed up with Dr. Kurt P. Helgerson, M.D., of ProMed Family Practice in Richland, Michigan, who diagnosed her with grief reaction and adjustment disorder. Dr. Helgerson has authored an affidavit (attached as **Exhibit B**) confirming Ms. Smith's medical diagnoses and that she should have been excused from class as discussed below. On August 15, Ms. Smith again presented to ProMed Family Practice in Richland, Michigan, with adjustment disorder, anxiety, depression, and chronic back pain.

In accordance with the nursing program guidelines, Ms. Smith was required to obtain clinical experience through a course entitled "NURS 281." On September 5, 2018, Ms. Smith

---

[1] A "clinical" consists of partly in-class lecture as well as actual experience within a hospital, working alongside a supervisor.

began NURS 281, which involved clinical experience at Bronson Methodist Hospital, located in Kalamazoo, Michigan. Ms. Michelle Colyer, a Kellogg professor and course supervisor, provided the clinical students with a letter dated September 3, 2018 (attached as **Exhibit C**), which stated that "Nursing school is one of the most stressful times in our lives, my goal is to partner with you and keep stress at bay. Please know that I am here to help you this semester! Let me know how I can help."

Ms. Smith experienced additional anxiety in her course work and discussed with her professors the issues surrounding her father's death and her subsequent anxiety and sleep disorder. On September 19, 2018, Ms. Smith approached Ms. Colyer pursuant to her letter, which to come to her with any troubles, about the challenges she was having and expressed concern about the possibility of needing additional help. No such help was provided or recommended. Ms. Colyer neither informed Ms. Smith about the availability of Student Services to request accommodations for her disability nor did Ms. Colyer refer the matter to Student Services. On October 16, 2018, Ms. Smith again followed up with ProMed Family Practice, which again confirmed her diagnoses of insomnia and adjustment disorder, and her ATIVAN prescription was affirmed.

On November 7, 2018, Ms. Colyer administered to Ms. Smith a first violation of Kellogg's attendance policy. On that date, Ms. Smith's insomnia, anxiety, and other medical conditions had been particularly disabling as she was unable to get to sleep until approximately 5:00 a.m. that morning, as evidenced by her Verified Complaint. As a result of her disability on that date, Ms. Smith was 18 minutes late to her clinical and was issued a first violation of the attendance policy for tardiness. Later on November 7, 2018, Ms. Smith was seen again at Bronson, where her diagnoses of anxiety, depression, and adjustment disorder were confirmed.

On November 14, 2018, Ms. Smith again spoke with Ms. Colyer about her continued struggles and concerns about her medical diagnoses and medical prescriptions affecting her clinical performance. Ms. Colyer again failed to refer her to Student Services to seek accommodations or to herself offer any accommodations.

On November 28, 2018, Ms. Smith was four minutes late to another clinical due to her medications causing her to sleep through her alarm, and she was given a second attendance violation by Ms. Colyer.

On the morning of December 5, 2018, Ms. Smith had awoken to find her rental home completely covered in snow and ice. On that date, travel was slow-going for Ms. Smith and the rest of the clinical students, some of which had to call in stating that they could not make it given the weather. Ms. Smith, however, arrived promptly at Bronson's parking ramp at approximately 6:50 a.m. and noticed the time as 6:55 a.m. before entering the building. Ms. Smith had arrived by 7:00 a.m. to the clinical, sat down in the classroom before class had begun and before clinical assignments had been handed out, but Michelle Colyer pulled her aside and stated that she had arrived at 7:02 a.m., two minutes late. Ms. Colyer cited Ms. Smith with a third attendance violation and expelled her from the nursing program as a clinical failure.

Kellogg has an attendance policy (**Exhibit D**) stating that if a student is tardy three times in a semester, she is not allowed to take the final examination and shall be expelled from the nursing program. Given Kellogg's attendance policy, Ms. Smith was asked by Ms. Colyer to leave Bronson on December 5, 2018. Later on December 5, 2018, Ms. Smith emailed Ms. Liz Fluty, Kellogg's Director of Nursing Education, and requested a meeting to seek resolution of the issue. On December 6, 2018, Ms. Smith met with Ms. Fluty and described to her the medical

issues which caused her to be late on the two given dates and that she was not late for the third date.

Originally, Ms. Fluty stated to Ms. Smith that she was on her side and that if it were up to her, she would look past the absences. However, Ms. Fluty further stated that the decision was within Ms. Karen Kulhanek's, a nursing professor at Kellogg, discretion and that Ms. Smith should have sought Student Service's assistance with any medical problems, although this information had not been previously conveyed to Ms. Smith. Ms. Fluty discouraged Ms. Smith from making an issue of her diagnoses and encouraged her to pursue the school's due process policy, which was unrelated to her medical explanation.

On December 17, 2018, Ms. Smith received an email from Karen Kulhanek, Nursing Professor at Kellogg, stating that she could come take her final examination the next day. The next day, Ms. Smith showed up ready to take the final examination, only to find that Ms. Kulhanek had misrepresented to her that she would be allowed to take the examination. Instead, Ms. Kulhanek had Ms. Smith fill out a final evaluation form for the course.

Ms. Smith sought an appeal from Kellogg's Dean, Ms. Jan Karazim, who met with Ms. Smith on January 15, 2019. In the meeting, Ms. Smith explained the side effects of her prescribed medications and that they had caused her to sleep through her alarms. She also explained that the weather was horrible on December 5, 2018, but that she had not been late. Ms. Karazim denied Ms. Smith's appeal, citing no weather-related issues. However, Ms. Smith provided the results of the Kalamazoo County Dispatch Logs (**Exhibit E**) for a seven-day period that showed on December 5, 2018, there were 47 crashes reported in Kalamazoo alone, whereas a "normal" day sees an average of less than ten crashes.

Ms. Smith sought further appeal to Kellogg's Vice President for Instruction, Dr. Paul R. Watson II, and in a letter dated February 8, 2019 (**Exhibit F**), Dr. Watson denied Ms. Smith's appeal, upholding Dr. Karazim's decision and that she should have sought accommodation from student services, which again had not been previously conveyed to Ms. Smith despite her discussions with professors and supervisors regarding her medical issues and disabilities.

Ms. Smith has yet to take the final examination for NURS 281, which is required for May 2019 graduation, and has been unable to enroll in the required subsequent course, NURS 285. Ms. Smith was accepted into a highly competitive nurse externship program at Bronson, where she earns $18/hour . Although not required for graduation, her externship is highly coveted and acts as a year-long interview process, leading to a transition to a fulltime position upon graduation  As a part of her nurse externship program, she not only received a pay increase, but also placement upon graduation with an expected starting salary of between $58,240–$63,276. However, Ms. Smith's externship requires that she be enrolled in a nursing program.  Having been expelled from Kellogg's nursing program, she now risks losing her position with Bronson. As a result of her dismissal from the nursing program, Ms. Smith may not re-enroll in Kellogg's nursing program until June 2020.

As a result of Kellogg's discriminatory conduct towards Ms. Smith, Ms. Smith's graduation as a registered nurse, and any earnings therefrom, may now be delayed as much as two years, and she stands to lose both her current job and health benefits for her herself and her two young children, but also her future expected position with Bronson.

Within seven days of the undersigned date, Plaintiff needs to take the final examination for NURS 281 and proceed with clinical and coursework for NURS 285-04 to stay on track for her May 2019 graduation.  Ms. Smith has a splendid record in the nursing program, and in fact

has received favorable evaluations (**Exhibit G**), showing that she is fully capable of performing well in curriculum. If not for Kellogg's blatant discrimination, she would be continually working towards her RN.

Concurrent with this Motion, Plaintiff filed a Complaint alleging violations of the Federal Americans with Disabilities Act, Michigan's Personas with Disabilities Civil Rights Act, and the Rehabilitation Act.

## II.   LAW & ARGUMENT:

### A.   Introduction

Preliminary injunctive relief is designed to preserve the *status quo* and prevent harm from occurring until a decision may be rendered on the merits. *Michigan Coalition of State Employee Unions v Michigan Civil Serv Comm'n*, 465 Mich 212, 236-37; 634 NW2d 692 (2001). Ms. Smith is now requesting that she be allowed, as a reasonable accommodation for her disability, to take the final examination for NURS 281 within seven days of the undersigned date, and be allowed to enroll in NURS 285-04 and to make up any missed clinical or coursework, preventing irreparable and ongoing harm to her education and potential earning capacity.

The Michigan Supreme Court has established a four-part test for a court to determine whether a preliminary injunction should be ordered:

> (1) the likelihood of success on the merits; (2) the danger that the applicant will suffer irreparable injury if a preliminary injunction is not granted; (3) the risk that the applicant will suffer more harm without an injunction than the opposing party would suffer if the injunction is granted; (4) the harm to the public interest if the injunction is issued.

*State Employees Ass'n v Dept of Mental Health,* 421 Mich 152, 157-58; 365 NW 2d 93 (1984). As applied, the balance weighs heavily in favor of granting a preliminary injunction.

**B.     Plaintiff Has A High Likelihood Of Success On The Merits.**

**1.     ADA Claim**

Title II of the ADA provides:

[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 USC 12132.

In alleging the public service claim Plaintiff has here, Plaintiff must prove that (1) she has a record of having, or is regarded as having a *disability*, as that word is defined in the ADA, 42 U.S.C. § 12102(1); (2) Plaintiff is a *qualified individual*, meaning that with or without reasonable modifications to the rules, policies, and practices of the public entity, she meets the essential eligibility requirements for participation in the programs or activities provided by the public entity, 42 U.S.C. § 12131(2); and (3) despite the fact that Plaintiff is a qualified individual, Plaintiff has been or is being denied the benefits of, or participation in, the services provided, because of her disability. *Lewis v Humboldt Acquisition Corp*, 681 F2d 312 (6th Cir. 2012).

First, Plaintiff has a record of having, or is regarded as having, a disability as that word is defined in the ADA. The ADA defines "disability" as the following:

(A)     a physical or mental impairment that substantially limits one or more major life activities of such individual;

(B)     a record of such an impairment; or

(C)     being regarded as having such an impairment (as described in paragraph (3)).

(2)     Major life activities

(A)     In general

For purposes of paragraph (1), major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, **sleeping**, walking, standing, lifting, bending, speaking, breathing, **learning**, reading, **concentrating**, **thinking**, **communicating**, and **working**.

42 USC 12102 (emphasis added).

In order for a sleep disorder to be a disability under the ADA, a plaintiff must show that the condition is the result of a physiological condition. *EEOC v Watkins Motor Lines, Inc*, 463 F3d 436, 443 (6th Cir 2006). Dr. Helgerson's affidavit (**Exhibit B**) clearly shows that Plaintiff's sleep disorder (insomnia) is a result of her physiological conditions, including anxiety, grief reaction, and adjustment disorder. Plaintiff's Verified Complaint also demonstrates that her disability affects her sleeping, learning, concentration, thinking, communications, and ability to work, which are all major life activities as defined under the ADA. Plaintiff was prescribed ATIVAN, which is a sedative, and Dr. Helgerson opines that Plaintiff's medical condition on both November 7 and November 28, 2018, excused Plaintiff from clinical work altogether. Defendant will not be able to show that Plaintiff's medical conditions do not substantially impair one or more or her major life activities. Plaintiff is disabled and satisfies the first element.

Second, Plaintiff is a qualified individual, meaning that with or without reasonable modifications to the rules, policies, and practices of the public entity, she meets the essential eligibility requirements for participation in the programs or activities provided by the public entity, 42 U.S.C. § 12131(2). Plaintiff satisfies this element on its face because she was accepted into Kellogg's nursing program and is only impeded from continuing further due to Kellogg's discrimination against her on the basis of her disability. This is further evidenced by her evaluations received throughout the program, an example of which is attached hereto as **Exhibit G**. The ADA requires "reasonable modifications that would not fundamentally alter that nature

of the service performed . . . ." *Tennessee v Lane*, 541 US 509, 531; 124 S Ct 1978 (2004); *Kaltenberger v Ohio College of Podiatric Medicine*, 162 F3d 432, 435–36 (6th Cir 1998).

Clearly, Plaintiff is not asking Kellogg to modify its nursing curriculum or program—she is simply requesting that she be given the same opportunity as every other student, that being to take her final examination for NURS 281 and proceed with additional course and clinical work to meet her expected graduation timeline. A request to re-take an examination based upon a disability an appropriate request for accommodation. See, e.g., *Peters v Cincinnati College of Med*, unpublished opinion of the United States District Court for the Southern District of Ohio, issued September 6, 2012 (Docket No. 1:10-CV-906) (attached as **Exhibit H**). Defendant will not be able to offer any explanation as to why it has failed to abide by the ADA in providing a reasonable accommodation for Plaintiff's medical disability. Plaintiff has a high likelihood of satisfying the second element.

Third, despite the fact that Plaintiff is a qualified individual, Plaintiff has been or is being denied the benefits of, or participation in, the services provided, because of her disability. Defendant had the responsibility of providing Plaintiff with reasonable accommodations for her disability. *Johnson v City of Saline*, 151 F3d 564, 572–73 (6th Cir 1998). Kellogg offered Plaintiff no reasonable accommodations for her disability and disallowed her to take her final examination after only two late arrivals resulting from her disability. Under the circumstances, a reasonable accommodation would be to allow Ms. Smith to take her final examination and pending the results, proceed with course and clinical work to keep her on track for graduation. Rather, Defendant failed to offer Plaintiff *any* accommodation for her disability and blamed Defendant for not getting in contact with Student Services, a service for which had not been recommended to her until after she was determined a clinical failure. Plaintiff followed Ms.

Colyer's letter (**Exhibit C**), which instructed students to come to her with any issues they may be having. Ms. Colyer failed to provide Plaintiff with any accommodation or to refer the matter to Student Services. In any event, there is nothing preventing Defendant from offering a reasonable accommodation *now* in allowing Ms. Smith to take her final examination. All evidence shows that Defendant discriminated against Ms. Smith on the basis of her disability. A reasonable trier of fact would conclude that Defendant's discrimination in this regard violated the ADA. This, along with the fact that no third late absence even occurred, satisfies the third element under the ADA.

As such, Plaintiff has a valid ADA claim and is likely to succeed on the merits.

### 2. PDCRA Claim

To have a valid PDCRA claim under MCL 37.1401 *et seq.*, Plaintiff must prove the following: (1) that she is a person with a disability as the PDCRA defines that term, MCL 37.1103; (2) she is qualified for the educational opportunity that she seeks despite the disability; and (3) that in spite of these qualifications, the plaintiff has not been given an equal opportunity to secure a similar education as other persons. *Lindberg v Livonia Pub Sch*, 219 Mich App 364, 556 NW2d 509 (1996); *Crancer v Board of Regents*, 156 Mich App 790, 402 NW2d 90 (1986).

First, Plaintiff has a disability as defined by the PDCRA. "Disability" means 1 or more of the following:

> (i) A determinable physical or mental characteristic of an individual, which may result from disease, injury, congenital condition of birth, or functional disorder, if the characteristic:
>
> . . .
>
> (C) For purposes of article 4, is unrelated to the individual's ability to utilize and benefit from educational opportunities, programs, and facilities at an educational institution.

. . .

(ii) A history of a determinable physical or mental characteristic described in subparagraph (i).

(iii) Being regarded as having a determinable physical or mental characteristic described in subparagraph (i).

MCL 37.1103.

Again, Plaintiff's medical condition is evidenced by Dr. Helgerson's affidavit (**Exhibit B**) and is not related to Plaintiff's ability to utilize and benefit from education opportunities, programs, and facilities at the college because Plaintiff has a history of performing excellent course work and in engaging in the program. If not for Defendant's discrimination, she would be continuing to do so. Allowing Plaintiff to take the final examination for NURS 281 does not change the curriculum or affect the program, it simply puts Plaintiff in the position she should have already been in.

Second, as discussed above, Plaintiff is qualified for the program.

And third, Plaintiff has not been given an equal opportunity to secure a similar education as others because she has been not been provided with reasonable accommodations given her disability, as discussed above.

Plaintiff has a high likelihood of success on the merits regarding her PDCRA claim.

### 3.   Rehabilitation Act Claim

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 USC 794(a).

To establish a claim under the Rehabilitation Act, a plaintiff must prove (1) that she is a "handicapped person" under the Act; (2) that she is "otherwise qualified"; (3) that she is being excluded from participation in, being denied the benefits of, or being subjected to discrimination under the program solely because of her handicap; and (4) that the program or activity receives federal funds. *Burns v. City of Columbus*, 91 F.3d 836, 840-41 (6th Cir.1996). The Sixth Circuit has held that the standard for determining whether a plaintiff has been discriminated against is the same as that applied under the ADA. *Sandison v Michigan High Sch Athletic Ass'n*, 64 F3d 1026 (6th Cir 1995). The plaintiff must show that her exclusion from participation or benefits was "solely by reason of disability." *Tucker v Tennessee*, 539 F3d 526, 532 (6th Cir 2008).

Because the analysis is essentially the same under both the Rehabilitation Act and the ADA, Plaintiff shall not repeat her argument from above. It shall suffice to state that for the reasons discussed above, Plaintiff's Rehabilitation Act claim is likelihood to succeed on the merits.

## C.   Plaintiff Faces A High Level Of Danger That It Will Suffer Irreparable Injury If A Preliminary Injunction Is Not Granted.

In order to establish irreparable injury,

> the moving party must demonstrate a noncompensable injury for which there is no legal measurement of damages or for which damages cannot be determined with a sufficient degree of certainty. The injury must be both certain and great, and it must be actual rather than theoretical

*Thermatool Corp v Borzym*, 227 Mich App 366, 377; 575 NW2d 334 (1998).

Applying the foregoing to the present case, potential irreparable injuries will occur to Plaintiff if she is not allowed to take her final examination for NURS 281 and proceed with subsequent course and clinical. Failure to do so may result in her graduation being delayed up to two years and inhibiting her future earning capacity in a self-fulling occupation, as well as a loss

of professional and self-esteem. She is also at immediate risk of losing her highly coveted externship position, which will likely result in a fulltime position upon her graduation.

Potential monetary damages cannot be determined with any sort of certainty. Money damages are so indefinite and speculative at this time so as to be incapable of exact proof. Potential money damages include loss of potential earning capacity and gaining reputation within the community and profession. **No adequate remedy at law exists**. Plaintiff's professional future is in immediate risk.

### D. Plaintiff Faces A Much Higher Risk Of Harm If The Injunction Is Not Granted Than Kellogg Faces If The Injunction Is Granted.

Potential risk of harm requires this Court to balance the hardships as between Plaintiff and Defendant. *Friendship Materials, Inc v Michigan Brick, Inc*, 679 F2d 100, 105 (CA 6 1982). This Court must balance the "irreparable harm to the plaintiff if there is no preliminary injunction . . . against any injuries likely to be suffered by the defendant if a preliminary injunction is granted." *Id.* at 104.

Balancing the hardship in this case is one-sided. Plaintiff faces exponentially more harm than Kellogg, if this Court does not grant the injunction, as discussed above. Upon information and belief, Defendant has the capability of simply providing the final examination to Ms. Smith and is able to accommodate her to make up any missed clinical time for NURS 285-04.

From the outset it must be noted that Plaintiff seeks the injunction for the simple reason of enforcing the understanding between the parties that a student be allowed to take her final examination. Enforcement of this agreement should come as no surprise to Kellogg. Kellogg risks nothing in allowing Ms. Smith to continue take her final examination and continue in her

coursework. Contrarily, Ms. Smith stands to lose all that she has worked for the past two and a half years.

### E.    There Is No Harm To The Public Interest If The Injunction Is Issued.

If anything, by granting the sought after injunction, the public interest will be protected. The public faces no harm and has an interest in the injunction being granted.

Issuance of the injunction will not prevent Kellogg from enforcing its attendance policy or curriculum, but will bind it to the law in having to make reasonable accommodations to those with disabilities. Consequently, the public interest supports granting the injunction.

### F.    Prior to the Issuance of a Preliminary Injunction, A Temporary Restraining Order Enforcing the Agreement Is Appropriate Due To The Immediate and Irreparable Harm That Would Be Caused To Plaintiff If Kellogg is Permitted to Violate Federal and Michigan Law.

This Court may order a temporary restraining order ("TRO") prior to the preliminary injunction without notice to the adverse party.    Under MCR 3.310(B)(1)(a), a TRO may be granted if:

> it clearly appears from specific facts shown by affidavit or by a verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant from the delay required to effect notice or from the risk that notice will itself precipitate adverse action before an order can be issued[.]

The rule contains three requirements: (1) irreparable injury, (2) imminent injury, and (3) proof that notice to the adverse party would precipitate adverse action. In this case, all three requirements are satisfied.

#### i.    *Plaintiff Will Suffer Irreparable Harm If A Temporary Restraining Order Is Not Immediately Granted.*

For the reasons set-forth above, irreparable harm is easily demonstrated in this instance.

### ii. Plaintiff Potential Injury is Real and Imminent.

The threatened injury in this case is real and imminent. In *Acer Paradise, Inc v Kalkaska Co Rd Com'n*, 262 Mich App 193, 205; 684 NW2d 903 (2004), the court held that the threatened injury was not imminent because the complaint alleged that the threatened injury "may eventually" happen at some uncertain time in the distant future. The present case is distinguishable from *Acer Paradise* because here the danger is imminent.

As discussed, Ms. Smith is unable to continue her coursework, jeopardizing her entire nursing career based upon 22 minutes of absence resulting from physiological conditions attributable to her father's death. Plaintiff stands to lose her coveted externship with Bronson Methodist Hospital and risks losing her capability of providing for herself and her family.

### iii. Notice To Kellogg Would Precipitate The Harm That Plaintiff Seeks To Avoid.

As alleged in the Complaint, Defendant has already reneged on promises to allow Ms. Smith to take her final examination for NURS 281. This Court should not provide Defendant with another opportunity to do so but should order it to immediately allow Ms. Smith to take the final examination enroll in the courses needed to continue the nursing program. Time is of the essence because Plaintiff stands to lose the ability to catch up on any missed coursework for NURS 285-04 and stands to lose her coveted externship. Undersigned counsel certifies that efforts have been made to give notice to counsel for Defendant.

## IV. CONCLUSION:

Injunctive relief is designed to meet the threat of a future wrong and preserve the *status quo*. The only way to preserve the *status quo* and prevent future harm is to grant the relief requested herein and issue a temporary restraining order and later preliminary injunction.

Absent injunctive relief, Kellogg will be permitted to cause irreparable harm to Plaintiff. Applicable factors weigh heavily in favor of this Court granting the preliminary injunction and initial temporary restraining order. Plaintiff seeks to reverse the wrong initiated by Defendant until a full hearing on the merits is held. Issuing the injunctive relief will ensure that Plaintiff gets an opportunity to present its case before this Court. Refusing to issue the injunctive has the potential to cause Plaintiff to suffer an immediate and devastating financial loss. Consequently, for the reasons stated herein, Plaintiff respectfully requests this Court grant the Motion and enter the Order attached hereto (**Exhibit I**).

Respectfully submitted,

KREIS, ENDERLE,
HUDGINS & BORSOS, P.C.

Dated: February _20_, 2019

_____
Mark E. Kreter (P35475)
Daniel W. Boocher (P81550)
Attorneys for Plaintiff

# EXHIBIT A

## Medications Administered During Your Visit

No data available for this section

## Assessment and Plan

### Future Scheduled Tests

Laboratory:

Renal Function Panel 2/15/19

Radiology:

MRI Brain w/ + w/o Contrast 6/28/18

VUS AAA Screening 8/10/18

US Pelvis Complete Transabd/Vag w/o Dopp 11/9/18

## Functional Status

No data available for this section

## Mental Status

No data available for this section

## Encounter Procedures

No data available for this section

## Results

No data available for this section

## Vital Signs

11/9/18

| | | |
|---|---|---|
| Blood Pressure | | 122/80 mmHg (Normal is 90-140/60-90 mmHg) |
| Blood Pressure Location | | Left arm |
| Blood Pressure Method | | Cuff |
| Mean Arterial Pressure | | 94 mmHg (Normal is 70-100 mmHg) |
| Measured Weight in Kilograms | | 74.6 kg |
| Measured Weight in Pounds | | 164 lb 7 oz 1 |
| Height in Centimeters | | 171 cm |

| Measured Height in Inches | 67.3 in2 |
|---|---|
| Body Mass Index | 25.5 kg/m2 |

1Result Comment: Result placed secondary from kg, converted to lbs

2Result Comment: Result placed secondary from cm, converted to Inches

## Social History

| Social History Type | Response |
|---|---|
| Smoking Status | Never (less than 100 in lifetime) entered on: 11/7/18 |
| Birth Sex | |

## Goals

No data available for this section

## Discharge Instructions

**Patient Education**

11/09/2018 13:35:08

**ABDOMINAL PAIN, Unknown Cause, (Female)**

Unknown Causes of Abdominal Pain (Female)

The exact cause of your abdominal (stomach) pain is not clear. This does not mean that this is something to worry about. Everyone likes to know the exact cause of the problem, but sometimes with abdominal pain, there is no clear-cut cause, and this could be a good thing. The good news is that your symptoms can be treated, and you will feel better.

Your condition does not seem serious now; however, sometimes the signs of a serious problem may take more time to appear. For this reason, it is important for you to watch for any new symptoms, problems, or worsening of your condition.

Over the next few days, the abdominal pain may come and go, or be continuous. Other common symptoms can include nausea and vomiting. Sometimes it can be difficult to tell if you feel nauseous, you may just feel bad and not associate that feeling with nausea. Constipation, diarrhea, and a fever may go along with the pain.

The pain may continue even if treated correctly over the following days. Depending on how things go, sometimes the cause can become clear and may require further or different treatment. Additional evaluations, medications, or tests may also be needed.

Home care

Your healthcare provider may prescribe medicine for pain, symptoms, or an infection. Follow the healthcare provider's instructions for taking these medicines.

General care

• Rest as much as you can until your next exam. No strenuous activities.

• Try to find positions that ease discomfort. A small pillow placed on the abdomen may help relieve pain.

• Something warm on your abdomen (such as a heating pad) may help, but be careful not to burn yourself.

Diet

• Do not force yourself to eat, especially if having cramps, vomiting, or diarrhea.

• Water is important so you do not get dehydrated. Soup may also be good. Sports drinks may also help, especially if they are not too acidic. Make sure you don't drink sugary drinks as this can make things worse. Take liquids in small amounts. Do not guzzle them.

• Caffeine sometimes makes the pain and cramping worse.

• Avoid dairy products if you have vomiting or diarrhea.

• Don't eat large amounts at a time. Wait a few minutes between bites.

• Eat a diet low in fiber (called a low-residue diet). Foods allowed include refined breads, white rice, fruit and vegetable juices without

pulp, tender meats. These foods will pass more easily through the intestine.

• Avoid whole-grain foods, whole fruits and vegetables, meats, seeds and nuts, fried or fatty foods, dairy, alcohol and spicy foods until your symptoms go away.

Follow-up care

Follow up with your healthcare provider, or as advised, if your pain does not begin to improve in the next 24 hours.

Call 911

Call 911 if any of these occur:

• Trouble breathing

• Confusion

• Fainting or loss of consciousness

• Rapid heart rate

• Seizure

When to seek medical advice

Call your healthcare provider right away if any of these occur:

• Pain gets worse or moves to the right lower abdomen

• New or worsening vomiting or diarrhea

• Swelling of the abdomen

• Unable to pass stool for more than 3 days

• Fever of 100.4°F (38°C) or higher, or as directed by your healthcare provider.

• Blood in vomit or bowel movements (dark red or black color)

• Jaundice (yellow color of eyes and skin)

• Weakness, dizziness

• Chest, arm, back, neck or jaw pain

• Unexpected vaginal bleeding or missed period

• Can't keep down liquids or water and are getting dehydrated

© 2000-2015 The StayWell Company, LLC. 780 Township Line Road, Yardley, PA 19067. All rights reserved. This information is not intended as a substitute for professional medical care. Always follow your healthcare professional's instructions.

**Follow Up Care**

11/09/2016 13:35:08

**With:** Jennifer Frink

**Address:** Unknown

**When:** Unknown

**Comments:** after ultrasound, for results

## Reason for Referral

No data available for this section

## Health Concerns

No data available for this section

## SMITH, CARRIE S

Sex: F  DOB: 01/10/1987

**Continuity of Care Document**

Created: 02/15/2019

Summarization of Episode Note | 11/9/2018 to 11/9/2018

Source: Ascension Borgess Hospital Borgess Women's Health - Currier

## Demographics

| Contact Information: | Marital Status: Life Partner | Ethnic Group: Not Hispanic or Latino |
|---|---|---|
| 10464 WILDWOOD DRRICHLAND, MI 49083-8519, US | Religion: Christian | Language: eng |
| Tel: (000)000-0000 | Race: White | IDs: 761427 |
| Tel: (269)491-8524 | **Previous Name(s): --** | |
| Tel: (269)491-8524 | | |
| Mail: carriesuzsmith@gmail.com | | |

## Care Team

| Type | Name | Represented Organization | Address | Phone |
|---|---|---|---|---|
| primary care physician | No, Doctor | -- | -- | -- |
| primary care physician | No, Doctor | -- | -- | -- |
| primary care physician | Mindock PA-C, Gregory P | -- | Work:8450 N. 32nd StreetRichland, MI 49083-, US | Work Tel: (269)324-8600 |

## Relationships

No Data to Display

## Document Details

| Source Contact Info | Author Contact Info | Recipient Contact Info |
|---|---|---|
| 7895 Currier DriveSuite APortage, MI 49002-, US | -- | -- |
| Tel: (269)321-7000 | | |

### Healthcare Professionals

No Data to Display

### IDs & Code Type Data

Document Type ID: 2.16.840.1.113883.1.3 : POCD_HD000040

Document Template ID: 2.16.840.1.113883.10.20.22.1.1 : 2015-08-01, 2.16.840.1.113883.10.20.22.1.2 : 2015-08-01

Document ID: 2.16.840.1.113883.3.891.11.999362 : 35130996

Document Type Code: 2.16.840.1.113883.6.1, 34133-9

Document Language Code: en-US

Document Set ID: --

Document Version Number: --

## Primary Encounter

### Encounter Information

Registration Date: 11/9/2018

Discharge Date: 11/9/2018

Visit ID: --

### Location Information

Ascension Borgess Hospital Borgess Women's Health - Currier

Work:7895 Currier DriveSuite APortage, MI 49002-, US

### Providers

| Type | Name | Address | Phone |
|---|---|---|---|
| Admitting | Frink DO, Jennifer L. | Work:7895 Currier DriveSuite APortage, MI 49002-, US | Work Tel: (269)226-5927 |
| Attending | Frink DO, Jennifer L. | Work:7895 Currier DriveSuite APortage, MI 49002-, US | Work Tel: (269)226-5927 |

## Encounter

11/9/18 - 11/9/18

Ascension Borgess Hospital Borgess Women's Health - Currier 7895 Currier Drive Suite A Portage, MI 49002- USA (269) 321-7000

Encounter Diagnosis

Female pelvic pain (Discharge Diagnosis) - 11/9/18

Attending Physician: Frink, Jennifer L., DO

Admitting Physician: Frink, Jennifer L., DO

## Problem List

Female pelvic pain (This Visit)

ADD (attention deficit disorder) | Adjustment reaction with anxiety and depression | Chronic SI joint pain | Donor of kidney for transplant | Ehlers-Danlos disease | Esophageal Reflux | PCOS (polycystic ovarian syndrome) | PFD (pelvic floor dysfunction) | Refused diphtheria-pertussis-tetanus (DPT) vaccination

## Allergies, Adverse Reactions, Alerts

Levaquin (heavy arms)

## Medications

**amphetamine-dextroamphetamine (Adderall XR 30 mg oral capsule, extended release)**

1 cap(s) By Mouth 2 times a day for 30 Days. Refills: 0.

Ordering provider: Runge, Rebecca A, DO

**benzoyl peroxide-clindamycin topical (benzoyl peroxide-clindamycin 5%-1% topical gel)**

1 app On Skin 2 times a day. Refills: 11.

Ordering provider: Helgerson, Kurt P, MD

**dapsone topical (dapsone 5% topical gel)**

1 app On Skin 2 times a day. Refills: 11.

Ordering provider: Helgerson, Kurt P, MD

**drospirenone-ethinyl estradiol (Yaz 3 mg-0.02 mg oral tablet)**

1 tab(s) By Mouth once a day for 84 Days. Refills: 4.

Ordering provider: Runge, Rebecca A, DO

**mupirocin topical (Bactroban 2% topical ointment)**

1 app On Skin 3 times a day. apply a thin film. Refills: 1.

Ordering provider: Helgerson, Kurt P, MD

**omega-3 polyunsaturated fatty acids (Fish Oil oral capsule)**

**tretinoin topical (tretinoin 0.05% topical cream)**

1 app On Skin once a day (at bedtime) for 60 Days. Refills: 5.

Ordering provider: Helgerson, Kurt P, MD

## Immunizations

No data available for this section

## Medications Administered During Your Visit

No data available for this section

## Assessment and Plan

Future Scheduled Tests

Laboratory:

Renal Function Panel 2/15/19

Radiology:

MRI Brain w/ + w/o Contrast 6/28/18

VUS AAA Screening 8/10/18

US Pelvis Complete Transabd/Vag w/o Dopp 11/9/18

## Functional Status

No data available for this section

## Mental Status

No data available for this section

## Encounter Procedures

No data available for this section

## Results

No data available for this section

## Vital Signs

11/9/18

| | |
|---|---|
| Blood Pressure | 122/80 mmHg (Normal is 90-140/60-90 mmHg) |
| Blood Pressure Location | Left arm |
| Blood Pressure Method | Cuff |
| Mean Arterial Pressure | 94 mmHg (Normal is 70-100 mmHg) |
| Measured Weight in Kilograms | 74.6 kg |
| Measured Weight in Pounds | 164 lb 7 oz 1 |
| Height in Centimeters | 171 cm |
| Measured Height in Inches | 67.3 in2 |
| Body Mass Index | 25.5 kg/m2 |

1Result Comment: Result placed secondary from kg, converted to lbs

2Result Comment: Result placed secondary from cm, converted to inches

## Social History

| Social History Type | Response |
|---|---|

| Social History Type | Response |
|---|---|
| Smoking Status | Never (less than 100 in lifetime) |
| | entered on: 11/7/18 |

Birth Sex

## Goals

No data available for this section

## Discharge Instructions

**Patient Education**
11/09/2018 13:35:08

**ABDOMINAL PAIN, Unknown Cause, (Female)**

Unknown Causes of Abdominal Pain (Female)

The exact cause of your abdominal (stomach) pain is not clear. This does not mean that this is something to worry about. Everyone likes to know the exact cause of the problem, but sometimes with abdominal pain, there is no clear-cut cause, and this could be a good thing. The good news is that your symptoms can be treated, and you will feel better.

Your condition does not seem serious now; however, sometimes the signs of a serious problem may take more time to appear. For this reason, it is important for you to watch for any new symptoms, problems, or worsening of your condition.

Over the next few days, the abdominal pain may come and go, or be continuous. Other common symptoms can include nausea and vomiting. Sometimes it can be difficult to tell if you feel nauseous, you may just feel bad and not associate that feeling with nausea. Constipation, diarrhea, and a fever may go along with the pain. The pain may continue even if treated correctly over the following days. Depending on how things go, sometimes the cause can become clear and may require further or different treatment. Additional evaluations, medications, or tests may also be needed.

Home care

Your healthcare provider may prescribe medicine for pain, symptoms, or an infection.  Follow the healthcare provider's instructions for taking these medicines.

General care

· Rest as much as you can until your next exam. No strenuous activities.

· Try to find positions that ease discomfort. A small pillow placed on the abdomen may help relieve pain.

· Something warm on your abdomen (such as a heating pad) may help, but be careful not to burn yourself.

Diet

· Do not force yourself to eat, especially if having cramps, vomiting, or diarrhea.

· Water is important so you do not get dehydrated. Soup may also be good. Sports drinks may also help, especially if they are not too acidic. Make sure you don't drink sugary drinks as this can make things worse. Take liquids in small amounts. Do not guzzle them.

· Caffeine sometimes makes the pain and cramping worse.

· Avoid dairy products if you have vomiting or diarrhea.

· Don't eat large amounts at a time. Wait a few minutes between bites.

· Eat a diet low in fiber (called a low-residue diet). Foods allowed include refined breads, white rice, fruit and vegetable juices without pulp, tender meats. These foods will pass more easily through the intestine.

· Avoid whole-grain foods, whole fruits and vegetables, meats, seeds and nuts, fried or fatty foods, dairy, alcohol and spicy foods until your symptoms go away.

Follow-up care

Follow up with your healthcare provider, or as advised, if your pain does not begin to improve in the next 24 hours.

Call 911

Call 911 if any of these occur:

· Trouble breathing

· Confusion

· Fainting or loss of consciousness

· Rapid heart rate

· Seizure

When to seek medical advice

Call your healthcare provider right away if any of these occur:

· Pain gets worse or moves to the right lower abdomen

- New or worsening vomiting or diarrhea
- Swelling of the abdomen
- Unable to pass stool for more than 3 days
- Fever of 100.4°F (38°C) or higher, or as directed by your healthcare provider.
- Blood in vomit or bowel movements (dark red or black color)
- Jaundice (yellow color of eyes and skin)
- Weakness, dizziness
- Chest, arm, back, neck or jaw pain
- Unexpected vaginal bleeding or missed period
- Can't keep down liquids or water and are getting dehydrated

© 2000-2015 The StayWell Company, LLC. 780 Township Line Road, Yardley, PA 19067. All rights reserved. This information is not intended as a substitute for professional medical care. Always follow your healthcare professional's instructions.

**Follow Up Care**
11/09/2018 13:35:08
**With:** Jennifer Frink
**Address:** Unknown
**When:** Unknown
**Comments:** after ultrasound, for results

## Reason for Referral

No data available for this section

## Health Concerns

No data available for this section

## SMITH, CARRIE S

Sex: F  DOB: **01/10/1987**

**Continuity of Care Document**

Summarization of Episode Note | 11/14/2018 to 11/16/2018                                    Created: 02/15/2019

Source: Ascension Borgess Hospital ProMed Family Practice Richland

### Demographics

| | | |
|---|---|---|
| Contact Information: | Marital Status: Life Partner | Ethnic Group: Not Hispanic or Latino |
| 10464 WILDWOOD DRRICHLAND, MI 49083-8519, US | Religion: Christian | Language: eng |
| Tel: (000)000-0000 | Race: White | IDs: 761427 |
| Tel: (269)491-8524 | **Previous Name(s): --** | |
| Tel: (269)491-8524 | | |
| Mail: carriesuzsmith@gmail.com | | |

### Care Team

| Type | Name | Represented Organization | Address | Phone |
|---|---|---|---|---|
| primary care physician | No, Doctor | -- | -- | -- |
| primary care physician | No, Doctor | -- | -- | -- |
| primary care physician | Mindock PA-C, Gregory P | -- | Work:8450 N. 32nd StreetRichland, MI 49083-, US | Work Tel: (269)324-8600 |

### Relationships

No Data to Display

### Document Details

| Source Contact Info | Author Contact Info | Recipient Contact Info |
|---|---|---|
| 8450 N. 32nd StreetRichland, MI 49083-, US | -- | -- |
| Tel: (269)552-2500 | | |

### Healthcare Professionals

No Data to Display

### IDs & Code Type Data

Document Type ID: 2.16.840.1.113883.1.3 : POCD_HD000040

Document Template ID: 2.16.840.1.113883.10.20.22.1.1 : 2015-08-01, 2.16.840.1.113883.10.20.22.1.2 : 2015-08-01

Document ID: 2.16.840.1.113883.3.891.8.999362 : 35130865

Document Type Code: 2.16.840.1.113883.6.1, 34133-9

Document Language Code: en-US

Document Set ID: --

Document Version Number: --

### Primary Encounter

**Encounter Information**

Registration Date: 11/14/2018

Discharge Date: 11/16/2018

Visit ID: --

**Location Information**

Ascension Borgess Hospital ProMed Family Practice Richland

Work:8450 N. 32nd StreetRichland, MI 49083-, US

### Providers

| Type | Name | Address | Phone |
|---|---|---|---|
| Attending | Runge DO, Rebecca A | Work:8450 N. 32nd StreetRichland, MI 49083-, US | Work Tel: (269)324-8600 |

## Encounter

**11/14/18 - 11/16/18**

Ascension Borgess Hospital ProMed Family Practice Richland 8450 N. 32nd Street Richland, MI 49083- USA (269) 552-2500

**Encounter Diagnosis**

PFD (pelvic floor dysfunction) (Discharge Diagnosis) - 11/14/18

Lumbar region somatic dysfunction (Discharge Diagnosis) - 11/14/18

Sacral region somatic dysfunction (Discharge Diagnosis) - 11/14/18

Thoracic region somatic dysfunction (Discharge Diagnosis) - 11/14/18

Chronic SI joint pain (Discharge Diagnosis) - 11/14/18

Cervical somatic dysfunction (Discharge Diagnosis) - 11/14/18

Pelvic somatic dysfunction (Discharge Diagnosis) - 11/14/18

Lumbago with sciatica, left side (Discharge Diagnosis) - 11/14/18

Attending Physician: Runge, Rebecca A, DO

## Problem List

Cervical somatic dysfunction | Chronic SI joint pain | Lumbago with sciatica, left side | Lumbar region somatic dysfunction | Pelvic somatic dysfunction | PFD (pelvic floor dysfunction) | Sacral region somatic dysfunction | Thoracic region somatic dysfunction (This Visit)

ADD (attention deficit disorder) | Adjustment reaction with anxiety and depression | Chronic SI joint pain | Donor of kidney for transplant | Ehlers-Danlos disease | Esophageal Reflux | PCOS (polycystic ovarian syndrome) | PFD (pelvic floor dysfunction) | Refused diphtheria-pertussis-tetanus (DPT) vaccination

## Allergies, Adverse Reactions, Alerts

Levaquin (heavy arms)

## Medications

**amphetamine-dextroamphetamine (Adderall XR 30 mg oral capsule, extended release)**

1 cap(s) By Mouth 2 times a day for 30 Days. Refills: 0.

Ordering provider: Runge, Rebecca A, DO

**benzoyl peroxide-clindamycin topical (benzoyl peroxide-clindamycin 5%-1% topical gel)**

1 app On Skin 2 times a day. Refills: 11.

Ordering provider: Helgerson, Kurt P, MD

**dapsone topical (dapsone 5% topical gel)**

1 app On Skin 2 times a day. Refills: 11.

Ordering provider: Helgerson, Kurt P, MD

**drospirenone-ethinyl estradiol (Yaz 3 mg-0.02 mg oral tablet)**

1 tab(s) By Mouth once a day for 84 Days. Refills: 4.

Ordering provider: Runge, Rebecca A, DO

**mupirocin topical (Bactroban 2% topical ointment)**

1 app On Skin 3 times a day. apply a thin film. Refills: 1.

Ordering provider: Helgerson, Kurt P, MD

**omega-3 polyunsaturated fatty acids (Fish Oil oral capsule)**

**tretinoin topical (tretinoin 0.05% topical cream)**

1 app On Skin once a day (at bedtime) for 60 Days. Refills: 5.

Ordering provider: Helgerson, Kurt P, MD

## Immunizations

No data available for this section

## Medications Administered During Your Visit

No data available for this section

## Assessment and Plan

### Future Scheduled Tests
Laboratory:

Renal Function Panel 2/15/19

Radiology:

MRI Brain w/ + w/o Contrast 6/28/18

VUS AAA Screening 8/10/18

US Pelvis Complete Transabd/Vag w/o Dopp 11/9/18

## Functional Status

No data available for this section

## Mental Status

No data available for this section

## Encounter Procedures

No data available for this section

## Results

No data available for this section

## Vital Signs

11/14/18

| | |
|---|---|
| Respiratory Rate | 14 br/min (Normal is 14-20 br/min) |
| Blood Pressure | 126/82 mmHg (Normal is 90-140/60-90 mmHg) |
| Blood Pressure Location | Left arm |
| Blood Pressure Method | Cuff |
| Mean Arterial Pressure | 96.7 mmHg (Normal is 70-100 mmHg) |
| Peripheral Pulse Rate | 82 bpm (Normal is 60-100 bpm) |
| Temperature Tympanic (DegC) | 36.9 DegC (Normal is 36.6-37.6 DegC) |
| Temperature Tympanic (DegF) | 98.4 DegF (Normal is 97.9-99.7 DegF) |
| Measured Weight in Kilograms | 75.5 kg |
| Measured Weight in Pounds | 166 lb 7 oz 1 |

| | |
|---|---|
| Height in Centimeters | 171 cm |
| Measured Height in Inches | 67.3 in2 |
| Body Mass Index | 25.8 kg/m2 |

1Result Comment: Result placed secondary from kg, converted to lbs

2Result Comment: Result placed secondary from cm, converted to Inches

## Social History

| Social History Type | Response |
|---|---|
| Smoking Status | Never (less than 100 in lifetime) |
| | entered on: 11/7/18 |
| Birth Sex | |

## Goals

No data available for this section

## Discharge Instructions

**Patient Education**

**11/14/2018 16:03:19**

**BACK CARE TIPS**

Back Care Tips

Caring for your back

These are things you can do to prevent a recurrence of acute back pain and to reduce symptoms from chronic back pain:

• Maintain a healthy weight. If you are overweight, losing weight will help most types of back pain.

• Exercise is an important part of recovery from most types of back pain. The back is supported by the muscles behind and in front of the spine. This means both the back muscles and the abdominal muscles must be strengthened to provide better support for your spine.

• Swimming and brisk walking are good overall exercises to improve your fitness level.

• Practice safe lifting methods (below).

• Practice good posture when sitting, standing and walking. Avoid prolonged sitting. This puts more stress on the lower back than standing or walking.

• Wear quality shoes with sufficient arch support. Foot and ankle alignment can affect back symptoms. Women should avoid high heels.

• Therapeutic massage can help relax the back muscles without stretching them.

• During the first 24 to 72 hours after an acute injury or flare-up of chronic back pain, apply an ice pack to the painful area for 20 minutes and then remove it for 20 minutes over a period of 60 to 90 minutes or several times a day. As a safety precaution, do not use a heating pad at bedtime. Sleeping on a heating pad can lead to skin burns or tissue damage.

• Ice and heat therapies can be alternated.

Medications

Talk to your doctor before using medications, especially if you have other medical problems or are taking other medicines.

• You may use acetaminophen or ibuprofen to control pain, unless other pain medicine was prescribed. If you have chronic conditions like diabetes, liver or kidney disease, stomach ulcers or gastrointestinal bleeding, or are taking blood thinners, talk with your doctor before taking any medications.

• Be careful if you are given prescription pain medicines, narcotics, or medication for muscle spasm. They can cause drowsiness, affect your coordination, reflexes and judgment. Do not drive or operate heavy machinery.

Lumbar stretch

Here is a simple stretching exercise that will help relax muscle spasm and keep your back more limber. If exercise makes your back pain worse, don't do it.

• Lie on your back with your knees bent and both feet on the ground.

• Slowly raise your left knee to your chest as you flatten your lower back against the floor. Hold for 5 seconds.

• Relax and repeat the exercise with your right knee.

• Do 10 of these exercises for each leg

Safe lifting method

• Don't bend over at the waist to lift an object off the floor. Instead, bend your knees and hips in a squat.

• Keep your back and head upright

• Hold the object close to your body, directly in front of you.

• Straighten your legs to lift the object.

• Lower the object to the floor in the reverse fashion.

• If you must slide something across the floor, push it.

Posture tips

Sitting

Sit in chairs with straight backs or low-back support. rKeep your knees lower than your hip, with your feet flat on the floor.

When driving, sit up straight. Adjust the seat forward so you are not leaning toward the steering wheel. A small pillow or rolled towel behind your lower back may help if you are driving long distances.

Standing

When standing for long periods, shift most of your weight to one leg at a time. Alternate legs every few minutes.

Sleeping

The best way to sleep is on your side with your knees bent. Put a low pillow under your head to support your neck in a neutral spine position. Avoid thick pillows that bend your neck to one side. Put a pillow between your legs to further relax your lower back. If you sleep on your back, put pillows under your knees to support your legs in a slightly flexed position. Use a firm mattress. If your mattress sags, replace it, or use a 1/2-inch plywood board under the mattress to add support.

Follow-up care

Follow up with your health care provider or as directed by our staff.

If X-rays, a CT scan or an MRI scan were taken, they will be reviewed by a radiologist. You will be notified of any new findings that may affect your care.

Call 911

Seek emergency medical care if any of the following occur:

• Trouble breathing

• Confusion

• Very drowsy or trouble breathing

• Fainting or loss of consciousness

• Rapid or very slow heart rate

• Loss of bwel or bladder control

When to seek medical care

Call your health care provider if any of the following occur:

• Pain becomes worse or spreads to your arms or legs

• Weakness or numbness in one or both arms or legs

• Numbness in the groin area

© 2000-2015 The StayWell Company, LLC. 780 Township Line Road, Yardley, PA 19067. All rights reserved. This information is not intended as a substitute for professional medical care. Always follow your healthcare professional's instructions.

**Follow Up Care**

11/14/2018 16:03:19

**With:** Rebecca Runge

**Address:** Unknown

**When:** 1 month

only if needed

**Comments:** OMT

## Reason for Referral

No data available for this section

## Health Concerns

No data available for this section

**SMITH, CARRIE S**   Sex: **F**   DOB: **01/10/1987**

**Continuity of Care Document**

Summarization of Episode Note | 11/7/2018 to 11/9/2018

Source: Ascension Borgess Hospital ProMed Family Practice Richland

Created: 01/21/2019

## Demographics

Contact Information:

10464 WILDWOOD DR RICHLAND, MI 49083-8519, US

Tel: (000)000-0000

Tel: (269)491-8524

Tel: (269)491-8524

Mail: carriesuzsmith@gmail.com

Marital Status: Life Partner

Religion: Christian

Race: White

**Previous Name(s): --**

Ethnic Group: Not Hispanic or Latino

Language: eng

IDs: 761427

## Care Team

| Type | Name | Represented Organization | Address | Phone |
|---|---|---|---|---|
| primary care physician | No, Doctor | -- | -- | -- |
| primary care physician | No, Doctor | -- | -- | -- |
| primary care physician | Mindock PA-C, Gregory P | -- | Work:8450 N. 32nd StreetRichland, MI 49083- , US | Work Tel: (269)324-8600 |

## Relationships

No Data to Display

## Document Details

**Source Contact Info**

8450 N. 32nd StreetRichland, MI 49083- , US

Tel: (269)552-2500

**Author Contact Info**

--

**Recipient Contact Info**

--

**Healthcare Professionals**

No Data to Display

**IDs & Code Type Data**

Document Type ID: 2.16.840.1.113883.1.3 : POCD_HD000040

Document Template ID: 2.16.840.1.113883.10.20.22.1.1 : 2015-08-01, 2.16.840.1.113883.10.20.22.1.2 : 2015-08-01

Document ID: 2.16.840.1.113883.3.891.8.999362 : 34414602

Document Type Code: 2.16.840.1.113883.6.1, 34133-9

Document Language Code: en-US

Document Set ID: --
Document Version Number: --

## Primary Encounter

### Encounter Information
Registration Date: 11/7/2018
Discharge Date: 11/9/2018
Visit ID: --

### Location Information
Ascension Borgess Hospital ProMed Family Practice Richland

Work:8450 N. 32nd StreetRichland, MI 49083- , US

### Providers
No Data to Display

## Encounter

**11/7/18 - 11/9/18**

Ascension Borgess Hospital ProMed Family Practice Richland 8450 N. 32nd Street Richland, MI 49083- USA (269) 552-2500

**Encounter Diagnosis**

Low back pain (Discharge Diagnosis) - 11/7/18

Adjustment reaction with anxiety and depression (Discharge Diagnosis) - 11/7/18

## Problem List

Adjustment reaction with anxiety and depression | Low back pain (This Visit)

ADD (attention deficit disorder) | Adjustment reaction with anxiety and depression | Chronic SI joint pain | Donor of kidney for transplant | Ehlers-Danlos disease | Esophageal Reflux| PCOS (polycystic ovarian syndrome) | PFD (pelvic floor dysfunction) | Refused diphtheria-pertussis-tetanus (DPT) vaccination

## Allergies, Adverse Reactions, Alerts

Levaquin (heavy arms)

## Medications

**amphetamine-dextroamphetamine (Adderall XR 30 mg oral capsule, extended release)**
1 cap(s) By Mouth 2 times a day for 30 Days. Refills: 0.
Ordering provider: Runge, Rebecca A, DO

**benzoyl peroxide-clindamycin topical (benzoyl peroxide-clindamycin 5%-1% topical gel)**
1 app On Skin 2 times a day. Refills: 11.
Ordering provider: Helgerson, Kurt P, MD

**dapsone topical (dapsone 5% topical gel)**
1 app On Skin 2 times a day. Refills: 11.
Ordering provider: Helgerson, Kurt P, MD

**drospirenone-ethinyl estradiol (Yaz 3 mg-0.02 mg oral tablet)**
1 tab(s) By Mouth once a day for 84 Days. Refills: 4.
Ordering provider: Runge, Rebecca A, DO

**mupirocin topical (Bactroban 2% topical ointment)**
1 app On Skin 3 times a day. apply a thin film. Refills: 1.
Ordering provider: Helgerson, Kurt P, MD

**omega-3 polyunsaturated fatty acids (Fish Oil oral capsule)**

**tretinoin topical (tretinoin 0.05% topical cream)**
1 app On Skin once a day (at bedtime) for 60 Days. Refills: 5.
Ordering provider: Helgerson, Kurt P, MD

## Immunizations

No data available for this section

**Medications Administered During Your Visit**

No data available for this section

**Assessment and Plan**

**Future Scheduled Tests**

Laboratory:

Renal Function Panel 2/15/19

Radiology:

MRI Brain w/ + w/o Contrast 6/28/18

VUS AAA Screening 8/10/18

US Pelvis Complete Transabd/Vag w/o Dopp 11/9/18

**Functional Status**

No data available for this section

**Mental Status**

No data available for this section

**Encounter Procedures**

No data available for this section

**Results**

No data available for this section

**Vital Signs**

11/7/18

| | |
|---|---|
| Respiratory Rate | 16 br/min (Normal is 14-20 br/min) |
| Blood Pressure | 110/76 mmHg (Normal is 90-140/60-90 mmHg) |
| Blood Pressure Location | Left arm |
| Blood Pressure Method | Cuff |
| Mean Arterial Pressure | 87.3 mmHg (Normal is 70-100 mmHg) |
| Peripheral Pulse Rate | 92 bpm (Normal is 60-100 bpm) |
| Temperature Tympanic (DegC) | 36.5 DegC*LOW* (Normal is 36.6-37.6 DegC) |

**SMITH, CARRIE S**   Sex: F   DOB: **01/10/1987**

**Continuity of Care Document**

Summarization of Episode Note | 11/9/2018 to 11/9/2018

Source: Ascension Borgess Hospital Borgess Women's Health - Currier

Created: 01/21/2019

## Demographics

Contact Information:

10464 WILDWOOD DRRICHLAND, MI 49083-8519, US

Tel: (000)000-0000

Tel: (269)491-8524

Tel: (269)491-8524

Mail: carriesuzsmith@gmail.com

Marital Status: Life Partner

Religion: Christian

Race: White

**Previous Name(s): --**

Ethnic Group: Not Hispanic or Latino

Language: eng

IDs: 761427

## Care Team

| Type | Name | Represented Organization | Address | Phone |
|------|------|--------------------------|---------|-------|
| primary care physician | No, Doctor | -- | -- | -- |
| primary care physician | No, Doctor | -- | -- | -- |
| primary care physician | Mindock PA-C, Gregory P | -- | Work;8450 N. 32nd StreetRichland, MI 49083- , US | Work Tel: (269)324-8600 |

## Relationships

No Data to Display

## Document Details

### Source Contact Info

7895 Currier DriveSuite APortage, MI 49002- , US

Tel: (269)321-7000

### Author Contact Info

--

### Recipient Contact Info

--

### Healthcare Professionals

No Data to Display

### IDs & Code Type Data

Document Type ID: 2.16.840.1.113883.1.3 : POCD_HD000040

Document Template ID: 2.16.840.1.113883.10.20.22.1.1 : 2015-08-01, 2.16.840.1.113883.10.20.22.1.2 : 2015-08-01

Document ID: 2.16.840.1.113883.3.891.11.999362 : 34414601

Document Type Code: 2.16.840.1.113883.6.1, 34133-9

Document Language Code: en-US

Document Set ID: --
Document Version Number: --

## Primary Encounter

### Encounter Information
Registration Date: 11/9/2018
Discharge Date: 11/9/2018
Visit ID: --

### Location Information
Ascension Borgess Hospital Borgess Women's Health - Currier
Work:7895 Currier DriveSuite APortage, MI 49002- , US

### Providers

| Type | Name | Address | Phone |
|---|---|---|---|
| Admitting | Frink DO, Jennifer L. | Work:7895 Currier DriveSuite APortage, MI 49002- , US | Work Tel: (269)226-5927 |
| Attending | Frink DO, Jennifer L. | Work:7895 Currier DriveSuite APortage, MI 49002- , US | Work Tel: (269)226-5927 |

## Encounter

**11/9/18 - 11/9/18**

Ascension Borgess Hospital Borgess Women's Health - Currier 7895 Currier Drive Suite A Portage, MI 49002- USA (269) 321-7000

**Encounter Diagnosis**

Female pelvic pain (Discharge Diagnosis) - 11/9/18

Attending Physician: Frink, Jennifer L., DO

Admitting Physician: Frink, Jennifer L., DO

## Problem List

Female pelvic pain (This Visit)

ADD (attention deficit disorder) | Adjustment reaction with anxiety and depression | Chronic SI joint pain | Donor of kidney for transplant | Ehlers-Danlos disease | Esophageal Reflux | PCOS (polycystic ovarian syndrome) | PFD (pelvic floor dysfunction) | Refused diphtheria-pertussis-tetanus (DPT) vaccination

## Allergies, Adverse Reactions, Alerts

Levaquin (heavy arms)

## Medications

**amphetamine-dextroamphetamine (Adderall XR 30 mg oral capsule, extended release)**

1 cap(s) By Mouth 2 times a day for 30 Days. Refills: 0.

Ordering provider: Runge, Rebecca A, DO

**benzoyl peroxide-clindamycin topical (benzoyl peroxide-clindamycin 5%-1% topical gel)**

1 app On Skin 2 times a day. Refills: 11.

Ordering provider: Helgerson, Kurt P, MD

**dapsone topical (dapsone 5% topical gel)**

1 app On Skin 2 times a day. Refills: 11.

Ordering provider: Helgerson, Kurt P, MD

**drospirenone-ethinyl estradiol (Yaz 3 mg-0.02 mg oral tablet)**

1 tab(s) By Mouth once a day for 84 Days. Refills: 4.

Ordering provider: Runge, Rebecca A, DO

**mupirocin topical (Bactroban 2% topical ointment)**

1 app On Skin 3 times a day. apply a thin film. Refills: 1.

Ordering provider: Helgerson, Kurt P, MD

**omega-3 polyunsaturated fatty acids (Fish Oil oral capsule)**

**tretinoin topical (tretinoin 0.05% topical cream)**

1 app On Skin once a day (at bedtime) for 60 Days. Refills: 5.

Ordering provider: Helgerson, Kurt P, MD

## Immunizations

No data available for this section

**SMITH, CARRIE S**                                                                          Sex: F  DOB: **01/10/1987**

**Continuity of Care Document**                                                              Created: 02/15/2019

Summarization of Episode Note | 06/5/2018 to 11/12/2018

Source: Ascension Borgess Hospital Outpatient

## Demographics

| Contact Information: | Marital Status: Life Partner | Ethnic Group: Not Hispanic or Latino |
|---|---|---|
| 10464 WILDWOOD DRRICHLAND, MI 49083-8519, US | Religion: Christian | Language: eng |
| Tel: (000)000-0000 | Race: White | IDs: 761427 |
| Tel: (269)491-8524 | **Previous Name(s): --** | |
| Tel: (269)491-8524 | | |
| Mail: carriesuzsmith@gmail.com | | |

## Care Team

| Type | Name | Represented Organization | Address | Phone |
|---|---|---|---|---|
| primary care physician | No, Doctor | -- | -- | -- |
| primary care physician | No, Doctor | -- | -- | -- |
| primary care physician | Mindock PA-C, Gregory P | -- | Work:8450 N. 32nd StreetRichland, MI 49083- , US | Work Tel: (269)324-8600 |

## Relationships

No Data to Display

## Document Details

| Source Contact Info | Author Contact Info | Recipient Contact Info |
|---|---|---|
| Ascension Borgess Hospital1521 Gull RoadKalamazoo, -- | -- | |
| MI 49048- , US | | |
| Tel: (269)226-5917 | | |

### Healthcare Professionals

No Data to Display

### IDs & Code Type Data

Document Type ID: 2.16.840.1.113883.1.3 : POCD_HD000040

Document Template ID: 2.16.840.1.113883.10.20.22.1.1 : 2015-08-01, 2.16.840.1.113883.10.20.22.1.2 : 2015-06-01

Document ID: 2.16.840.1.113883.3.891.117.999362 : 35130911

Document Type Code: 2.16.840.1.113883.6.1, 34133-9

Document Language Code: en-US

Document Set ID: --

Document Version Number: --

## Primary Encounter

| Encounter Information | Location Information |
|---|---|
| Registration Date: 06/5/2018 | Main Hospital Campus |
| Discharge Date: 11/12/2018 | Work:1521 Gull RoadKalamazoo, MI 49048- , US |
| Visit ID: -- | |

## Providers

| Type | Name | Address | Phone |
|---|---|---|---|
| Attending | Belker PAC, Analiso J | Work:7901 Angling Road, Ste 201BPortage, MI 49024- , US | Work Tel: (269)324-8600 |

## Encounter

**FIN 7614270064 Date(s): 6/5/18 - 11/12/18**

Ascension Borgess Hospital Outpatient 1521 Gull Road Kalamazoo, MI 49048- USA (269) 226-5917

**Encounter Diagnosis**

Low back pain (Final) - 6/12/18

Discharge Disposition: Home/ Self Care

Attending Physician: Betker, Analise J, PAC

## Problem List

Low back pain (This Visit)

ADD (attention deficit disorder) | Adjustment reaction with anxiety and depression | Chronic SI joint pain | Donor of kidney for transplant | Ehlers-Danlos disease | Esophageal Reflux | PCOS (polycystic ovarian syndrome) | PFD (pelvic floor dysfunction) | Refused diphtheria-pertussis-tetanus (DPT) vaccination

## Allergies, Adverse Reactions, Alerts

Levaquin (heavy arms)

## Medications

**amphetamine-dextroamphetamine (Adderall XR 30 mg oral capsule, extended release)**

1 cap(s) By Mouth 2 times a day for 30 Days. Refills: 0.

Ordering provider: Runge, Rebecca A, DO

**benzoyl peroxide-clindamycin topical (benzoyl peroxide-clindamycin 5%-1% topical gel)**

1 app On Skin 2 times a day. Refills: 11.

Ordering provider: Helgerson, Kurt P, MD

**dapsone topical (dapsone 5% topical gel)**

1 app On Skin 2 times a day. Refills: 11.

Ordering provider: Helgerson, Kurt P, MD

**drospirenone-ethinyl estradiol (Yaz 3 mg-0.02 mg oral tablet)**

1 tab(s) By Mouth once a day for 84 Days. Refills: 4.

Ordering provider: Runge, Rebecca A, DO

**mupirocin topical (Bactroban 2% topical ointment)**

1 app On Skin 3 times a day. apply a thin film. Refills: 1.

Ordering provider: Helgerson, Kurt P, MD

**omega-3 polyunsaturated fatty acids (Fish Oil oral capsule)**

**tretinoin topical (tretinoin 0.05% topical cream)**

1 app On Skin once a day (at bedtime) for 60 Days. Refills: 5.

Ordering provider: Helgerson, Kurt P, MD

## Immunizations

No data available for this section

## Medications Administered During Your Visit

No data available for this section

## Assessment and Plan

**Future Scheduled Tests**

Laboratory:

Renal Function Panel 2/15/19

Radiology:

MRI Brain w/ + w/o Contrast 6/28/18

VUS AAA Screening 8/10/18

US Pelvis Complete Transabd/Vag w/o Dopp 11/9/18

## Functional Status

No data available for this section

## Mental Status

No data available for this section

## Encounter Procedures

No data available for this section

## Results

No data available for this section

## Vital Signs

No data available for this section

## Social History

| Social History Type | Response |
|---|---|
| Smoking Status | Never (less than 100 in lifetime) |
| | entered on: 11/7/18 |
| Birth Sex | |

## Goals

No data available for this section

## Discharge Instructions

No data available for this section

Community of Care Document

## Reason for Referral

No data available for this section

## Health Concerns

No data available for this section

| | |
|---|---|
| Temperature Tympanic (DegF) | 97.7 DegF*LOW* (Normal is 97.9-99.7 DegF) |
| Measured Weight in Kilograms | 74.8 kg |
| Measured Weight in Pounds | 164 lb 15 oz 1 |
| Height in Centimeters | 171 cm |
| Measured Height in Inches | 67.3 in2 |
| Body Mass Index | 25.6 kg/m2 |

1Result Comment: Result placed secondary from kg, converted to lbs

2Result Comment: Result placed secondary from cm, converted to Inches

## Social History

| Social History Type | Response |
|---|---|
| Smoking Status | Never (less than 100 in lifetime) entered on: 11/7/18 |
| Birth Sex | |

## Goals

No data available for this section

## Discharge Instructions



**Patient Education**

11/07/2018 15:59:27

**ADJUSTMENT DISORDER**

Adjustment Disorder

Life changes — work, family, parents, children — each can cause a great deal of stress in life. An adjustment disorder means you have trouble dealing with this change and stress. This problem can have serious results. You may feel helpless, depressed, make bad decisions, or even feel like you want to hurt yourself.

Adjustment disorder can cause anxiety or depression. It is triggered by daily stresses such as:

• Death of a loved one

• Divorce

• Marriage

• General life changes such as changing or leaving a job

• Moving

• Illness or other health issue for you or a family member

• Sex

• Money

Symptoms may include:

• Sadness, crying

• Anxiety

• Insomnia

- Poor concentration
- Trouble doing simple things
- New problems at work or with family or friends
- Loss of self-esteem
- Sense of hopelessness
- Feeling trapped or cut off from others

With this condition, it is common to feel sad, guilty, hopeless and restless. These feelings may continue for weeks or months. It can be helpful to identify what is causing the additional stress and take steps to get extra support. If new stressful events do not occur, it is likely that you will gradually start feeling better.

Home care

- If you have been given a prescription for medicine, take it as directed.
- It helps to talk about your feelings and thoughts with family or friends that understand and support you.

Follow-up care

Follow up with your healthcare provider, or therapist as advised. Let them know if this condition does not improve or gets worse.

When to seek medical advice

Call your healthcare provider right away if any of these occur:

- Worsening depression or anxiety
- Feeling out of control
- Thoughts of harming yourself or another
- Being unable to care for yourself

© 2000-2015 The StayWell Company, LLC. 780 Township Line Road, Yardley, PA 19067. All rights reserved. This information is not intended as a substitute for professional medical care. Always follow your healthcare professional's instructions.

**BACK EXERCISES, Lumbar**

Exercises To Strengthen Your Lower Back

Strong lower-back and abdominal muscles work together to support your spine. The exercises below will help strengthen the muscles of the lower back. It is important that you begin exercising slowly and increase levels gradually.

Always begin any exercise program with stretching. If you feel pain while doing any of these exercises, stop and talk to your doctor about a more specific exercise program that better suits your condition.

Low back stretch

The point of stretching is to make you more flexible and increase your range of motion. Stretch only as much as you are able. Stretch slowly. Do not push your stretch to the limit. If at any point you feel pain while stretching, this is your (temporary) limit.

- Lie on your back with your knees bent and both feet on the ground.
- Slowly raise your left knee to your chest as you flatten your lower back against the floor. Hold for 5 seconds.
- Relax and repeat the exercise with your right knee.
- Do 10 of these exercises for each leg.
- Repeat hugging both knees to your chest at the same time.

Building lower back strength

Start your exercise routine with 10 to 30 minutes a day, 1 to 3 times a day.

Initial exercises

Lying on your back:

1. Ankle pumps: Move your foot up and down, towards your head, and then away. Repeat 10 times with each foot.

2. Heel slides: Slowly bend your knee, drawing the heel of your foot towards you. Then slide your heel/foot from you, straightening your knee. Do not lift your foot off the floor (this is not a leg lift).

3. Abdominal contraction: Bend your knees and put your hands on your stomach. Tighten your stomach muscles. Hold for 5 seconds, then relax. Repeat 10 times.

4. Straight leg raise: Bend one leg at the knee and keep the other leg straight. Tighten your stomach muscles. Slowly lift your straight leg 6 to 12 inches off the floor and hold for up to 5 seconds. Repeat 10 times on each side.

Standing:

1. Wall squats: Stand with your back against the wall. Move your feet about 12 inches away from the wall. Tighten your stomach muscles,

and slowly bend your knees until they are at about a 45 degree angle. Do not go down too far. Hold about 5 seconds. Then slowly return to your starting position. Repeat 10 times.

2. Heel raises: Stand facing the wall. Slowly raise the heels of your feet up and down, while keeping your toes on the floor. If you have trouble balancing, you can touch the wall with your hands. Repeat 10 times.

More advanced exercises

When you feel comfortable enough, try these exercises.

1. Kneeling lumbar extension: Begin on your hands and knees. At the same time, raise and straighten your right arm and left leg until they are parallel to the ground. Hold for 2 seconds and come back slowly to a starting position. Repeat with left arm and right leg, alternating 10 times.

2. Prone lumbar extension: Lie face down, arms extended overhead, palms on the floor. At the same time, raise your right arm and left leg as high as comfortably possible. Hold for 10 seconds and slowly return to start. Repeat with left arm and right leg, alternating 10 times. Gradually build up to 20 times. (Advanced: Repeat this exercise raising both arms and both legs a few inches off the floor at the same time. Hold for 5 seconds and release.)

3. Pelvic tilt: Lie on the floor on your back with your knees bent at 90 degrees. Your feet should be flat on the floor. Inhale, exhale, then slowly contract your abdominal muscles bringing your navel toward your spine. Let your pelvis rock back until your lower back is flat on the floor. Hold for 10 seconds while breathing smoothly.

4. Abdominal crunch: Perform a pelvic tilt (above) flattening your lower back against the floor. Holding the tension in your abdominal muscles, take another breath and raise your shoulder blades off the ground (this is not a full sit-up). Keep your head in line with your body (don't bend your neck forward). Hold for 2 seconds, then slowly lower.

© 2000-2015 The StayWell Company, LLC. 780 Township Line Road, Yardley, PA 19067. All rights reserved. This information is not intended as a substitute for professional medical care. Always follow your healthcare professional's instructions.

## BACK CARE TIPS

Back Care Tips

Caring for your back

These are things you can do to prevent a recurrence of acute back pain and to reduce symptoms from chronic back pain:

• Maintain a healthy weight. If you are overweight, losing weight will help most types of back pain.

• Exercise is an important part of recovery from most types of back pain. The back is supported by the muscles behind and in front of the spine. This means both the back muscles and the abdominal muscles must be strengthened to provide better support for your spine.

• Swimming and brisk walking are good overall exercises to improve your fitness level.

• Practice safe lifting methods (below).

• Practice good posture when sitting, standing and walking. Avoid prolonged sitting. This puts more stress on the lower back than standing or walking.

• Wear quality shoes with sufficient arch support. Foot and ankle alignment can affect back symptoms. Women should avoid high heels.

• Therapeutic massage can help  relax the back muscles without stretching them.

• During the first 24 to 72 hours after an acute injury or flare-up of chronic back pain, apply an ice pack to the painful area for 20 minutes and then remove it for 20 minutes over a period of 60 to 90 minutes or several times a day. As a safety precaution, do not use a heating pad at bedtime. Sleeping on a heating pad can lead to skin burns or tissue damage.

• Ice and heat therapies can be alternated.

Medications

Talk to your doctor before using medications, especially if you have other medical problems or are taking other medicines.

• You may use acetaminophen or ibuprofen to control pain, unless other pain medicine was prescribed. If you have chronic conditions like diabetes, liver or kidney disease, stomach ulcers or gastrointestinal bleeding, or are taking blood thinners, talk with your doctor before taking any medications.

• Be careful if you are given prescription pain medicines, narcotics, or medication for muscle spasm. They can cause drowsiness, affect your coordination, reflexes and judgment. Do not drive or operate heavy machinery.

Lumbar stretch

Here is a simple stretching exercise that will help relax muscle spasm and keep your back more limber. If exercise makes your back pain worse, don't do it.

• Lie on your back with your knees bent and both feet on the ground.

- Slowly raise your left knee to your chest as you flatten your lower back against the floor. Hold for 5 seconds.
- Relax and repeat the exercise with your right knee.
- Do 10 of these exercises for each leg.

Safe lifting method

- Don't bend over at the waist to lift an object off the floor. Instead, bend your knees and hips in a squat.
- Keep your back and head upright
- Hold the object close to your body, directly in front of you.
- Straighten your legs to lift the object.
- Lower the object to the floor in the reverse fashion.
- If you must slide something across the floor, push it.

Posture tips

Sitting

Sit in chairs with straight backs or low-back support. rKeep your knees lower than your hip, with your feet flat on the floor.

When driving, sit up straight. Adjust the seat forward so you are not leaning toward the steering wheel. A small pillow or rolled towel behind your lower back may help if you are driving long distances.

Standing

When standing for long periods, shift most of your weight to one leg at a time. Alternate legs every few minutes.

Sleeping

The best way to sleep is on your side with your knees bent. Put a low pillow under your head to support your neck in a neutral spine position. Avoid thick pillows that bend your neck to one side. Put a pillow between your legs to further relax your lower back. If you sleep on your back, put pillows under your knees to support your legs in a slightly flexed position. Use a firm mattress. If your mattress sags, replace it, or use a 1/2-inch plywood board under the mattress to add support.

Follow-up care

Follow up with your health care provider or as directed by our staff.

If X-rays, a CT scan or an MRI scan were taken, they will be reviewed by a radiologist. You will be notified of any new findings that may affect your care.

Call 911

Seek emergency medical care if any of the following occur:

- Trouble breathing
- Confusion
- Very drowsy or trouble breathing
- Fainting or loss of consciousness
- Rapid or very slow heart rate
- Loss of bwel or bladder control

When to seek medical care

Call your health care provider if any of the following occur:

- Pain becomes worse or spreads to your arms or legs
- Weakness or numbness in one or both arms or legs
- Numbness in the groin area

© 2000-2015 The StayWell Company, LLC. 780 Township Line Road, Yardley, PA 19067. All rights reserved. This information is not intended as a substitute for professional medical care. Always follow your healthcare professional's instructions.

**Follow Up Care**
11/07/2018 15:59:27
**With:** Rebecca Runge
**Address:** Unknown
**When:** 1 to 2 weeks
only if needed

**Reason for Referral**

No data available for this section

**Health Concerns**

No data available for this section

AFTER VISIT SUMMARY

**Carrie S. Smith** MRN: 0005810874



📅 8/5/2018   📍 BKMH Trauma & Emergency Department 269-341-6386

## Instructions

Your personalized instructions can be found at the end of this document.



Your medications have changed

⊙ START taking:
LORazepam (ATIVAN)

**Review your updated medication list below.**



Pick up these medications from any pharmacy with your printed prescription
LORazepam



Call PROMED PHYSICIANS - FAMILY in 1 day (around 8/6/2018)
Contact: 8450 N 32ND ST
Richland MI 49083
269-552-2500

## What's Next

You currently have no upcoming appointments scheduled.

## You are allergic to the following

| Allergen | Reactions |
|---|---|
| **Levaquin (Levofloxacin)** | Not listed (specify in comments) |
| Severe fatigue "Paralysis like" and night terrors | |

## Today's Visit

You were seen by JEREMIAH J LEDESMA, MD

Reason for Visit
- insomina
- Anxiety

Diagnoses
- Anxiety state
- Insomnia, unspecified type

Your End of Visit Vitals

| Blood Pressure | 137/85 | Temperature (Oral) | 98.3 °F |
| Pulse | 106 | Respiration | 18 |
| Oxygen Saturation | 100% | | |

MyChart

View your After Visit Summary and more online at https://mychart.bronsonhealth.com/mychart/accesscheck.asp.

# Changes to Your Medication List

## START taking these medications



**LORazepam 0.5 MG tablet**
Commonly known as: ATIVAN

START

Take 1 tablet (0.5 mg total) by mouth every 6 (six) hours as needed for Anxiety

## Special Instructions

|  | Most Recent Value |
|---|---|
| Mental health | **See medical care immediately if you feel you will harm yourself or cause harm to others., Consider counseling. Talking with a counselor can help you understand the stresses in your life, repair damaged relationships with others, restore lost self-esteem, and work out ways to prevent a repeat episode of the illness., Resolve to avoid future problems by living a healthier lifestyle, eating better, getting regular physical exercise (such as walking for 30 minutes every day), and avoiding drugs and alcohol., If you keep a positive attitude, you will find others around you will be positive, too., Develop ways to prepare yourself for stressors that can't be avoided, such as talking with a trusted friend, or setting aside time to be alone after stressful times, or taking a break during the day for a brief rest or meditation., Try different relaxation methods until you find the one right for you. Some methods that have worked for others include: Walking, Listening to music, Dancing, Bicycling, Meditation, Yoga, or Artwork., Allow yourself to relax and set aside time for relaxation. Make a commitment to spend some time relaxing at the same time each day or week. Write it on your schedule or calendar if you need to be reminded.** |
| Safety and care | **Seek medical attention if your symptoms worsen.** |

## Last BP and BP Information

**Your blood pressure on discharge was**
BP Readings from Last 1 Encounters:
08/05/18         137/85
.

High Blood Pressure can cause different types of long term health problems and may lead to a stroke, heart attack, or kidney problems, along with a lot of other diseases. For that reason we want to make sure that you are aware of your current blood pressure, and that you may need follow up monitoring or treatment.

If your blood pressure is greater than 120/80 (either number higher), your Emergency Department Physician recommends that you schedule an office visit with your primary care provider within the next month for follow up of your Emergency Department visit and for blood pressure screening.

If your blood pressure is greater than 140/90 (either number higher), your Emergency Department Physician strongly recommends that you schedule an office visit with your primary care provider within the next week, and that you visit your primary care provider within the next 2 weeks to further evaluate your elevated blood pressure and start treatment if indicated.

Instructions

# Insomnia

Insomnia is a sleep disorder that makes it difficult to fall asleep or to stay asleep. Insomnia can cause tiredness (*fatigue*), low energy, difficulty concentrating, mood swings, and poor performance at work or school.

There are three different ways to classify insomnia:

- Difficulty falling asleep.
- Difficulty staying asleep.
- Waking up too early in the morning.

Any type of insomnia can be long-term (*chronic*) or short-term (*acute*). Both are common. Short-term insomnia usually lasts for three months or less. Chronic insomnia occurs at least three times a week for longer than three months.

## What are the causes?

Insomnia may be caused by another condition, situation, or substance, such as:

- Anxiety.
- Certain medicines.
- Gastroesophageal reflux disease (GERD) or other gastrointestinal conditions.
- Asthma or other breathing conditions.
- Restless legs syndrome, sleep apnea, or other sleep disorders.
- Chronic pain.
- Menopause. This may include hot flashes.
- Stroke.
- Abuse of alcohol, tobacco, or illegal drugs.
- Depression.
- Caffeine.
- Neurological disorders, such as Alzheimer disease.
- An overactive thyroid (*hyperthyroidism*).

The cause of insomnia may not be known.

## What increases the risk?

Risk factors for insomnia include:

- Gender. Women are more commonly affected than men.
- Age. Insomnia is more common as you get older.
- Stress. This may involve your professional or personal life.
- Income. Insomnia is more common in people with lower income.
- Lack of exercise.
- Irregular work schedule or night shifts.
- Traveling between different time zones.

## What are the signs or symptoms?

If you have insomnia, trouble falling asleep or trouble staying asleep is the main symptom. This may lead to other symptoms, such as:

- Feeling fatigued.
- Feeling nervous about going to sleep.

- Not feeling rested in the morning.
- Having trouble concentrating.
- Feeling irritable, anxious, or depressed.

## How is this treated?

Treatment for insomnia depends on the cause. If your insomnia is caused by an underlying condition, treatment will focus on addressing the condition. Treatment may also include:

- Medicines to help you sleep.
- Counseling or therapy.
- Lifestyle adjustments.

## Follow these instructions at home:

- Take medicines only as directed by your health care provider.
- Keep regular sleeping and waking hours. Avoid naps.
- Keep a sleep diary to help you and your health care provider figure out what could be causing your insomnia. Include:
  - When you sleep.
  - When you wake up during the night.
  - How well you sleep.
  - How rested you feel the next day.
  - Any side effects of medicines you are taking.
  - What you eat and drink.
- Make your bedroom a comfortable place where it is easy to fall asleep:
  - Put up shades or special blackout curtains to block light from outside.
  - Use a white noise machine to block noise.
  - Keep the temperature cool.
- Exercise regularly as directed by your health care provider. Avoid exercising right before bedtime.
- Use relaxation techniques to manage stress. Ask your health care provider to suggest some techniques that may work well for you. These may include:
  - Breathing exercises.
  - Routines to release muscle tension.
  - Visualizing peaceful scenes.
- Cut back on alcohol, caffeinated beverages, and cigarettes, especially close to bedtime. These can disrupt your sleep.
- **Do not** overeat or eat spicy foods right before bedtime. This can lead to digestive discomfort that can make it hard for you to sleep.
- Limit screen use before bedtime. This includes:
  - Watching TV.
  - Using your smartphone, tablet, and computer.
- Stick to a routine. This can help you fall asleep faster. Try to do a quiet activity, brush your teeth, and go to bed at the same time each night.
- Get out of bed if you are still awake after 15 minutes of trying to sleep. Keep the lights down, but try reading or doing a quiet activity. When you feel sleepy, go back to bed.
- Make sure that you drive carefully. Avoid driving if you feel very sleepy.
- Keep all follow-up appointments as directed by your health care provider. This is important.

## Contact a health care provider if:

- You are tired throughout the day or have trouble in your daily routine due to sleepiness.
- You continue to have sleep problems or your sleep problems get worse.

## Get help right away if:

- You have serious thoughts about hurting yourself or someone else.

This information is not intended to replace advice given to you by your health care provider. Make sure you discuss any questions you have with your health care provider.

Document Released: 12/15/2001 Document Revised: 05/19/2017 Document Reviewed: 09/18/2015
Elsevier Interactive Patient Education © 2018 Elsevier Inc.

## General Instructions

### Why is it important to me to do this?
These instructions are being given to you to help you with your care. We care about you. It is important that you follow up with a doctor or health care provider for your ongoing care. The exam and treatment you received in the Emergency Department was for an urgent problem and was not intended as complete care.

### If you were given medications in the Emergency Department:
- If side effects develop, such as a rash, trouble breathing, or a severe upset stomach, stop the medication and call your doctor or the Emergency Department.
- If a medicine makes you sleepy, do not drive or use machines. Do not drink alcohol while taking this drug.

### If you had tests done in Emergency Department:
- If you had testing today contact your primary care Doctor for results that may be pending. It is your responsibility to get your test results. If you have questions about your tests talk with your Doctor. If you were assigned a doctor or agency for follow-up, they will discuss the results with you at that visit. We will call you if any changes are needed in your treatment from today's emergency department visit. We must have a current phone number for you.

## If You Need a Physician or Have Been Asked to Follow Up with BMH HealthAnswers

### Need help finding a doctor for your own care?
Call Bronson Health Answers Monday through Friday between 8a and 5p at (269) 341-7723.
If you do not have a primary care office or provider, please call Bronson Health Answers. Bronson Health Answers will work with you to find an appropriate primary care provider near your home. Having ongoing primary care and follow-up for your medical needs is very important.

## Plain Language Summary

### Bronson Financial Assistance Policy Summary

## Plain Language Summary (continued)

Bronson's Financial Assistance Program is for patients who are in need of or already had emergency or medically necessary care and are not able to pay.

You may be approved if:
- You are a resident of Michigan, Ohio, Illinois or Indiana
- You have income at or below 350% of the Federal Poverty Level (FPL)
- You complete the Bronson Financial Assistance Application
- You provide the needed documents

Patients have 240 days from the first billing statement after discharge for those services to apply for financial assistance.

Discounts below were calculated from the Amounts Generally Billed (AGB), which is based on a calculation using amounts received as reimbursement from insurance companies for services. Patients that are eligible for financial assistance will not be responsible for more than AGB for their services. Eligibility is determined using a sliding scale based on current Federal Poverty Guidelines if family income is at or below 350 percent of the Federal Poverty Level (FPL) www.healthcare.gov/glossary/federal-poverty-level-FPL.

### Bronson Battle Creek Hospital, Bronson LakeView Hospital, Bronson Methodist Hospital and Bronson South Haven Hospital

| Family Income as a % of FPL | Discount |
|---|---|
| Up to 200% | 100% |
| Up to 250% | 90% |
| Up to 300% | 80% |
| Up to 350% | 70% |

Bronson's financial assistance staff will review applications. They will decide if patients are approved for full assistance, partial assistance or not eligible. The decision is made based on the application information, income, assets and some additional conditions that can be found in the full financial assistance policy. Patients will get a decision within 30 business days after a complete application is received. Applications that need more information before a decision is made will get a notice. The patient will have 10 business days from the provided date to return the information.

Revised: 11/28/2017

To be approved for financial assistance, patients must return all documents. If information is not correct, or another solution is found, Bronson may not be able to help.

Bronson gives care for emergency medical conditions even if the patient can't pay. This is the law based on the Emergency Medical Treatment and Labor Act (EMTALA).

Free copies of the policy, application and policy summary in English, Spanish, Arabic and Burmese can be found on the website www.bronsonhealth.com/financialassistance. Copies are also are located in the emergency, admitting and financial counseling departments. To get copies in the mail, call Bronson billing at (800) 699-6117.

To apply for financial assistance or find out more about Bronson's financial assistance program, contact Bronson billing or financial counselors:

**Bronson Billing Department:** (800) 699-6117
Hours are Monday through Friday 8:30 a.m. to 5:30 p.m.

**Bronson Financial Counseling:** Available on-site to assist with questions or the application process, as well as Medicaid applications.

Hours: Monday through Friday 8:30 a.m. to 4:30 p.m.

- **Bronson Battle Creek Hospital**
  (269) 245-8124
  Outpatient Center entrance in the registration department to the right, past the greeter's desk
- **Bronson LakeView Hospital**
  (269) 657-1532
  First floor, north entrance in the outpatient registration area
- **Bronson Methodist Hospital**
  (269) 341-6120
  Financial Services office on the first floor main campus behind main information desk
- **Bronson South Haven Hospital**
  (269) 639-2865
  Cashier's office is on the first floor across from the gift shop, enter through the door marked Main Entrance and turn left

# AFTER VISIT SUMMARY

**Carrie S. Smith** MRN: 0005810874



📅 8/20/2018 📍 BMH Trauma & Emergency Department 269-341-6386

## Instructions


Read the attached information
Back Pain Adult (English)


Ambulatory Referral to Neuroscience Center (Speedy Spine/Concussion/TIA)
Where: Bronson Neuroscience Center Neurosurgery Kalamazoo a Department of Bronson Methodist Hospital (269-341-7500)
Address: 601 John St, Suite M 124 KALAMAZOO MI 49007-5377
Multiple visits requested (expires 8/21/2019)


Schedule an appointment with PROMED PHYSICIANS - FAMILY as soon as possible for a visit
Contact: 8450 N 32ND ST
Richland MI 49083
269-552-2500


Schedule an appointment with Bronson Neuroscience Center Neurosurgery Kalamazoo a Department of Bronson Methodist Hospital as soon as possible for a visit
Why: Speedy spine clinic
Specialty: Neurosurgery
Contact: 601 John St, Suite M 124
Kalamazoo Michigan 49007-5377
269-341-7500

## What's Next

You currently have no upcoming appointments scheduled.

## You are allergic to the following

| Allergen | Reactions |
|---|---|
| **Levaquin (Levofloxacin)** | Not listed (specify in comments) |
| Severe fatigue "Paralysis like" and night terrors | |

## Changes to Your Medication List

You have not been prescribed any medications.

## Last BP and BP Information

**Your blood pressure on discharge was**

**BP Readings from Last 1 Encounters:**
08/20/18    118/72

## Today's Visit

You were seen by JEREMIAH J LEDESMA, MD and MEGAN D POTILECHIO, DO

Reason for Visit
• Back Pain
• Numbness

Diagnosis
Acute bilateral low back pain without sciatica

🔬 Lab Tests Completed
CBC and differential
Comprehensive metabolic panel
Urinalysis - reflex order to a culture if indicated

📷 Imaging Tests
MRI Spine Lumbar Without Contrast

🏥 Done Today
Bladder scan
Straight cath patient if no void in 30 minutes

💊 Medications Given
ALPRAZolam (XANAX) last given at 10:32 PM

### Your End of Visit Vitals

| Blood Pressure | Temperature (Oral) |
|---|---|
| **118/72** | **98.3** °F |
| Pulse | Respiration |
| **102** | **17** |
| Oxygen Saturation | |
| **99%** | |

## MyChart

View your After Visit Summary and more online at https:// mychart.bronsonhealth.com/mychart/ accesscheck.asp.



Last BP and BP Information (continued)

High Blood Pressure can cause different types of long term health problems and may lead to a stroke, heart attack, or kidney problems, along with a lot of other diseases. For that reason we want to make sure that you are aware of your current blood pressure, and that you may need follow up monitoring or treatment.

If your blood pressure is greater than 120/80 (either number higher), your Emergency Department Physician recommends that you schedule an office visit with your primary care provider within the next month for follow up of your Emergency Department visit and for blood pressure screening.

If your blood pressure is greater than 140/90 (either number higher), your Emergency Department Physician strongly recommends that you schedule an office visit with your primary care provider within the next week, and that you visit your primary care provider within the next 2 weeks to further evaluate your elevated blood pressure and start treatment if indicated.

## Document info

| | |
|---|---|
| Result type: | Borgess Ambulatory Patient Education |
| Result date: | Aug 14, 2018, 11:52 p.m. |
| Result status: | altered |
| Performed by: | Analise Betker |
| Verified by: | Analise Betker |
| Modified by: | Analise Betker |

# Borgess Ambulatory Patient Education

| Patient: | **CARRIE SMITH** | DOB: | **Jan 10, 1987** |
|---|---|---|---|

**Borgess Ambulatory Patient Education**

**Name:** SMITH, CARRIE S
**Date of Birth:** 01/10/1987

**Medical Record Number:** 0006040051
**Visit Date:** 08/10/18 10:28:00

### Patient Education Materials Given

Ambulatory

Grief Reaction

Grief is the feeling that we all have when we lose someone or something that has been important in our life. Grief is an unavoidable and normal reaction to this loss, and can last from months to years. The amount of time depends on different factors. These include how close the person was to you, and how much support you have through the grief process. Symptoms include both physical and emotional symptoms.

**Physical reactions:**

- Loss of appetite or overeating

- Changes in weight

- Trouble getting to sleep or staying asleep

- Hair loss

- Upset stomach, indigestion, heart burn, abdominal pain, cramping, diarrhea

- Sense of trouble breathing

- Trembling, shakiness

**Emotional reactions:**

- Sadness

- Anxiety

- Feeling depressed or helpless

- Difficulty concentrating

- Detachment or withdrawal from those around you

- Loss of interest in your normal life and work

Home care

- Allow yourself to feel the pain of your loss. For some, this can be a key part of healing grief. Talk about your pain with others who understand. Share good memories that involve the person, pet, or possession you lost.

- Take time for yourself. Make it a point to do things that you enjoy (gardening, walking in nature, going to a movie, etc.).

- Take care of your physical body. Eat a balanced diet (low in saturated fat and high in fruits and vegetables) and establish an exercise plan at least 3 times a week for 30 minutes. Even mild-moderate exercise (like brisk walking) can make you feel better. Get plenty of sleep.

- Avoid the use of alcohol and drugs to cover your emotional pain. This only slows down the emotional healing process.

- Do not isolate yourself from others. Have daily contact with family or friends. Talk about your loss to those closest to you.

- For additional support, meet with your pastor/priest/rabbi, a counselor or therapist, or your own doctor.

- Consider joining a grief support group. Ask your doctor or our staff for information on how to find one in your area.

- If you have been prescribed a medicine to help with your symptoms, take it only as directed. Do not use it with alcohol.

**Follow-up care**

Follow up with your healthcare provider, or as advised.

**Call 911**

Call 911 if any of these occur:

- Trouble breathing

- Very confused

- Very drowsy or trouble awakening

- Fainting or loss of consciousness

- Rapid heart rate

- Seizure

- New chest pain that becomes more severe, lasts longer, or spreads into your shoulder, arm, neck, jaw or back

**When to seek medical advice**

Call your healthcare provider right away if any of these occur:

- Worsening symptoms

- Unable to eat or sleep for three days in a row

- Feeling extreme depression, fear, anxiety, or anger toward yourself or others

- Feeling out of control

- Feeling that you may try to harm yourself

- family or friends express concern over your behavior and ask you to get help

© 2000-2015 The StayWell Company, LLC. 780 Township Line Road, Yardley, PA 19067. All rights reserved. This information is not intended as a substitute for professional medical care. Always follow your healthcare professional's instructions.

## Document info

| | |
|---|---|
| Result type: | Borgess Ambulatory Patient Education |
| Result date: | Aug 17, 2018, 05:49 p.m. |
| Result status: | authenticated |
| Performed by: | Rebecca Runge |
| Verified by: | Rebecca Runge |
| Modified by: | Rebecca Runge |

# Borgess Ambulatory Patient Education

| Patient: | **CARRIE SMITH** | DOB: | **Jan 10, 1987** |
|---|---|---|---|

**Borgess Ambulatory Patient Education**

**Name:** SMITH, CARRIE S
**Date of Birth:** 01/10/1987

**Medical Record Number:** 0006040051
**Visit Date:** 08/17/18 10:57:00

## Patient Education Materials Given

Orthopaedics

Anatomy of the Sacroiliac Joint

There are 2 sacroiliac (SI) joints. They are in the very low back (buttocks area). There is 1 joint on either side of the pelvis. The SI joints link the **sacrum** to the **ilium**. The sacrum is a triangular bone at the bottom of the spine. The ilium is part of the pelvis. The SI joints are held in place by ligaments. Ligaments are strong tissue that link bone to bone. The joints do not move very much, but they do help with mobility. They work with your spine and femurs to help you bend and walk. They also help bear the weight of your upper body.



Front view of pelvis (hip bone)



Back view of hip (pelvis)

© 2000-2015 The StayWell Company, LLC. 780 Township Line Road, Yardley, PA 19067. All rights reserved. This information is not intended as a substitute for professional medical care. Always follow your healthcare professional's instructions.

**Document info**

| | |
|---|---|
| Result type: | Borgess Ambulatory Patient Education |
| Result date: | Nov 07, 2018, 05:09 p.m. |
| Result status: | altered |
| Performed by: | Gregory Mindock |
| Verified by: | Gregory Mindock |
| Modified by: | Gregory Mindock |

# Borgess Ambulatory Patient Education

| Patient: | CARRIE SMITH | DOB: | Jan 10, 1987 |
|---|---|---|---|

**Borgess Ambulatory Patient Education**

**Name:** SMITH, CARRIE S          **Medical Record Number:** 0006040051
**Date of Birth:** 01/10/1987          **Visit Date:** 11/07/18 15:59:00

## Patient Education Materials Given

Ambulatory

Adjustment Disorder

Life changes — work, family, parents, children — each can cause a great deal of stress in life. An adjustment disorder means you have trouble dealing with this change and stress. This problem can have serious results. You may feel helpless, depressed, make bad decisions, or even feel like you want to hurt yourself.

Adjustment disorder can cause anxiety or depression. It is triggered by daily stresses such as:

- Death of a loved one

- Divorce

- Marriage

- General life changes such as changing or leaving a job

- Moving

- Illness or other health issue for you or a family member

- Sex

- Money

Symptoms may include:

- Sadness, crying

- Anxiety

- Insomnia

- Poor concentration

- Trouble doing simple things

- New problems at work or with family or friends

- Loss of self-esteem

- Sense of hopelessness

- Feeling trapped or cut off from others

With this condition, it is common to feel sad, guilty, hopeless and restless. These feelings may continue for weeks or months. It can be helpful to identify what is causing the additional stress and take steps to get extra support. If new stressful events do not occur, it is likely that you will gradually start feeling better.

**Home care**

- If you have been given a prescription for medicine, take it as directed.

- It helps to talk about your feelings and thoughts with family or friends that understand and support you.

### Follow-up care

Follow up with your healthcare provider, or therapist as advised. Let them know if this condition does not improve or gets worse.

### When to seek medical advice

Call your healthcare provider right away if any of these occur:

- Worsening depression or anxiety

- Feeling out of control

- Thoughts of harming yourself or another

- Being unable to care for yourself

© 2000-2015 The StayWell Company, LLC. 780 Township Line Road, Yardley, PA 19067. All rights reserved. This information is not intended as a substitute for professional medical care. Always follow your healthcare professional's instructions.

## Exercises To Strengthen Your Lower Back

Strong lower-back and abdominal muscles work together to support your spine. The exercises below will help strengthen the muscles of the lower back. It is important that you begin exercising slowly and increase levels gradually.

Always begin any exercise program with stretching. If you feel pain while doing any of these exercises, stop and talk to your doctor about a more specific exercise program that better suits your condition.

### Low back stretch

The point of stretching is to make you more flexible and increase your range of motion. Stretch only as much as you are able. Stretch slowly. Do not push your stretch to the limit. If at any point you feel pain while stretching, this is your (temporary) limit.

- Lie on your back with your knees bent and both feet on the ground.

- Slowly raise your left knee to your chest as you flatten your lower back against the floor. Hold for 5 seconds.

- Relax and repeat the exercise with your right knee.

- Do 10 of these exercises for each leg.

- Repeat hugging both knees to your chest at the same time.

## Building lower back strength

Start your exercise routine with 10 to 30 minutes a day, 1 to 3 times a day.

### Initial exercises

Lying on your back:

1. Ankle pumps: Move your foot up and down, towards your head, and then away. Repeat 10 times with each foot.

2. Heel slides: Slowly bend your knee, drawing the heel of your foot towards you. Then slide your heel/foot from you, straightening your knee. Do not lift your foot off the floor (this is not a leg lift).

3. Abdominal contraction: Bend your knees and put your hands on your stomach. Tighten your stomach muscles. Hold for 5 seconds, then relax. Repeat 10 times.

4. Straight leg raise: Bend one leg at the knee and keep the other leg straight. Tighten your stomach muscles. Slowly lift your straight leg 6 to 12 inches off the floor and hold for up to 5 seconds. Repeat 10 times on each side.

Standing:

1. Wall squats: Stand with your back against the wall. Move your feet about 12 inches away from the wall. Tighten your stomach muscles, and slowly bend your knees until they are at about a 45 degree angle. Do not go down too far. Hold about 5 seconds. Then slowly return to your starting position. Repeat 10 times.

2. Heel raises: Stand facing the wall. Slowly raise the heels of your feet up and down, while keeping your toes on the floor. If you have trouble balancing, you can touch the wall with your hands. Repeat 10 times.

## More advanced exercises

When you feel comfortable enough, try these exercises.

1. Kneeling lumbar extension: Begin on your hands and knees. At the same time, raise and straighten your right arm and left leg until they are parallel to the ground. Hold for 2 seconds and come back slowly to a starting position. Repeat with left arm and right leg, alternating 10 times.

2. Prone lumbar extension: Lie face down, arms extended overhead, palms on the floor. At the same time, raise your right arm and left leg as high as comfortably possible. Hold for 10 seconds and slowly return to start. Repeat with left arm and right leg, alternating 10 times. Gradually build up to 20 times. (Advanced: Repeat this exercise raising both arms and both legs a few inches off the floor at the same time. Hold for 5 seconds and release.)

3. Pelvic tilt: Lie on the floor on your back with your knees bent at 90 degrees. Your feet should be flat on the floor. Inhale, exhale, then slowly contract your abdominal muscles bringing your navel toward your spine. Let your pelvis rock back until your lower back is flat on the floor. Hold for 10 seconds while breathing smoothly.

4. Abdominal crunch: Perform a pelvic tilt (above) flattening your lower back against the floor. Holding the tension in your abdominal muscles, take another breath and raise your shoulder blades off the ground (this is not a full sit-up). Keep your head in line with your body (don't bend your neck forward). Hold for 2 seconds, then slowly lower.

© 2000-2015 The StayWell Company, LLC. 780 Township Line Road, Yardley, PA 19067. All rights reserved. This information is not intended as a substitute for professional medical care. Always follow your healthcare professional's instructions.

Back Care Tips



## Caring for your back

These are things you can do to prevent a recurrence of acute back pain and to reduce symptoms from chronic back pain:

- Maintain a healthy weight. If you are overweight, losing weight will help most types of back pain.

- Exercise is an important part of recovery from most types of back pain. The back is supported by the muscles behind and in front of the spine. This means both the back muscles and the abdominal muscles must be strengthened to provide better support for your spine.

- Swimming and brisk walking are good overall exercises to improve your fitness level.

- Practice safe lifting methods (below).

- Practice good posture when sitting, standing and walking. Avoid prolonged sitting. This puts more stress on the lower back than standing or walking.

- Wear quality shoes with sufficient arch support. Foot and ankle alignment can affect back symptoms. Women should avoid high heels.

- Therapeutic massage can help relax the back muscles without stretching them.

- During the first 24 to 72 hours after an acute injury or flare-up of chronic back pain, apply an ice pack to the painful area for 20 minutes and then remove it for 20 minutes over a period of 60 to 90 minutes or several times a day. As a safety precaution, do not use a heating pad at bedtime. Sleeping on a heating pad can lead to skin burns or tissue damage.

- Ice and heat therapies can be alternated.

**Medications**

Talk to your doctor before using medications, especially if you have other medical problems or are taking other medicines.

- You may use acetaminophen or ibuprofen to control pain, unless other pain medicine was prescribed. If you have chronic conditions like diabetes, liver or kidney disease, stomach ulcers or gastrointestinal bleeding, or are taking blood thinners, talk with your doctor before taking any meidcations.

- Be careful if you are given prescription pain medicines, narcotics, or medication for muscle spasm. They can cause drowsiness, affect your coordination, reflexes and judgment. Do not drive or operate heavy machinery.

**Lumbar stretch**

Here is a simple stretching exercise that will help relax muscle spasm and keep your back more limber. If exercise makes your back pain worse, don't do it.

- Lie on your back with your knees bent and both feet on the ground.

- Slowly raise your left knee to your chest as you flatten your lower back against the floor. Hold for 5 seconds.

- Relax and repeat the exercise with your right knee.

- Do 10 of these exercises for each leg.

**Safe lifting method**

- Don't bend over at the waist to lift an object off the floor.  Instead, bend your knees and hips in a squat.

- Keep your back and head upright

- Hold the object close to your body, directly in front of you.

- Straighten your legs to lift the object.

- Lower the object to the floor in the reverse fashion.

- If you must slide something across the floor, push it.

**Posture tips**

Sitting

Sit in chairs with straight backs or low-back support. rKeep your k nees lower than your hip, with your feet flat on the floor.

When driving, sit up straight. Adjust the seat forward so you are not leaning toward the steering wheel.  A small pillow or rolled towel behind your lower back may help if you are driving long distances.

Standing

When standing for long periods, shift most of your weight to one leg at a time. Alternate legs every few minutes.

Sleeping

The best way to sleep is on your side with your knees bent. Put a low pillow under your head to support your neck in a neutral spine position. Avoid thick pillows that bend your neck to one side. Put a pillow between your legs to further relax your lower back. If you sleep on your back, put pillows under your knees to support your legs in a slightly flexed position. Use a firm mattress. If your mattress sags, replace it, or use a 1/2-inch plywood board under the mattress to add support.

**Follow-up care**

Follow up with your health care provider or as directed by our staff.

If X-rays, a CT scan or an MRI scan were taken, they will be reviewed by a radiologist. You will be notified of any new findings that may affect your care.

**Call 911**

Seek emergency medical care if any of the following occur:

- Trouble breathing

- Confusion

- Very drowsy or trouble breathing

- Fainting or loss of consciousness

- Rapid or very slow heart rate

- Loss of bwel or bladder control

**When to seek medical care**

Call your health care provider if any of the following occur:

- Pain becomes worse or spreads to your arms or legs

- Weakness or numbness in one or both arms or legs

- Numbness in the groin area

© 2000-2015 The StayWell Company, LLC. 780 Township Line Road, Yardley, PA 19067. All rights reserved. This information is not intended as a substitute for professional medical care. Always follow your healthcare professional's instructions.

**Document info**

| | |
|---|---|
| Result type: | Borgess Ambulatory Patient Education |
| Result date: | Nov 11, 2018, 10:18 p.m. |
| Result status: | altered |
| Performed by: | Jennifer Frink |
| Verified by: | Jennifer Frink |
| Modified by: | Jennifer Frink |

# Borgess Ambulatory Patient Education

| Patient: | **CARRIE SMITH** | DOB: | **Jan 10, 1987** |
|---|---|---|---|

**Borgess Ambulatory Patient Education**

**Name:** SMITH, CARRIE S
**Date of Birth:** 01/10/1987

**Medical Record Number:** 0006040051
**Visit Date:** 11/09/18 13:34:00

## Patient Education Materials Given

### Ambulatory

Unknown Causes of Abdominal Pain (Female)



The exact cause of your abdominal (stomach) pain is not clear. This does not mean that this is something to worry about. Everyone likes to know the exact cause of the problem, but sometimes with abdominal pain, there is no clear-cut cause, and this could be a good thing. The good news is that your symptoms can be treated, and you will feel better.

Your condition does not seem serious now; however, sometimes the signs of a serious problem may take more time to appear. For this reason, it is important for you to watch for any new symptoms, problems, or worsening of your condition.

Over the next few days, the abdominal pain may come and go, or be continuous. Other common symptoms can include nausea and vomiting. Sometimes it can be difficult to tell if you feel nauseous, you may just feel bad and not associate that feeling with nausea. Constipation, diarrhea, and a fever may go along with the pain.

The pain may continue even if treated correctly over the following days. Depending on how things go, sometimes the cause can become clear and may require further or different treatment. Additional evaluations, medications, or tests may also be needed.

## Home care

Your healthcare provider may prescribe medicine for pain, symptoms, or an infection. Follow the healthcare provider's instructions for taking these medicines.

## General care

- Rest as much as you can until your next exam. No strenuous activities.

- Try to find positions that ease discomfort. A small pillow placed on the abdomen may help relieve pain.

- Something warm on your abdomen (such as a heating pad) may help, but be careful not to burn yourself.

**Diet**

- Do not force yourself to eat, especially if having cramps, vomiting, or diarrhea.

- Water is important so you do not get dehydrated. Soup may also be good. Sports drinks may also help, especially if they are not too acidic. Make sure you don't drink sugary drinks as this can make things worse. Take liquids in small amounts. Do not guzzle them.

- Caffeine sometimes makes the pain and cramping worse.

- Avoid dairy products if you have vomiting or diarrhea.

- Don't eat large amounts at a time. Wait a few minutes between bites.

- Eat a diet low in fiber (called a low-residue diet). Foods allowed include refined breads, white rice, fruit and vegetable juices without pulp, tender meats. These foods will pass more easily through the intestine.

- Avoid whole-grain foods, whole fruits and vegetables, meats, seeds and nuts, fried or fatty foods, dairy, alcohol and spicy foods until your symptoms go away.

**Follow-up care**

Follow up with your healthcare provider, or as advised, if your pain does not begin to improve in the next 24 hours.

**Call 911**

Call 911 if any of these occur:

- Trouble breathing

- Confusion

- Fainting or loss of consciousness

- Rapid heart rate

- Seizure

**When to seek medical advice**

Call your healthcare provider right away if any of these occur:

- Pain gets worse or moves to the right lower abdomen

- New or worsening vomiting or diarrhea

- Swelling of the abdomen

- Unable to pass stool for more than 3 days

- Fever of 100.4°F (38°C) or higher, or as directed by your healthcare provider.

- Blood in vomit or bowel movements (dark red or black color)

- Jaundice (yellow color of eyes and skin)

- Weakness, dizziness

- Chest, arm, back, neck or jaw pain

- Unexpected vaginal bleeding or missed period

- Can't keep down liquids or water and are getting dehydrated

© 2000-2015 The StayWell Company, LLC. 780 Township Line Road, Yardley, PA 19067. All rights reserved. This information is not intended as a substitute for professional medical care. Always follow your healthcare professional's instructions.

**Document info**

| | |
|---|---|
| Result type: | Borgess Ambulatory Patient Education |
| Result date: | Nov 16, 2018, 12:23 a.m. |
| Result status: | altered |
| Performed by: | Rebecca Runge |
| Verified by: | Rebecca Runge |
| Modified by: | Rebecca Runge |

# Borgess Ambulatory Patient Education

| Patient: | CARRIE SMITH | DOB: | Jan 10, 1987 |
|---|---|---|---|

**Borgess Ambulatory Patient Education**

**Name:** SMITH, CARRIE S       **Medical Record Number:** 0006040051
**Date of Birth:** 01/10/1987       **Visit Date:** 11/14/18 16:03:00

## Patient Education Materials Given

Ambulatory

Back Care Tips



## Caring for your back

These are things you can do to prevent a recurrence of acute back pain and to reduce symptoms from chronic back pain:

- Maintain a healthy weight. If you are overweight, losing weight will help most types of back pain.

- Exercise is an important part of recovery from most types of back pain. The back is supported by the muscles behind and in front of the spine. This means both the back muscles and the abdominal muscles must be strengthened to provide better support for your spine.

- Swimming and brisk walking are good overall exercises to improve your fitness level.

- Practice safe lifting methods (below).

- Practice good posture when sitting, standing and walking. Avoid prolonged sitting. This puts more stress on the lower back than standing or walking.

- Wear quality shoes with sufficient arch support. Foot and ankle alignment can affect back symptoms. Women should avoid high heels.

- Therapeutic massage can help relax the back muscles without stretching them.

- During the first 24 to 72 hours after an acute injury or flare-up of chronic back pain, apply an ice pack to the painful area for 20 minutes and then remove it for 20 minutes over a period of 60 to 90 minutes or several times a day. As a safety precaution, do not use a heating pad at bedtime. Sleeping on a heating pad can lead to skin burns or tissue damage.

- Ice and heat therapies can be alternated.

## Medications

Talk to your doctor before using medications, especially if you have other medical problems or are taking other medicines.

- You may use acetaminophen or ibuprofen to control pain, unless other pain medicine was prescribed. If you have chronic conditions like diabetes, liver or kidney disease, stomach ulcers or gastrointestinal bleeding, or are taking blood thinners, talk with your doctor before taking any meidcations.

- Be careful if you are given prescription pain medicines, narcotics, or medication for muscle spasm. They can cause drowsiness, affect your coordination, reflexes and judgment. Do not drive or operate heavy machinery.

## Lumbar stretch

Here is a simple stretching exercise that will help relax muscle spasm and keep your back more limber. If exercise makes your back pain worse, don't do it.

- Lie on your back with your knees bent and both feet on the ground.

- Slowly raise your left knee to your chest as you flatten your lower back against the floor. Hold for 5 seconds.

- Relax and repeat the exercise with your right knee.

- Do 10 of these exercises for each leg.

**Safe lifting method**

- Don't bend over at the waist to lift an object off the floor.  Instead, bend your knees and hips in a squat.

- Keep your back and head upright

- Hold the object close to your body, directly in front of you.

- Straighten your legs to lift the object.

- Lower the object to the floor in the reverse fashion.

- If you must slide something across the floor, push it.

**Posture tips**

Sitting

Sit in chairs with straight backs or low-back support. rKeep your k nees lower than your hip, with your feet flat on the floor.

When driving, sit up straight. Adjust the seat forward so you are not leaning toward the steering wheel.  A small pillow or rolled towel behind your lower back may help if you are driving long distances.

Standing

When standing for long periods, shift most of your weight to one leg at a time. Alternate legs every few minutes.

Sleeping

The best way to sleep is on your side with your knees bent. Put a low pillow under your head to support your neck in a neutral spine position. Avoid thick pillows that bend your neck to one side. Put a pillow between your legs to further relax your lower back. If you sleep on your back, put pillows under your knees to support your legs in a slightly flexed position. Use a firm mattress. If your mattress sags, replace it, or use a 1/2-inch plywood board under the mattress to add support.

**Follow-up care**

Follow up with your health care provider or as directed by our staff.

If X-rays, a CT scan or an MRI scan were taken, they will be reviewed by a radiologist. You will be notified of any new findings that may affect your care.

## Call 911

Seek emergency medical care if any of the following occur:

- Trouble breathing

- Confusion

- Very drowsy or trouble breathing

- Fainting or loss of consciousness

- Rapid or very slow heart rate

- Loss of  bwel or bladder control

## When to seek medical care

Call your health care provider if any of the following occur:

- Pain becomes worse or spreads to your arms or legs

- Weakness or numbness in one or both arms or legs

- Numbness in the groin area

© 2000-2015 The StayWell Company, LLC. 780 Township Line Road, Yardley, PA 19067. All rights reserved. This information is not intended as a substitute for professional medical care. Always follow your healthcare professional's instructions.

SMITH, CARRIE S   Sex: F   DOB: **01/10/1987**

**Continuity of Care Document**
Summarization of Episode Note | 06/5/2018 to 11/12/2018
Source: Ascension Borgess Hospital Outpatient
Created: 01/21/2019

## Demographics

Contact Information:
10464 WILDWOOD DRRICHLAND, MI 49083-8519, US
Tel: (000)000-0000
Tel: (269)491-8524
Tel: (269)491-8524
Mail: carriesuzsmith@gmail.com
Marital Status: Life Partner
Religion: Christian
Race: White
**Previous Name(s):** --
Ethnic Group: Not Hispanic or Latino
Language: eng
IDs: 761427

## Care Team

| Type | Name | Represented Organization | Address | Phone |
|---|---|---|---|---|
| primary care physician | No, Doctor | -- | -- | -- |
| primary care physician | No, Doctor | -- | -- | -- |
| primary care physician | Mindock PA-C, Gregory P | -- | Work: 8450 N. 32nd StreetRichland, MI 49083- , US | Work Tel: (269)324-8600 |

**Relationships**
No Data to Display

## Document Details

**Source Contact Info**
Ascension Borgess Hospital1521 Gull RoadKalamazoo, MI 49048- , US
Tel: (269)226-5917
**Author Contact Info**
--
**Recipient Contact Info**
--

**Healthcare Professionals**
No Data to Display

**IDs & Code Type Data**
Document Type ID: 2.16.840.1.113883.1.3 : POCD_HD000040
Document Template ID: 2.16.840.1.113883.10.20.22.1.1 : 2015-08-01, 2.16.840.1.113883.10.20.22.1.2 : 2015-08-01
Document ID: 2.16.840.1.113883.3.891.117.999362 : 34414604
Document Type Code: 2.16.840.1.113883.6.1, 34133-9
Document Language Code: en-US

Document Set ID: --
Document Version Number: --

## Primary Encounter

### Encounter Information

Registration Date: 06/5/2018
Discharge Date: 11/12/2018
Visit ID: --

### Location Information

Main Hospital Campus
Work:1521 Gull RoadKalamazoo, MI 49048- , US

### Providers

| Type | Name | Address | Phone |
|---|---|---|---|
| Attending | Betker PAC, Analise J | Work:7901 Angling Road, Ste 201BPortage, MI 49024- , US | Work Tel: (269)324-8600 |

## Encounter

**FIN 7614270064 Date(s): 6/5/18 - 11/12/18**

Ascension Borgess Hospital Outpatient 1521 Gull Road Kalamazoo, MI 49048- USA (269) 226-5917

**Encounter Diagnosis**

Low back pain (Final) - 6/12/18

Discharge Disposition: Home/ Self Care

Attending Physician: Betker, Analise J, PAC

## Problem List

Low back pain (This Visit)

ADD (attention deficit disorder) | Adjustment reaction with anxiety and depression | Chronic SI joint pain | Donor of kidney for transplant | Ehlers-Danlos disease | Esophageal Reflux | PCOS (polycystic ovarian syndrome) | PFD (pelvic floor dysfunction) | Refused diphtheria-pertussis-tetanus (DPT) vaccination

## Allergies, Adverse Reactions, Alerts

Levaquin (heavy arms)

## Medications

**amphetamine-dextroamphetamine (Adderall XR 30 mg oral capsule, extended release)**

1 cap(s) By Mouth 2 times a day for 30 Days. Refills: 0.

Ordering provider: Runge, Rebecca A, DO

**benzoyl peroxide-clindamycin topical (benzoyl peroxide-clindamycin 5%-1% topical gel)**

1 app On Skin 2 times a day. Refills: 11.

Ordering provider: Helgerson, Kurt P, MD

**dapsone topical (dapsone 5% topical gel)**

1 app On Skin 2 times a day. Refills: 11.

Ordering provider: Helgerson, Kurt P, MD

**drospirenone-ethinyl estradiol (Yaz 3 mg-0.02 mg oral tablet)**

1 tab(s) By Mouth once a day for 84 Days. Refills: 4.

Ordering provider: Runge, Rebecca A, DO

**mupirocin topical (Bactroban 2% topical ointment)**

1 app On Skin 3 times a day. apply a thin film. Refills: 1.

Ordering provider: Helgerson, Kurt P, MD

**omega-3 polyunsaturated fatty acids (Fish Oil oral capsule)**

**tretinoin topical (tretinoin 0.05% topical cream)**

1 app On Skin once a day (at bedtime) for 60 Days. Refills: 5.

Ordering provider: Helgerson, Kurt P, MD

## Immunizations

No data available for this section

## Medications Administered During Your Visit

No data available for this section

## Assessment and Plan

### Future Scheduled Tests
Laboratory:

Renal Function Panel 2/15/19

Radiology:

MRI Brain w/ + w/o Contrast 6/28/18

VUS AAA Screening 8/10/18

US Pelvis Complete Transabd/Vag w/o Dopp 11/9/18

## Functional Status

No data available for this section

## Mental Status

No data available for this section

## Encounter Procedures

No data available for this section

## Results

No data available for this section

## Vital Signs

No data available for this section

## Social History

| Social History Type | Response |
|---|---|
| Smoking Status | Never (less than 100 in lifetime) |
| | entered on: 11/7/18 |
| Birth Sex | |

## Goals

No data available for this section

## Discharge Instructions

No data available for this section

## Reason for Referral

No data available for this section

## Health Concerns

No data available for this section

**SMITH, CARRIE S**  Sex: F  DOB: **01/10/1987**

**Continuity of Care Document**
Summarization of Episode Note | 08/10/2018 to 08/12/2018
Source: Ascension Borgess Hospital ProMed Family Practice Richland
Created: 01/21/2019

## Demographics

Contact Information:
10464 WILDWOOD DR RICHLAND, MI 49083-8519, US
Tel: (000)000-0000
Tel: (269)491-8524
Tel: (269)491-8524
Mail: carriesuzsmith@gmail.com
Marital Status: Life Partner
Religion: Christian
Race: White
**Previous Name(s):** --
Ethnic Group: Not Hispanic or Latino
Language: eng
IDs: 761427

## Care Team

| Type | Name | Represented Organization | Address | Phone |
|---|---|---|---|---|
| primary care physician | No, Doctor | -- | -- | -- |
| primary care physician | No, Doctor | -- | -- | -- |
| primary care physician | Mindock PA-C, Gregory P | -- | Work: 8450 N. 32nd Street Richland, MI 49083- , US | Work Tel: (269)324-8600 |

## Relationships
No Data to Display

## Document Details

**Source Contact Info**
8450 N. 32nd Street Richland, MI 49083- , US
Tel: (269)552-2500
**Author Contact Info**
--
**Recipient Contact Info**
--

**Healthcare Professionals**
No Data to Display

**IDs & Code Type Data**
Document Type ID: 2.16.840.1.113883.1.3 : POCD_HD000040
Document Template ID: 2.16.840.1.113883.10.20.22.1.1 : 2015-08-01, 2.16.840.1.113883.10.20.22.1.2 : 2015-08-01
Document ID: 2.16.840.1.113883.3.891.8.999362 : 34414587
Document Type Code: 2.16.840.1.113883.6.1, 34133-9
Document Language Code: en-US

Document Set ID: --
Document Version Number: --

## Primary Encounter

### Encounter Information
Registration Date: 08/10/2018
Discharge Date: 08/12/2018
Visit ID: --

### Location Information
Ascension Borgess Hospital ProMed Family Practice Richland
Work: 8450 N. 32nd StreetRichland, MI 49083- , US

## Providers

| Type | Name | Address | Phone |
|---|---|---|---|
| Attending | Betker PAC, Analise J | Work: 7901 Angling Road, Ste 201BPortage, MI 49024- , US | Work Tel: (269)324-8600 |

## Encounter

8/10/18 - 8/12/18

Ascension Borgess Hospital ProMed Family Practice Richland 8450 N. 32nd Street Richland, MI 49083- USA (269) 552-2500

**Encounter Diagnosis**

Annual physical exam (Discharge Diagnosis) - 8/10/18

Situational anxiety (Discharge Diagnosis) - 8/10/18

Grief reaction (Discharge Diagnosis) - 8/10/18

Family history of MI (myocardial infarction) (Discharge Diagnosis) - 8/12/18

Family history of abdominal aortic aneurysm (AAA) (Discharge Diagnosis) - 8/12/18

Attending Physician: Betker, Analise J, PAC

## Problem List

Annual physical exam | Family history of abdominal aortic aneurysm (AAA) | Family history of MI (myocardial infarction) | Grief reaction | Situational anxiety (This Visit)

ADD (attention deficit disorder) | Adjustment reaction with anxiety and depression | Chronic SI joint pain | Donor of kidney for transplant | Ehlers-Danlos disease | Esophageal Reflux | PCOS (polycystic ovarian syndrome) | PFD (pelvic floor dysfunction) | Refused diphtheria-pertussis-tetanus (DPT) vaccination

## Allergies, Adverse Reactions, Alerts

Levaquin (heavy arms)

## Medications

**amphetamine-dextroamphetamine (Adderall XR 30 mg oral capsule, extended release)**

1 cap(s) By Mouth 2 times a day for 30 Days. Refills: 0.

Ordering provider: Runge, Rebecca A, DO

**benzoyl peroxide-clindamycin topical (benzoyl peroxide-clindamycin 5%-1% topical gel)**

1 app On Skin 2 times a day. Refills: 11.

Ordering provider: Helgerson, Kurt P, MD

**dapsone topical (dapsone 5% topical gel)**

1 app On Skin 2 times a day. Refills: 11.

Ordering provider: Helgerson, Kurt P, MD

**drospirenone-ethinyl estradiol (Yaz 3 mg-0.02 mg oral tablet)**

1 tab(s) By Mouth once a day for 84 Days. Refills: 4.

Ordering provider: Runge, Rebecca A, DO

**mupirocin topical (Bactroban 2% topical ointment)**

1 app On Skin 3 times a day, apply a thin film. Refills: 1.

Ordering provider: Helgerson, Kurt P, MD

**omega-3 polyunsaturated fatty acids (Fish Oil oral capsule)**

**tretinoin topical (tretinoin 0.05% topical cream)**

1 app On Skin once a day (at bedtime) for 60 Days. Refills: 5.

Ordering provider: Helgerson, Kurt P, MD

Immunizations

No data available for this section

## Medications Administered During Your Visit

No data available for this section

## Assessment and Plan

### Future Scheduled Tests

Laboratory:

Renal Function Panel 2/15/19

Radiology:

MRI Brain w/ + w/o Contrast 6/28/18

VUS AAA Screening 8/10/18

US Pelvis Complete Transabd/Vag w/o Dopp 11/9/18

## Functional Status

No data available for this section

## Mental Status

No data available for this section

## Encounter Procedures

No data available for this section

## Results

No data available for this section

## Vital Signs

8/10/18

| | |
|---|---|
| Respiratory Rate | 16 br/min (Normal is 14-20 br/min) |
| Blood Pressure | 120/76 mmHg (Normal is 90-140/60-90 mmHg) |
| Blood Pressure Location | Left arm |
| Blood Pressure Method | Cuff |
| Mean Arterial Pressure | 90.7 mmHg (Normal is 70-100 mmHg) |

| | |
|---|---|
| Peripheral Pulse Rate | 96 bpm (Normal is 60-100 bpm) |
| Temperature Tympanic (DegC) | 36.9 DegC (Normal is 36.6-37.6 DegC) |
| Temperature Tympanic (DegF) | 98.4 DegF (Normal is 97.9-99.7 DegF) |
| Measured Weight in Kilograms | 70.2 kg |
| Measured Weight in Pounds | 154 lb 12 oz 1 |
| Height in Centimeters | 168.2 cm |
| Measured Height in Inches | 66.2 in2 |
| Body Mass Index | 24.8 kg/m2 |

1Result Comment: Result placed secondary from kg, converted to lbs

2Result Comment: Result placed secondary from cm, converted to Inches

## Social History

| Social History Type | Response |
|---|---|
| Smoking Status | Never (less than 100 in lifetime) entered on: 11/7/18 |
| Birth Sex | |

## Goals

No data available for this section

## Discharge Instructions

**Patient Education**

08/10/2018 10:28:27

**GRIEF REACTION**

Grief Reaction

Grief is the feeling that we all have when we lose someone or something that has been important in our life. Grief is an unavoidable and normal reaction to this loss, and can last from months to years. The amount of time depends on different factors. These include how close the person was to you, and how much support you have through the grief process. Symptoms include both physical and emotional symptoms.

Physical reactions:

• Loss of appetite or overeating

• Changes in weight

• Trouble getting to sleep or staying asleep

• Hair loss

• Upset stomach, indigestion, heart burn, abdominal pain, cramping, diarrhea

• Sense of trouble breathing

• Trembling, shakiness

Emotional reactions:

• Sadness

- Anxiety
- Feeling depressed or helpless
- Difficulty concentrating
- Detachment or withdrawal from those around you
- Loss of interest in your normal life and work

Home care

- Allow yourself to feel the pain of your loss. For some, this can be a key part of healing grief. Talk about your pain with others who understand. Share good memories that involve the person, pet, or possession you lost.
- Take time for yourself. Make it a point to do things that you enjoy (gardening, walking in nature, going to a movie, etc.).
- Take care of your physical body. Eat a balanced diet (low in saturated fat and high in fruits and vegetables) and establish an exercise plan at least 3 times a week for 30 minutes. Even mild-moderate exercise (like brisk walking) can make you feel better. Get plenty of sleep.
- Avoid the use of alcohol and drugs to cover your emotional pain. This only slows down the emotional healing process.
- Do not isolate yourself from others. Have daily contact with family or friends. Talk about your loss to those closest to you.
- For additional support, meet with your pastor/priest/rabbi, a counselor or therapist, or your own doctor.
- Consider joining a grief support group. Ask your doctor or our staff for information on how to find one in your area.
- If you have been prescribed a medicine to help with your symptoms, take it only as directed. Do not use it with alcohol.

Follow-up care

Follow up with your healthcare provider, or as advised.

Call 911

Call 911 if any of these occur:

- Trouble breathing
- Very confused
- Very drowsy or trouble awakening
- Fainting or loss of consciousness
- Rapid heart rate
- Seizure
- New chest pain that becomes more severe, lasts longer, or spreads into your shoulder, arm, neck, jaw or back

When to seek medical advice

Call your healthcare provider right away if any of these occur:

- Worsening symptoms
- Unable to eat or sleep for three days in a row
- Feeling extreme depression, fear, anxiety, or anger toward yourself or others
- Feeling out of control
- Feeling that you may try to harm yourself
- family or friends express concern over your behavior and ask you to get help

© 2000-2015 The StayWell Company, LLC. 780 Township Line Road, Yardley, PA 19067. All rights reserved. This information is not intended as a substitute for professional medical care. Always follow your healthcare professional's instructions.

**Follow Up Care**

08/10/2018 10:28:27

**With:** Analise Betker

**Address:** Unknown

**When:** Unknown

**Comments:** As scheduled

**Reason for Referral**

No data available for this section

**Health Concerns**

No data available for this section

## SMITH, CARRIE S

Sex: F   DOB: 01/10/1987

**Continuity of Care Document**

Summarization of Episode Note | 08/10/2018 to 08/12/2018

Source: Ascension Borgess Hospital ProMed Family Practice Richland

Created: 02/15/2019

## Demographics

| | | |
|---|---|---|
| Contact Information: | Marital Status: Life Partner | Ethnic Group: Not Hispanic or Latino |
| 10464 WILDWOOD DRRICHLAND, MI 49083-8519, US | Religion: Christian | Language: eng |
| Tel: (000)000-0000 | Race: White | IDs: 761427 |
| Tel: (269)491-8524 | **Previous Name(s): --** | |
| Tel: (269)491-8524 | | |
| Mail: carriesuzsmith@gmail.com | | |

## Care Team

| Type | Name | Represented Organization | Address | Phone |
|---|---|---|---|---|
| primary care physician | No, Doctor | -- | -- | -- |
| primary care physician | No, Doctor | -- | -- | -- |
| primary care physician | Mindock PA-C, Gregory P | -- | Work:8450 N. 32nd StreetRichland, MI 49083-, US | Work Tel: (269)324-8600 |

## Relationships

No Data to Display

## Document Details

| **Source Contact Info** | **Author Contact Info** | **Recipient Contact Info** |
|---|---|---|
| 8450 N. 32nd StreetRichland, MI 49083-, US | -- | -- |
| Tel: (269)552-2500 | | |

**Healthcare Professionals**

No Data to Display

**IDs & Code Type Data**

Document Type ID: 2.16.840.1.113883.1.3 : POCD_HD000040

Document Template ID: 2.16.840.1.113883.10.20.22.1.1 : 2015-08-01, 2.16.840.1.113883.10.20.22.1.2 : 2015-08-01

Document ID: 2.16.840.1.113883.3.891.8.999362 : 35131349

Document Type Code: 2.16.840.1.113883.6.1, 34133-9

Document Language Code: en-US

Document Set ID: --

Document Version Number: --

## Primary Encounter

**Encounter Information**

Registration Date: 08/10/2018

Discharge Date: 08/12/2018

Visit ID: --

**Location Information**

Ascension Borgess Hospital ProMed Family Practice Richland

Work:8450 N. 32nd StreetRichland, MI 49083-, US

## Providers

| Type | Name | Address | Phone |
|---|---|---|---|
| Attending | Betker PAC, Analise J | Work:7901 Angling Road, Ste 201BPortage, MI 49024-, US | Work Tel: (269)324-8600 |

## Encounter

**8/10/18 - 8/12/18**

Ascension Borgess Hospital ProMed Family Practice Richland 8450 N. 32nd Street Richland, MI 49083- USA (269) 552-2500

**Encounter Diagnosis**

Annual physical exam (Discharge Diagnosis) - 8/10/18

Situational anxiety (Discharge Diagnosis) - 8/10/18

Grief reaction (Discharge Diagnosis) - 8/10/18

Family history of MI (myocardial infarction) (Discharge Diagnosis) - 8/12/18

Family history of abdominal aortic aneurysm (AAA) (Discharge Diagnosis) - 8/12/18

Attending Physician: Betker, Analise J, PAC

## Problem List

Annual physical exam | Family history of abdominal aortic aneurysm (AAA) | Family history of MI (myocardial infarction) | Grief reaction | Situational anxiety (This Visit) | ADD (attention deficit disorder) | Adjustment reaction with anxiety and depression | Chronic SI joint pain | Donor of kidney for transplant | Ehlers-Danlos disease | Esophageal Reflux | PCOS (polycystic ovarian syndrome) | PFD (pelvic floor dysfunction) | Refused diphtheria-pertussis-tetanus (DPT) vaccination

## Allergies, Adverse Reactions, Alerts

Levaquin (heavy arms)

## Medications

**amphetamine-dextroamphetamine (Adderall XR 30 mg oral capsule, extended release)**

1 cap(s) By Mouth 2 times a day for 30 Days. Refills: 0.

Ordering provider: Runge, Rebecca A, DO

**benzoyl peroxide-clindamycin topical (benzoyl peroxide-clindamycin 5%-1% topical gel)**

1 app On Skin 2 times a day. Refills: 11.

Ordering provider: Helgerson, Kurt P, MD

**dapsone topical (dapsone 5% topical gel)**

1 app On Skin 2 times a day. Refills: 11.

Ordering provider: Helgerson, Kurt P, MD

**drospirenone-ethinyl estradiol (Yaz 3 mg-0.02 mg oral tablet)**

1 tab(s) By Mouth once a day for 84 Days. Refills: 4.

Ordering provider: Runge, Rebecca A, DO

**mupirocin topical (Bactroban 2% topical ointment)**

1 app On Skin 3 times a day. apply a thin film. Refills: 1.

Ordering provider: Helgerson, Kurt P, MD

**omega-3 polyunsaturated fatty acids (Fish Oil oral capsule)**

**tretinoin topical (tretinoin 0.05% topical cream)**

1 app On Skin once a day (at bedtime) for 60 Days. Refills: 5.

Ordering provider: Helgerson, Kurt P, MD

## Immunizations

No data available for this section

## Medications Administered During Your Visit

No data available for this section

## Assessment and Plan

### Future Scheduled Tests

Laboratory:

Renal Function Panel 2/15/19

Radiology:

MRI Brain w/ + w/o Contrast 6/28/18

VUS AAA Screening 8/10/18

US Pelvis Complete Transabd/Vag w/o Dopp 11/9/18

## Functional Status

No data available for this section

## Mental Status

No data available for this section

## Encounter Procedures

No data available for this section

## Results

No data available for this section

## Vital Signs

6/10/18

| | |
|---|---|
| Respiratory Rate | 16 br/min (Normal is 14-20 br/min) |
| Blood Pressure | 120/76 mmHg (Normal is 90-140/60-90 mmHg) |
| Blood Pressure Location | Left arm |
| Blood Pressure Method | Cuff |
| Mean Arterial Pressure | 90.7 mmHg (Normal is 70-100 mmHg) |
| Peripheral Pulse Rate | 96 bpm (Normal is 60-100 bpm) |
| Temperature Tympanic (DegC) | 36.9 DegC (Normal is 36.6-37.6 DegC) |
| Temperature Tympanic (DegF) | 98.4 DegF (Normal is 97.9-99.7 DegF) |
| Measured Weight in Kilograms | 70.2 kg |
| Measured Weight in Pounds | 154 lb 12 oz 1 |
| Height in Centimeters | 168.2 cm |
| Measured Height in Inches | 66.2 in2 |
| Body Mass Index | 24.8 kg/m2 |

Continuity of Care Document

1Result Comment: Result placed secondary from kg, converted to lbs

2Result Comment: Result placed secondary from cm, converted to inches

## Social History

| Social History Type | Response |
|---|---|
| Smoking Status | Never (less than 100 in lifetime) |
| | entered on: 11/7/18 |

Birth Sex

## Goals

No data available for this section

## Discharge Instructions

**Patient Education**

08/10/2016 10:28:27

**GRIEF REACTION**

Grief Reaction

Grief is the feeling that we all have when we lose someone or something that has been important in our life. Grief is an unavoidable and normal reaction to this loss, and can last from months to years. The amount of time depends on different factors. These include how close the person was to you, and how much support you have through the grief process. Symptoms include both physical and emotional symptoms.

Physical reactions:

• Loss of appetite or overeating

• Changes in weight

• Trouble getting to sleep or staying asleep

• Hair loss

• Upset stomach, indigestion, heart burn, abdominal pain, cramping, diarrhea

• Sense of trouble breathing

• Trembling, shakiness

Emotional reactions:

• Sadness

• Anxiety

• Feeling depressed or helpless

• Difficulty concentrating

• Detachment or withdrawal from those around you

• Loss of interest in your normal life and work

Home care

• Allow yourself to feel the pain of your loss. For some, this can be a key part of healing grief. Talk about your pain with others who understand. Share good memories that involve the person, pet, or possession you lost.

• Take time for yourself. Make it a point to do things that you enjoy (gardening, walking in nature, going to a movie, etc.).

• Take care of your physical body. Eat a balanced diet (low in saturated fat and high in fruits and vegetables) and establish an exercise plan at least 3 times a week for 30 minutes. Even mild-moderate exercise (like brisk walking) can make you feel better. Get plenty of sleep.

• Avoid the use of alcohol and drugs to cover your emotional pain. This only slows down the emotional healing process.

• Do not isolate yourself from others. Have daily contact with family or friends. Talk about your loss to those closest to you.

• For additional support, meet with your pastor/priest/rabbi, a counselor or therapist, or your own doctor.

• Consider joining a grief support group. Ask your doctor or our staff for information on how to find one in your area.

• If you have been prescribed a medicine to help with your symptoms, take it only as directed. Do not use it with alcohol.

Follow-up care

Follow up with your healthcare provider, or as advised.

Call 911

Call 911 if any of these occur:

• Trouble breathing

• Very confused

• Very drowsy or trouble awakening

• Fainting or loss of consciousness

• Rapid heart rate

• Seizure

• New chest pain that becomes more severe, lasts longer, or spreads into your shoulder, arm, neck, jaw or back

When to seek medical advice

Call your healthcare provider right away if any of these occur:

• Worsening symptoms

• Unable to eat or sleep for three days in a row

• Feeling extreme depression, fear, anxiety, or anger toward yourself or others

• Feeling out of control

• Feeling that you may try to harm yourself

• family or friends express concern over your behavior and ask you to get help

© 2000-2015 The StayWell Company, LLC. 780 Township Line Road, Yardley, PA 19067. All rights reserved. This information is not intended as a substitute for professional medical care. Always follow your healthcare professional's instructions.

**Follow Up Care**

08/10/2018 10:28:27

**With:** Analise Betker

**Address:** Unknown

**When:** Unknown

**Comments:** As scheduled

**Reason for Referral**

No data available for this section

**Health Concerns**

No data available for this section

## SMITH, CARRIE S

Sex: **F** DOB: **01/10/1987**

**Continuity of Care Document**

Created: 02/15/2019

Summarization of Episode Note | 08/15/2018 to 08/17/2018

Source: Ascension Borgess Hospital ProMed Family Practice Richland

## Demographics

| Contact Information: | Marital Status: Life Partner | Ethnic Group: Not Hispanic or Latino |
|---|---|---|
| 10464 WILDWOOD DRRICHLAND, MI 49083-8519, US | Religion: Christian | Language: eng |
| Tel: (000)000-0000 | Race: White | IDs: 761427 |
| Tel: (269)491-8524 | **Previous Name(s): --** | |
| Tel: (269)491-8524 | | |
| Mail: carriesuzsmith@gmail.com | | |

## Care Team

| Type | Name | Represented Organization | Address | Phone |
|---|---|---|---|---|
| primary care physician | No, Doctor | -- | -- | -- |
| primary care physician | No, Doctor | -- | -- | -- |
| primary care physician | Mindock PA-C, Gregory P | -- | Work:6450 N. 32nd StreetRichland, MI 49083-, US | Work Tel: (269)324-8600 |

## Relationships

No Data to Display

## Document Details

| Source Contact Info | Author Contact Info | Recipient Contact Info |
|---|---|---|
| 8450 N. 32nd StreetRichland, MI 49083-, US | -- | -- |
| Tel: (269)552-2500 | | |

### Healthcare Professionals

No Data to Display

### IDs & Code Type Data

Document Type ID: 2.16.840.1.113883.1.3 : POCD_HD000040

Document Template ID: 2.16.840.1.113883.10.20.22.1.1 : 2015-08-01, 2.16.840.1.113883.10.20.22.1.2 : 2015-08-01

Document ID: 2.16.840.1.113883.3.891.8.999362 : 35131275

Document Type Code: 2.16.840.1.113883.6.1, 34133-9

Document Language Code: en-US

Document Set ID: --

Document Version Number: --

## Primary Encounter

| Encounter Information | Location Information |
|---|---|
| Registration Date: 08/15/2018 | Ascension Borgess Hospital ProMed Family Practice Richland |
| Discharge Date: 08/17/2018 | Work:8450 N. 32nd StreetRichland, MI 49083-, US |
| Visit ID: -- | |

### Providers

| Type | Name | Address | Phone |
|---|---|---|---|
| Attending | Betker PAC, Analise J | Work:7901 Angling Road, Ste 201BPortage, MI 49024-, US | Work Tel: (269)324-8600 |

## Encounter

**8/15/18 - 8/17/18**

Ascension Borgess Hospital ProMed Family Practice Richland 8450 N. 32nd Street Richland, MI 49083- USA (269) 552-2500

**Encounter Diagnosis**

Hematuria (Discharge Diagnosis) - 8/15/18

Well adult exam (Discharge Diagnosis) - 8/18/18

Dysuria (Discharge Diagnosis) - 8/17/18

History of kidney donation (Discharge Diagnosis) - 8/17/18

Chronic diarrhea (Discharge Diagnosis) - 8/17/18

Mucous in stools (Discharge Diagnosis) - 8/17/18

Attending Physician: Betker, Analise J, PAC

## Problem List

Chronic diarrhea | Dysuria | Hematuria | History of kidney donation | Mucous in stools | Well adult exam (This Visit)

ADD (attention deficit disorder) | Adjustment reaction with anxiety and depression | Chronic SI joint pain | Donor of kidney for transplant | Ehlers-Danlos disease | Esophageal Reflux | PCOS (polycystic ovarian syndrome) | PFD (pelvic floor dysfunction) | Refused diphtheria-pertussis-tetanus (DPT) vaccination

## Allergies, Adverse Reactions, Alerts

Levaquin (heavy arms)

## Medications

**amphetamine-dextroamphetamine (Adderall XR 30 mg oral capsule, extended release)**

1 cap(s) By Mouth 2 times a day for 30 Days. Refills: 0.

Ordering provider: Runge, Rebecca A, DO

**benzoyl peroxide-clindamycin topical (benzoyl peroxide-clindamycin 5%-1% topical gel)**

1 app On Skin 2 times a day. Refills: 11.

Ordering provider: Helgerson, Kurt P, MD

**dapsone topical (dapsone 5% topical gel)**

1 app On Skin 2 times a day. Refills: 11.

Ordering provider: Helgerson, Kurt P, MD

**drospirenone-ethinyl estradiol (Yaz 3 mg-0.02 mg oral tablet)**

1 tab(s) By Mouth once a day for 84 Days. Refills: 4.

Ordering provider: Runge, Rebecca A, DO

**mupirocin topical (Bactroban 2% topical ointment)**

1 app On Skin 3 times a day. apply a thin film. Refills: 1.

Ordering provider: Helgerson, Kurt P, MD

**omega-3 polyunsaturated fatty acids (Fish Oil oral capsule)**

**tretinoin topical (tretinoin 0.05% topical cream)**

1 app On Skin once a day (at bedtime) for 60 Days. Refills: 5.

Ordering provider: Helgerson, Kurt P, MD

## Immunizations

No data available for this section

## Medications Administered During Your Visit

No data available for this section

## Assessment and Plan

**Future Scheduled Tests**

Laboratory:

Renal Function Panel 2/15/19

Radiology:

MRI Brain w/ + w/o Contrast 6/28/18

VUS AAA Screening 8/10/18

US Pelvis Complete Transabd/Vag w/o Dopp 11/9/18

## Functional Status

No data available for this section

## Mental Status

No data available for this section

## Encounter Procedures

exercise stress ECHO - EF 60-65%, normal, neg for ischemia, low risk

## Results

Laboratory List

| Name | Date |
|---|---|
| POC Urine Dipstick (Clinic) | 8/15/18 |

**8/15/18**

| Test | Result | Reference Range | Specimen Source | Laboratory |
|---|---|---|---|---|
| Urine Appearance Urine Dipstick POC | Clear | | | |
| Urine Color Urine Dipstick POC | Yellow | | | |
| Nitrite Urine Dipstick POC | Negative | | | |
| Glucose Urine Dipstick POC | Negative | | | |
| Specific Gravity Dipstick POC Clinic | 1.005 | | | |
| pH Urine Dipstick POC Clinic | 6.0 | | | |
| Leukocyte Urine Dipstick POC Clinic | Trace | | | |
| Protein Urine Dipstick POC Clinic | Negative | | | |

| | |
|---|---|
| Ketones Dipstick POC Clinic | Negative |
| Urobilinogen Urine Dipstick POC Clinic | Normal |
| Bilirubin Urine Dipstick POC Clinic | Negative |
| Blood Urine Dipstick POC Clinic | 50 |

## Vital Signs

8/15/18

| | |
|---|---|
| Respiratory Rate | 16 br/min (Normal is 14-20 br/min) |
| Blood Pressure | 114/76 mmHg (Normal is 90-140/60-90 mmHg) |
| Blood Pressure Location | Left arm |
| Blood Pressure Method | Cuff |
| Mean Arterial Pressure | 88.7 mmHg (Normal is 70-100 mmHg) |
| Peripheral Pulse Rate | 120 bpm*HI* (Normal is 60-100 bpm) |
| Temperature Tympanic (DegC) | 36.6 DegC (Normal is 36.6-37.6 DegC) |
| Temperature Tympanic (DegF) | 98.2 DegF (Normal is 97.9-99.7 DegF) |
| Measured Weight in Kilograms | 70 kg |
| Measured Weight in Pounds | 154 lb 5 oz 1 |
| Height in Centimeters | 171 cm |
| Measured Height in Inches | 67.3 In2 |
| Body Mass Index | 23.9 kg/m2 |

1Result Comment: Result placed secondary from kg, converted to lbs

2Result Comment: Result placed secondary from cm, converted to Inches

## Social History

| Social History Type | Response |
|---|---|
| Smoking Status | Never (less than 100 in lifetime) entered on: 11/7/18 |
| Birth Sex | |

## Goals

No data available for this section

## Discharge Instructions

**Patient Education**

08/15/2018 11:26:58

**Prevention Guidelines, Women Ages 18 to 39**

Prevention Guidelines, Women Ages 18 to 39

Screening tests and vaccines are an important part of managing your health. Health counseling is essential, too. Below are guidelines for these, for women ages 18 to 39.

Talk with your healthcare provider to make sure you're up-to-date on what you need.

Screening

Who needs it

Case 1:19-cv-00152-RJJ-RSK   ECF No. 1-1 filed 02/27/19   PageID.124   Page 121 of 173

How often

Alcohol misuse

All women in this age group

At routine exams

Blood pressure

All women in this age group

Every 2 years if your blood pressure is less than 120/80 mm Hg; yearly if your systolic blood pressure is 120 to 139 mm Hg, or your diastolic blood pressure reading is 80 to 89 mm Hg

Breast cancer

All women in this age group should talk with their healthcare providers about the need for clinical breast exams (CBE)1

Clinical breast exam every 3 years1

Cervical cancer

Women ages 21 and older

Women between ages 21 and 29 should have a Pap test every 3 years; women between ages 30 and 65 are advised to have a Pap test plus an HPV test every 5 years

Chlamydia

Sexually active women ages 24 and younger, and women at increased risk for infection

Every 3 years if you're at risk or have symptoms

Depression

All women in this age group

At routine exams

Diabetes mellitus, type 2

Adults with no symptoms who are overweight or obese and have 1 or more other risk factors for diabetes

At least every 3 years

Gonorrhea

Sexually active women at increased risk for infection

At routine exams

Hepatitis C

Anyone at increased risk

At routine exams

HIV

All women

At routine exams

Obesity

All women in this age group

At routine exams

Syphilis

Women at increased risk for infection – talk with your healthcare provider

At routine exams

Tuberculosis

Women at increased risk for infection – talk with your healthcare provider

Ask your healthcare provider

Vision

All women in this age group

At least 1 complete exam in your 20s, and 2 in your 30s

Vaccine2

Who needs it

How often

Chickenpox (varicella)

All women in this age group who have no record of this infection or vaccine

2 doses; the second dose should be given 4 to 8 weeks after the first dose

Hepatitis A

Women at increased risk for infection – talk with your healthcare provider

2 doses given at least 6 months apart

Hepatitis B

Women at increased risk for infection – talk with your healthcare provider

3 doses over 6 months; second dose should be given 1 month after the first dose; the third dose should be given at least 2 months after the second dose and at least 4 months after the first dose

Haemophilus influenzae Type B (HIB)

Women at increased risk for infection – talk with your healthcare provider

1 to 3 doses

Human papillomavirus (HPV)

All women in this age group up to age 26

3 doses; the second dose should be given 1 to 2 months after the first dose and the third dose given 6 months after the first dose

Influenza (flu)

All women in this age group

Once a year

Measles, mumps, rubella (MMR)

All women in this age group who have no record of these infections or vaccines

1 or 2 doses

Meningococcal

Women at increased risk for infection – talk with your healthcare provider

1 or more doses

Pneumococcal conjugate vaccine (PCV13) and pneumococcal polysaccharide vaccine (PPSV23)

Women at increased risk for infection – talk with your healthcare provider

PCV13: 1 dose ages 19 to 65 (protects against 13 types of pneumococcal bacteria) PPSV23: 1 to 2 doses through age 64, or 1 dose at 65 or older (protects against 23 types of pneumococcal bacteria)

Tetanus/diphtheria/pertussis (Td/Tdap) booster

All women in this age group

Td every 10 years, or a one-time dose of Tdap instead of a Td booster after age 18, then Td every 10 years

Counseling

Who needs it

How often

BRCA gene mutation testing for breast and ovarian cancer susceptibility

Women with increased risk for having gene mutation

When your risk is known

Breast cancer and chemoprevention

Women at high risk for breast cancer

When your risk is known

Diet and exercise

Women who are overweight or obese

When diagnosed, and then at routine exams

Domestic violence

Women at the age in which they are able to have children

At routine exams

Sexually transmitted infection prevention

Women who are sexually active

At routine exams

Skin cancer

Prevention of skin cancer in fair-skinned adults through age 24

At routine exams

Use of tobacco and the health effects it can cause

All women in this age group

Every visit

1According to the ACS, women ages 20 to 39 years should have a clinical breast exam (CBE) as part of their routine health exam every 3 years, and breast self-exams are an option for women starting in their 20s. However, the USPSTF does not recommend CBE.

2Those who are 18 years of age, who are not up-to-date on their childhood immunizations, should receive all appropriate catch-up vaccines recommended by the CDC

© 2000-2015 The StayWell Company, LLC. 780 Township Line Road, Yardley, PA 19067. All rights reserved. This information is not intended as a substitute for professional medical care. Always follow your healthcare professional's instructions.

**Follow Up Care**

06/15/2018 11:26:58

**With:** Analise Betkor

**Address:** Unknown

**When:** 1 year

only if needed

**Comments:** PE

## Reason for Referral

No data available for this section

## Health Concerns

No data available for this section

2/15/2019                                              Continuity of Care Document

**SMITH, CARRIE S**                                                                          Sex: F  DOB: 01/10/1987

**Continuity of Care Document**                                                             Created: 02/15/2019

Summarization of Episode Note | 08/17/2018 to 08/19/2018

Source: Ascension Borgess Hospital ProMed Family Practice Richland

## Demographics

| Contact Information: | Marital Status: Life Partner | Ethnic Group: Not Hispanic or Latino |
|---|---|---|
| 10464 WILDWOOD DRRICHLAND, MI 49083-8519, US | Religion: Christian | Language: eng |
| Tel: (000)000-0000 | Race: White | IDs: 761427 |
| Tel: (269)491-8524 | **Previous Name(s): --** | |
| Tel: (269)491-8524 | | |
| Mail: carriesuzsmith@gmail.com | | |

## Care Team

| Type | Name | Represented Organization | Address | Phone |
|---|---|---|---|---|
| primary care physician | No, Doctor | -- | -- | -- |
| primary care physician | No, Doctor | -- | -- | -- |
| primary care physician | Mindock PA-C, Gregory P | -- | Work:8450 N. 32nd StreetRichland, MI 49083- , US | Work Tel: (269)324-8600 |

## Relationships

No Data to Display

## Document Details

| Source Contact Info | Author Contact Info | Recipient Contact Info |
|---|---|---|
| 8450 N. 32nd StreetRichland, MI 49083- , US | -- | -- |
| Tel: (269)552-2500 | | |

### Healthcare Professionals

No Data to Display

### IDs & Code Type Data

Document Type ID: 2.16.840.1.113883.1.3 : POCD_HD000040

Document Template ID: 2.16.840.1.113883.10.20.22.1.1 : 2015-08-01, 2.16.840.1.113883.10.20.22.1.2 : 2015-08-01

Document ID: 2.16.840.1.113883.3.891.8.999362 : 35131233

Document Type Code: 2.16.840.1.113883.6.1, 34133-9

Document Language Code: en-US

Document Set ID: --

Document Version Number: --

## Primary Encounter

### Encounter Information

Registration Date: 08/17/2018

Discharge Date: 08/19/2018

Visit ID: --

### Location Information

Ascension Borgess Hospital ProMed Family Practice Richland

Work:8450 N. 32nd StreetRichland, MI 49083- , US

### Providers

| Type | Name | Address | Phone |
|---|---|---|---|
| Attending | Runge DO, Rebecca A | Work:8450 N. 32nd StreetRichland, MI 49083- , US | Work Tel: (269)324-8600 |

## Encounter

**8/17/18 - 8/19/18**

Ascension Borgess Hospital ProMed Family Practice Richland 8450 N. 32nd Street Richland, MI 49083- USA (269) 552-2500

**Encounter Diagnosis**

Adjustment reaction with anxiety and depression (Discharge Diagnosis) - 8/17/18

Pain of right sacroiliac joint (Discharge Diagnosis) - 8/17/18

Lumbar region somatic dysfunction (Discharge Diagnosis) - 8/17/18

Sacral region somatic dysfunction (Discharge Diagnosis) - 8/17/18

Pelvic somatic dysfunction (Discharge Diagnosis) - 8/17/18

Ehlers-Danlos disease (Discharge Diagnosis) - 8/17/18

Polyarthralgia (Discharge Diagnosis) - 8/17/18

Attending Physician: Runge, Rebecca A, DO

## Problem List

Adjustment reaction with anxiety and depression | Chronic diarrhea | Ehlers-Danlos disease | Lumbar region somatic dysfunction | Mucous in stools | Pain of right sacroiliac joint | Pelvic somatic dysfunction | Polyarthralgia | Sacral region somatic dysfunction (This Visit)

ADD (attention deficit disorder) | Adjustment reaction with anxiety and depression | Chronic SI joint pain | Donor of kidney for transplant | Ehlers-Danlos disease | Esophageal Reflux | PCOS (polycystic ovarian syndrome) | PFD (pelvic floor dysfunction) | Refused diphtheria-pertussis-tetanus (DPT) vaccination

## Allergies, Adverse Reactions, Alerts

Levaquin (heavy arms)

## Medications

**amphetamine-dextroamphetamine (Adderall XR 30 mg oral capsule, extended release)**

1 cap(s) By Mouth 2 times a day for 30 Days. Refills: 0.

Ordering provider: Runge, Rebecca A, DO

**benzoyl peroxide-clindamycin topical (benzoyl peroxide-clindamycin 5%-1% topical gel)**

1 app On Skin 2 times a day. Refills: 11.

Ordering provider: Helgerson, Kurt P, MD

**dapsone topical (dapsone 5% topical gel)**

1 app On Skin 2 times a day. Refills: 11.

Ordering provider: Helgerson, Kurt P, MD

**drospirenone-ethinyl estradiol (Yaz 3 mg-0.02 mg oral tablet)**

1 tab(s) By Mouth once a day for 84 Days. Refills: 4.

Ordering provider: Runge, Rebecca A, DO

**mupirocin topical (Bactroban 2% topical ointment)**

1 app On Skin 3 times a day. apply a thin film. Refills: 1.

Ordering provider: Helgerson, Kurt P, MD

**omega-3 polyunsaturated fatty acids (Fish Oil oral capsule)**

**tretinoin topical (tretinoin 0.05% topical cream)**

1 app On Skin once a day (at bedtime) for 60 Days. Refills: 5.

Ordering provider: Helgerson, Kurt P, MD

## Immunizations

No data available for this section

## Medications Administered During Your Visit

No data available for this section

## Assessment and Plan

### Future Scheduled Tests

Laboratory:

Renal Function Panel 2/15/19

Radiology:

MRI Brain w/ + w/o Contrast 6/28/18

VUS AAA Screening 8/10/18

US Pelvis Complete Transabd/Vag w/o Dopp 11/9/18

### Referrals to Other Providers

see CPOE order, referred to: Kalamazoo Gastroenterology

Referred by: Betker, Analise J, PAC

SEE ATTACHED ORDER, referred to: MI MED DIVISION OF RHEUMATOLOGY

Referred by: Runge, Rebecca A, DO

## Functional Status

No data available for this section

## Mental Status

No data available for this section

## Encounter Procedures

No data available for this section

## Results

No data available for this section

## Vital Signs

8/17/18

| | |
|---|---|
| Respiratory Rate | 16 br/min (Normal is 14-20 br/min) |
| Blood Pressure | 118/76 mmHg (Normal is 90-140/60-90 mmHg) |
| Blood Pressure Location | Left arm |
| Blood Pressure Method | Cuff |
| Mean Arterial Pressure | 90 mmHg (Normal is 70-100 mmHg) |
| Peripheral Pulse Rate | 100 bpm (Normal is 60-100 bpm) |

| | |
|---|---|
| Temperature Tympanic (DegC) | 36.5 DegC*LOW* (Normal is 36.6-37.6 DegC) |
| Temperature Tympanic (DegF) | 97.7 DegF*LOW* (Normal is 97.9-99.7 DagF) |
| Measured Weight in Kilograms | 70 kg |
| Measured Weight in Pounds | 154 lb 5 oz 1 |
| Height in Centimeters | 171 cm |
| Measured Height in Inches | 67.3 in2 |
| Body Mass Index | 23.9 kg/m2 |

1Result Comment: Result placed secondary from kg, converted to lbs
2Result Comment: Result placed secondary from cm, converted to inches

## Social History

| Social History Type | Response |
|---|---|
| Smoking Status | Never (less than 100 in lifetime) |
| | entered on: 11/7/18 |
| Birth Sex | |

## Goals

No data available for this section

## Discharge Instructions

**Patient Education**
08/17/2018 10:57:50
**Anatomy of the Sacroiliac Joints**
Anatomy of the Sacroiliac Joint

There are 2 sacroiliac (SI) joints. They are in the very low back (buttocks area). There is 1 joint on either side of the pelvis. The SI joints link the sacrum to the ilium. Tha sacrum is a triangular bone at the bottom of the spine. The ilium is part of the pelvis. The SI joints are held in place by ligaments. Ligaments are strong tissue that link bone to bone. The joints do not move very much, but they do help with mobility. They work with your spine and femurs to help you bend and walk. They also help bear the weight of your upper body.

© 2000-2015 The StayWell Company, LLC. 780 Township Line Road, Yardley, PA 18067. All rights reserved. This information is not intended as a substitute for professional medical care. Always follow your healthcare professional's instructions.

**Follow Up Care**
08/17/2018 10:57:50
**With:** Rebecca Runge
**Address:**
ProMed Family Practice - Richland
8450 North 32nd Street
Richland, MI 49083-
(269) 324-8600 Business (1)

**When:** 2 Months
only if needed
**Comments:** recheck anxiety/depression

## Reason for Referral

Continuity of Care Document

See Assessment and Plan

## Health Concerns

No data available for this section

## SMITH, CARRIE S                                                Sex: F  DOB: 01/10/1987

**Continuity of Care Document**                                                Created: 02/15/2019

Summarization of Episode Note | 08/15/2018 to 08/21/2018

Source: Ascension Borgess Hospital ProMed Family Practice Richland

## Demographics

| | | |
|---|---|---|
| Contact Information: | Marital Status: Life Partner | Ethnic Group: Not Hispanic or Latino |
| 10464 WILDWOOD DRRICHLAND, MI 49083-8519, US | Religion: Christian | Language: eng |
| Tel: (000)000-0000 | Race: White | IDs: 781427 |
| Tel: (269)491-8524 | **Previous Name(s): --** | |
| Tel: (269)491-8524 | | |
| Mail: carriesuzsmith@gmail.com | | |

## Care Team

| Type | Name | Represented Organization | Address | Phone |
|---|---|---|---|---|
| primary care physician | No, Doctor | -- | -- | -- |
| primary care physician | No, Doctor | -- | -- | -- |
| primary care physician | Mindock PA-C, Gregory P | -- | Work:8450 N. 32nd StreetRichland, MI 49083- , US | Work Tel: (269)324-8600 |

## Relationships

No Data to Display

## Document Details

| Source Contact Info | Author Contact Info | Recipient Contact Info |
|---|---|---|
| 8450 N. 32nd StreetRichland, MI 49083- , US | -- | -- |
| Tel: (269)552-2500 | | |

**Healthcare Professionals**

No Data to Display

**IDs & Code Type Data**

Document Type ID: 2.16.840.1.113883.1.3 : POCD_HD000040

Document Template ID: 2.16.840.1.113883.10.20.22.1.1 : 2015-08-01, 2.16.840.1.113883.10.20.22.1.2 : 2015-08-01

Document ID: 2.16.840.1.113883.3.891.8.999362 : 35131126

Document Type Code: 2.16.840.1.113883.8.1, 34133-9

Document Language Code: en-US

Document Set ID: --

Document Version Number: --

## Primary Encounter

**Encounter Information**                                                **Location Information**

Registration Date: 08/15/2018                                Ascension Borgess Hospital ProMed Family Practice Richland

Discharge Date: 08/21/2018                                Work:8450 N. 32nd StreetRichland, MI 49083- , US

Visit ID: --

**Providers**

No Data to Display

## Encounter

**8/15/18 - 8/21/18**

Ascension Borgess Hospital ProMed Family Practice Richland 8450 N. 32nd Street Richland, MI 49083- USA (269) 552-2500

## Problem List

ADD (attention deficit disorder) | Adjustment reaction with anxiety and depression | Chronic SI joint pain | Donor of kidney for transplant | Ehlers-Danlos disease | Esophageal Reflux | PCOS (polycystic ovarian syndrome) | PFD (pelvic floor dysfunction) | Refused diphtheria-pertussis-tetanus (DPT) vaccination

## Allergies, Adverse Reactions, Alerts

Levaquin (heavy arms)

## Medications

**amphetamine-dextroamphetamine (Adderall XR 30 mg oral capsule, extended release)**

1 cap(s) By Mouth 2 times a day for 30 Days. Refills: 0.

Ordering provider: Runge, Rebecca A, DO

**benzoyl peroxide-clindamycin topical (benzoyl peroxide-clindamycin 5%-1% topical gel)**

1 app On Skin 2 times a day. Refills: 11.

Ordering provider: Helgerson, Kurt P, MD

**dapsone topical (dapsone 5% topical gel)**

1 app On Skin 2 times a day. Refills: 11.

Ordering provider: Helgerson, Kurt P, MD

**drospirenone-ethinyl estradiol (Yaz 3 mg-0.02 mg oral tablet)**

1 tab(s) By Mouth once a day for 84 Days. Refills: 4.

Ordering provider: Runge, Rebecca A, DO

**mupirocin topical (Bactroban 2% topical ointment)**

1 app On Skin 3 times a day. apply a thin film. Refills: 1.

Ordering provider: Helgerson, Kurt P, MD

**omega-3 polyunsaturated fatty acids (Fish Oil oral capsule)**

**tretinoin topical (tretinoin 0.05% topical cream)**

1 app On Skin once a day (at bedtime) for 60 Days. Refills: 5.

Ordering provider: Helgerson, Kurt P, MD

## Immunizations

No data available for this section

## Medications Administered During Your Visit

No data available for this section

## Assessment and Plan

**Future Scheduled Tests**

Laboratory:

2/15/2019                                    Continuity of Care Document

Renal Function Panel 2/15/19

Radiology:

MRI Brain w/ + w/o Contrast 6/28/18

VUS AAA Screening 8/10/18

US Pelvis Complete Transabd/Vag w/o Dopp 11/9/18

## Functional Status

No data available for this section

## Mental Status

No data available for this section

## Encounter Procedures

No data available for this section

## Results

No data available for this section

## Vital Signs

No data available for this section

## Social History

| Social History Type | Response |
|---|---|
| Smoking Status | Never (less than 100 in lifetime) entered on: 11/7/18 |
| Birth Sex | |

## Goals

No data available for this section

## Discharge Instructions

No data available for this section

## Reason for Referral

No data available for this section

**Health Concerns**

No data available for this section

## SMITH, CARRIE S

Sex: F DOB: 01/10/1987

**Continuity of Care Document**

Summarization of Episode Note | 10/16/2018 to 10/18/2018

Source: Ascension Borgess Hospital ProMed Family Practice Richland

Created: 02/15/2019

## Demographics

| | | |
|---|---|---|
| Contact Information: | Marital Status: Life Partner | Ethnic Group: Not Hispanic or Latino |
| 10464 WILDWOOD DRRICHLAND, MI 49083-8519, US | Religion: Christian | Language: eng |
| Tel: (000)000-0000 | Race: White | IDs: 761427 |
| Tel: (269)491-8524 | Previous Name(s): -- | |
| Tel: (269)491-8524 | | |
| Mail: carriesuzsmith@gmail.com | | |

## Care Team

| Type | Name | Represented Organization | Address | Phone |
|---|---|---|---|---|
| primary care physician | No, Doctor | -- | -- | -- |
| primary care physician | No, Doctor | -- | -- | -- |
| primary care physician | Mindock PA-C, Gregory P | -- | Work:8450 N. 32nd StreetRichland, MI 49083-, US | Work Tel: (269)324-8600 |

## Relationships

No Data to Display

## Document Details

| **Source Contact Info** | **Author Contact Info** | **Recipient Contact Info** |
|---|---|---|
| 8450 N. 32nd StreetRichland, MI 49083-, US | -- | -- |
| Tel: (269)552-2500 | | |

## Healthcare Professionals

No Data to Display

## IDs & Code Type Data

Document Type ID: 2.16.840.1.113883.1.3 : POCD_HD000040

Document Template ID: 2.16.840.1.113883.10.20.22.1.1 : 2015-08-01, 2.16.840.1.113883.10.20.22.1.2 : 2015-08-01

Document ID: 2.16.840.1.113883.3.891.6.999362 : 35131040

Document Type Code: 2.16.840.1.113883.6.1, 34133-9

Document Language Code: en-US

Document Set ID: --

Document Version Number: --

## Primary Encounter

**Encounter Information**

Registration Date: 10/16/2018

Discharge Date: 10/18/2018

Visit ID: --

**Location Information**

Ascension Borgess Hospital ProMed Family Practice Richland

Work:8450 N. 32nd StreetRichland, MI 49083-, US

## Providers

| Type | Name | Address | Phone |
|---|---|---|---|
| Attending | Runge DO, Rebecca A | Work:8450 N. 32nd StreetRichland, MI 49083-, US | Work Tel: (269)324-8600 |

## Encounter

**10/16/18 - 10/18/18**

Ascension Borgess Hospital ProMed Family Practice Richland 8450 N. 32nd Street Richland, MI 49083- USA (269) 552-2500

**Encounter Diagnosis**

Ehlers-Danlos disease (Discharge Diagnosis) - 10/16/18

ADD (attention deficit disorder) (Discharge Diagnosis) - 10/16/18

Grief reaction (Discharge Diagnosis) - 10/16/18

Attending Physician: Runge, Rebecca A, DO

## Problem List

ADD (attention deficit disorder) | Ehlers-Danlos disease | Grief reaction | Polyarthralgia (This Visit)

ADD (attention deficit disorder) | Adjustment reaction with anxiety and depression | Chronic SI joint pain | Donor of kidney for transplant | Enlers-Danlos disease | Esophageal Reflux | PCOS (polycystic ovarian syndrome) | PFD (pelvic floor dysfunction) | Refused diphtheria-pertussis-tetanus (DPT) vaccination

## Allergies, Adverse Reactions, Alerts

Levaquin (heavy arms)

## Medications

**amphetamine-dextroamphetamine (Adderall XR 30 mg oral capsule, extended release)**

1 cap(s) By Mouth 2 times a day for 30 Days. Refills: 0.

Ordering provider: Runge, Rebecca A, DO

**benzoyl peroxide-clindamycin topical (benzoyl peroxide-clindamycin 5%-1% topical gel)**

1 app On Skin 2 times a day. Refills: 11.

Ordering provider: Helgerson, Kurt P, MD

**dapsone topical (dapsone 5% topical gel)**

1 app On Skin 2 times a day. Refills: 11.

Ordering provider: Helgerson, Kurt P, MD

**drospirenone-ethinyl estradiol (Yaz 3 mg-0.02 mg oral tablet)**

1 tab(s) By Mouth once a day for 84 Days. Refills: 4.

Ordering provider: Runge, Rebecca A, DO

**mupirocin topical (Bactroban 2% topical ointment)**

1 app On Skin 3 times a day, apply a thin film. Refills: 1.

Ordering provider: Helgerson, Kurt P, MD

**omega-3 polyunsaturated fatty acids (Fish Oil oral capsule)**

**tretinoin topical (tretinoin 0.05% topical cream)**

1 app On Skin once a day (at bedtime) for 60 Days. Refills: 5.

Ordering provider: Helgerson, Kurt P, MD

## Immunizations

influenza virus vaccine, inactivated | Tdap: Tetanus/diphtheria/acel pertussis

## Medications Administered During Your Visit

No data available for this section

## Assessment and Plan

### Future Scheduled Tests

Laboratory:

Renal Function Panel 2/15/19

Radiology:

MRI Brain w/ + w/o Contrast 6/28/18

VUS AAA Screening 8/10/18

US Pelvis Complete Transabd/Vag w/o Dopp 11/9/18

### Referrals to Other Providers

ehlers-danlos disease, polyarthralgia, referred to: BMH Rheumatology

Referred by: Runge, Rebecca A, DO

## Functional Status

No data available for this section

## Mental Status

No data available for this section

## Encounter Procedures

No data available for this section

## Results

No data available for this section

## Vital Signs

10/16/18

| | |
|---|---|
| Respiratory Rate | 16 br/min (Normal is 14-20 br/min) |
| Blood Pressure | 120/82 mmHg (Normal is 90-140/60-90 mmHg) |
| Blood Pressure Location | Left arm |
| Blood Pressure Method | Cuff |
| Mean Arterial Pressure | 94.7 mmHg (Normal is 70-100 mmHg) |
| Peripheral Pulse Rate | 88 bpm (Normal is 60-100 bpm) |
| Temperature Tympanic (DegC) | 36.6 DegC (Normal is 36.6-37.6 DegC) |
| Temperature Tympanic (DegF) | 97.9 DegF (Normal is 97.9-99.7 DegF) |
| Measured Weight in Kilograms | 73.8 kg |
| Measured Weight in Pounds | 162 lb 11 oz 1 |
| Height in Centimeters | 171 cm |
| Measured Height in Inches | 67.3 in2 |

Continuity of Care Document

| Body Mass Index | 25.2 kg/m2 |
|---|---|

1Result Comment: Result placed secondary from kg, converted to lbs

2Result Comment: Result placed secondary from cm, converted to inches

## Social History

| Social History Type | Response |
|---|---|
| Smoking Status | Never (less than 100 in lifetime) |
| | entered on: 11/7/18 |

Birth Sex

## Goals

No data available for this section

## Discharge Instructions

**Patient Education**

10/16/2018 14:21:29

**ADHD and Your Family**

ADHD and Your Family

Taking care of a child with ADHD might cause other relationships in the household to suffer. This doesn't have to happen. Each member of the family can help build lasting bonds. That way, life can get better for everyone.

How you may feel

If you have a child with ADHD, you may feel guilty, worried, and tired. Try to get enough rest and do some things you enjoy. Ask family and friends for support.

You and your partner

It's easy to blame each other. You may not agree on the child's diagnosis, treatment, or discipline. Finding answers isn't easy, but make an effort to talk each day. Now is the time to build new trust within your relationship.

Nurturing your other children

You may devote a lot of time and effort to the child with ADHD. As a result, your other children may feel left out. Do your best to spend time with your other children, too. Instead of using up your energy, you may find that these moments help build your reserves.

Parent's role

• For yourself: Recharge and relax. Free up some time by finding a caregiver who understands ADHD. Ask a counselor or your support group about people who might be able to supervise your child.

• For your marriage: Try to respect any differing opinions. Also, spend time alone as a couple. Talk about things other than your child and coping with ADHD.

• For your other children: Do things with them. Ask about their hobbies, desires, and fears. Let them know they matter to you. Then help them relate to the child with ADHD.

• Reward everyone's efforts to act like a family.

• Counseling may help you manage your stress. It can also help strengthen your marriage and resolve family conflicts.

The future holds promise

Your child's ADHD symptoms are likely to change and evolve as he or she matures. But with time and ongoing guidance, your child can learn to manage his or her traits. Many adults with ADHD are happy and successful.

© 2000-2015 The StayWell Company, LLC. 780 Township Line Road, Yardley, PA 19067. All rights reserved. This information is not intended as a substitute for professional medical care. Always follow your healthcare professional's instructions.

**Follow Up Care**

10/16/2018 14:21:29

**With:** Rebecca Runge

**Address:** Unknown

**When:** 3 months

only if needed

**Comments:** ADD recheck


## Reason for Referral

ehlers-danlos disease, polyarthralgia, referred to: BMH Rheumatology

Referred by: Runge, Rebecca A, DO


## Health Concerns

No data available for this section

# EXHIBIT B

STATE OF MICHIGAN
IN THE 37th Circuit Court for the County of Calhoun
161 E. Michigan Ave., Battle Creek, MI 49014  (269) 969-6530

CARRIE SMITH,

Case No. 19-      -CZ

Plaintiff,

Hon.

v

KELLOGG COMMUNITY COLLEGE,

Defendant.

Mark E. Kreter (P35475)
Daniel W. Boocher (P81550)
1 Michigan Ave
Battle Creek, MI 49017
(269) 966-3000 Phone
(269) 966-3022 Fax

## AFFIDAVIT OF DR. KURT P. HELGERSON

STATE OF MICHIGAN      )
                       )
COUNTY OF CALHOUN      )

I, Dr. Kurt P. Helgerson, of ProMed Family Practice, located at 8450 North 32nd Street, Richland, Michigan 49083, being first duly sworn, depose and state that if called to testify, I could testify competently to the following facts:

1.      My name is Dr. Kurt P. Helgerson, M.D., and I am a licensed medical doctor in the state of Michigan.

2.      I am familiar with the events in this case and with Carrie Smith's medical treatment.

3.      On August 5, 2018, Ms. Smith was diagnosed by Bronson Methodist Hospital as having insomnia and anxiety related to an adjustment disorder and grief reaction as a result of her father's passing.  Ms. Smith was also prescribed Lorazepam (ATIVAN).

4.   ATIVAN is a sedative used to treat anxiety and insomnia. ATIVAN has common side effects, including drowsiness and tiredness.

5.   On August 10, 2018, Ms. Smith followed up at ProMed Family Practice in Richland, Michigan, with Analise Betker, PA-C.

6.   On that date, her diagnoses of anxiety, adjustment disorder, and grief reaction may have been reviewed by Analise.  She confirmed that her prescription of ATIVAN was warranted given her diagnoses.

7.   Ms. Smith followed up on August 15, 2018, with Analise and on August 17, 2018, with Dr. Rebecca Runge, D.O., at our office.

8.   Based upon my medical experience, analysis, and expertise, Ms. Smith would have had difficulty waking up on November 7, 2018, and November 28, 2018, given her medical condition at those dates.

9.   For this reason, I authored a note on February 7, 2019, asking that Kellogg Community College excuse Ms. Smith from class on those dates for medical reasons. That note is attached hereto.

10.   In my professional opinion, Ms. Smith currently suffers from the above-described medical conditions and is properly prescribed ATIVAN for treatment thereof.


FURTHER AFFIANT SAYETH NOT.


Dated: February _20_, 2019                    _Kurt P Helgerson_    MD
                                              Dr. Kurt P. Helgerson

Subscribed, sworn to, and acknowledged before me on February ___, 2019, by Dr. Kurt P. Helgerson, to me known to be the person who executed the same.


*print notary name

                              *_____, Notary Public
                              State of _Michigan_, County of _Berry_
                              Acting in the County of _Kalamazoo_
                              My Commission Expires: _10/24/25_



Ryan Rarick
NOTARY PUBLIC   STATE OF MICHIGAN
County of Barry
My Commission Expires 10/24/2025
Acting in the County of Kalamazoo

2

**ProMed Family Practice**
8450 North 32ⁿᵈ Street
Richland, MI 49083
(269) 552-2500

**BORGESS**

2-7-19

Re:   Carrie Smith          DOB: 01-10-1987

To: KCC, please excuse Carrie for the dates of Nov 7 and Nov 28, 2018, for medical reasons.

**Kurt P. Helgerson, MD**   2/7/2019

A member of Ascension Health

# EXHIBIT C

Hello Students!                                                September 3, 2018

My name is Michelle Colyer and I will be facilitating your NURS 281clinical experience at
Bronson Methodist Hospital on the AMU. I hope you had a wonderful summer break and
got some well-deserved rest and time with family. I am so excited to meet you all and am
proud of each of you for working hard to make it to your last Medical Surgical Nursing
course this semester! You are so close to beginning your nursing career. This semester will
go fast (so be ready to polish your skills and push yourself to learn just as much as you can
in these last 6 months!

 Nursing school is one of the most stressful times in our lives, my goal is to partner with you 
to keep stress at bay. Please know that I am here to help you this semester! Let me know
how I can help

*Important guidelines about clinical:*

- Be professional and accountable. We are all adults- talking things through is such an
  important skill to practice. Treat everyone with dignity and respect.
- Help each other out and use your resources. If you need help finding the right
  resource to answer your question, expect that I will work with you to find the answer-
  don't let me take away a learning opportunity for you (unless it's a critical situation)!
  The best way to remember stuff is to look it up yourself or talk it through with a peer
  or myself.
- If you find yourself in "down time" there are always things to do. Look up diagnoses,
  tests, anything you can think of in relation to your patient.. Please make sure your
  patient personal care provided.
- Please see Clinical Overview for nursing students found on Moodle under Course
  documents as well as the Nursing Student Handbook found on the following
  website: http://www.kellogg.edu/wp-content/uploads/2018/08/Nursing-Student-Handbook-
  2018-2019.pdf
- Please be sure to review all information regarding clinical expectations.

Helpful hints

- Look at doctor progress notes to keep up with the medical care plan

- Look at social worker and case manager notes usually titled "discharge planning" to be familiar with where they are going and what kinds of things we need to teach them

- Learn to skim notes, don't take all your time looking through notes. You will be expected to give me an SBAR report before providing patient care. This can include what brought them in, any important interventions (MICU, intubations, etc.), and what the plan of care is, how they move, any lines or trach's, any important things about family, Change of shift/ reporting off report is also important to practice- I can help you with this, report seems to be a challenge for new nurses so we are going to practice this!

- Keep an eye out for new provider orders- you may not take orders, but definitely look for them and work with primary RN to carry them out.

- Introduce yourself to people, be friendly, even if they don't care you have practiced being comfortable as a professional.

- Be organized, you will have 4-5 patients eventually as a nurse, you will forget things-develop a system that works for you before you graduate and don't be afraid to modify it. I can help you with this.

- if you feel stressed, take an appropriate moment to breathe deeply in a private place, get in this habit instead of letting stress ruin your day.

- the goal is not perfection but presence- be mindful of what you're doing we all have "off days" but remember you'll soon be responsible for real lives.

- Take Kaplan seriously in your last semester

**Parking:**

Bronson has tried to accommodate student parking for many years but it has become impossible to do so now because of the tremendous growth Bronson has experienced in the past several years. In addition, the development of both the WMU Med School and also the new KVCC Culinary Institute has really compressed parking areas.  Students will now have to find parking in public areas like street meters, city lots etc.  It is important that we continue to prioritize parking on site for patients, visitors, and employees.  Security will escort students to and from parking areas upon request.  This link will take you the city parking site for more information.  http://www.downtownkalamazoo.org/Visit/Parking.aspx/

**For the *first day*:**

We will meet Bronson Methodist on North campus in the cafeteria area at 7am for orientation (This is not the South campus (AKA main) cafeteria. Please be prepared to review lots of information but also remember we will be working on the floor later in the morning.

My phone number is 517-795-4902. **I'd like each of you to text me when you get this email so I can store your contact info in my phone... texting me is best UNLESS YOU'RE CALLING IN to clinical**, per school policy I need to hear your lovely voice on the other end to let me know you won't be at clinical.

Speaking of phones, per school policy please keep your phone in your back pack, the emergency contact number you can give your family/babysitters is mine (517-795-4902). You will be able to use your phones off the unit ONLY. No photos or videos are to be taken at the clinical sites.

Let's get ready for a great semester!!

Sincerely,

Michelle

# EXHIBIT D

# POLICIES

## Academic Integrity

The Kellogg Community College policy on academic integrity is spelled out in the Student Handbook. If it is suspected that you are cheating, fabricating, facilitating academic dishonesty, or plagiarizing, there may be serious consequences. The incident will be documented and may be reported to the College Administration for possible disciplinary actions up to and including course, program, or college expulsion.

Students who are members of Kellogg Community College's Nursing program are expected to hold themselves accountable to the highest standard in regard to honesty, and academic integrity. While not all inclusive, the following behaviors listed below will be treated as academic dishonesty (aka "cheating"):

- Obtaining access to and/or use of any materials intended for instructor/faculty use only is strictly prohibited. Course book test banks are developed for faculty use only. Students may not obtain, gain access to, distribute or use these test banks. If a student is unsure if use of particular study materials is acceptable, they are responsible to check immediately with their classroom faculty. Any student discovered accessing instructor test bank resources is subject to dismissal from the program.
- Discussing exam questions/answers with students who have not yet taken the exam.
- Photographing or making a copy of any part of an exam or quiz.
- Sharing completed assignments with other students who have not yet completed the assignment (outside of a designated student group activity).
- Discussing simulated clinical experiences with other students. Sharing the learning experience with students who have not yet participated in the simulation impedes the learning experience intended for all.

## Advanced Placement Admission

See KCC Academic Catalog regarding admission to the LPN-to-Associate of Applied Science in Nursing degree. Advanced Placement applicants may identify their preference for full-time or part-time level two nursing course work. Advanced Placement students are notified by the Director of Nursing Education if seats are available for the full-time or part-time options near the end of Transitional Nursing (NURS 136). Students may register for level two nursing courses following notification by the Director of Nursing Education.

## Americans With Disabilities Act

Kellogg Community College does not discriminate in the admission or treatment of students on the basis of disability. KCC is committed to compliance with the Americans with Disabilities Act and Section 504 of the Rehabilitation Act. Information is available at https://www.ada.gov/cguide.htm

## Attendance

Classroom, clinical and lab attendance is necessary for successful completion of nursing courses. Attendance is required to meet course outcomes and clinical objectives of the course. Tardiness in a clinical or lab area is considered an unprofessional behavior and is not acceptable. A no call/no show to the clinical or scheduled laboratory or simulation setting is a serious occurrence and could result in a clinical failure. If a student has a no call/no show occurrence, it will be investigated and addressed on an individual basis.

If a student does not complete the clinical component of the course it will result in a letter grade of "F" for the course. If a student fails clinical for attendance, or any other reason, the student is not

permitted to return to clinical after being notified of the clinical failure. Pre-planned clinical or lab absences (i.e. vacation, appointment, etc.) will be considered an absence occurrence for each day or evening missed. Make-up assignments will still be required.

If a student does not successfully complete the clinical component of a nursing course, the student is not permitted to return to clinical after being notified of the clinical failure. The student may not finish the theory component of the course in which the clinical failure was issued. (See Program Progression and Readmission Policies).

A student's documented illness/childbirth resulting in two subsequent clinical attendance occurrences could be considered one occurrence, depending on the situation. It will be assessed and addressed on an individual basis by the classroom faculty, clinical instructor and the Director of Nursing Education.

For each **nursing clinical or scheduled lab or simulation experience**, an attendance occurrence of tardiness; leaving the clinical or lab early; or absence will all be treated equally with the following guidelines:

1st **Attendance Occurrence** – A learning contract will be initiated by the clinical or classroom faculty, including a make-up assignment as determined by the instructor.

2nd **Attendance Occurrence** – A second learning contract will be initiated by the clinical or classroom faculty with a second make-up assignment as determined by the instructor. The second learning contract will identify in the "Outcomes/Consequences" area that another occurrence will result in a clinical failure of the course.

3rd **Attendance Occurrence** – A clinical failure will be issued for the course. (See Readmissions Policy)

## Bereavement Leave

Any nursing student who is absent from either the theory or lab/clinical component of the program due to a death of an immediate family member must inform the classroom faculty and the Program Director in writing of the circumstances.  When a death occurs in a student's immediate family, they may take up to five (5) consecutive days off to attend the funeral or make funeral arrangements.  Immediate family member is defined as parent, child, spouse, life partner, sibling or grandparent.  Upon notification of the death and submission of verifying documentation, the classroom faculty and Program Director will work with the student to create an individualized learning plan to meet the clinical outcomes for the clinical time missed and follow up on missed classroom assignments and exams. Appropriate documentation is a death certificate, obituary or death notice. If the documents do not clearly indicate the relationship of the deceased to you, please supply document(s) that do indicate the relationship.

## Calling In

If it is necessary to miss a scheduled or arranged clinical or lab day, the student is required to do all of the following before the start time on the day of the absence:

- Call the clinical instructor at least one hour before the clinical is scheduled to begin. Text and e-mail call-ins are not acceptable.
- If the clinical instructor cannot be reached, call the clinical site and leave a detailed message for the clinical instructor.
- Notify the classroom faculty at the College via telephone. If he or she is not in the office, leave a voice mail message explaining the absence.

If the main campus cancels classes because of severe weather, classes and clinical experiences will be canceled.

# EXHIBIT E




# Kalamazoo County
# Consolidated Dispatch Authority

## *FOIA Request Form*

Date of Request: <u>1/25/2019</u>          Date Received: _____

Person/Dept. Requesting Information: Brian Methner

Telephone or Email: brian@kzoomortgage.com     Departmental Use: ☐ YES  ☑ NO

Reason for the Request: <u>Seeking to validate road conditions for school attendance purposes</u>

### *Incident Information:*

Date of Incident: <u>December 5th, 2018</u>     Time of Incident: <u>All Day</u>

Incident # and/or Location: <u>Kalamazoo County</u>

Details/Notes:

Seeking to verify the number of calls on December 5th, 2018 for crashes, slideoffs and weather related car accidents in Kalamazoo county. Have received verbal verification from two different public safety officers that the number of these incidents exceeded 58, not including WMU's campus area. I do NOT need information on individual accidents rather just something either confirming the total number or a statement of the overall road conditions in Kalamazoo county that morning.

Please submit completed requests to admin@kccda911.org or fax to 269-488-4957

### *Processing:*                                  *FOIA Record #:* _____

**Date:** _____  **Start Time:** _____   **Completion Time:** _____

**Processing Time (minutes):** _____  **Cost of Request:** _____

**Request Completed By:** _____

**Date of Payment:** _____  **Type of Payment:** Cash   Check # _____

FOIA fees are estimated and charged in 15-minute increments, with all partial time increments rounded down. If the time involved is less than 15 minutes, there will be no charge for completeing the FOIA request. Each additional 15 minute increment will be charged a fee of $8. This fee will be waived in accordance with fee waivers listed in FOIA and for all agencies that KCCDA services, so long as the request is for <u>departmental use</u>.

Governmental collaborative to create an efficient and non-duplicative way of providing cost effective and efficient response to public safety emergency services, including the dispatch of emergency police, fire, and medical services within Kalamazoo County.

| Row Labels | | | | | | | | | Grand Total |
|---|---|---|---|---|---|---|---|---|---|
| HR & Run Accident | 10 | 6 | | 5 | | 5 | 7 | 43 |
| PD Accident | 12 | 9 | 23 | 47 | 14 | 23 | 19 | 147 |
| PI - Entrapment | | 1 | 1 | | | 1 | | 2 |
| PI (Unknown/Known Injuries) | 1 | 4 | 3 | 3 | 2 | 3 | 4 | 20 |
| Traffic Hazard | 2 | 2 | 2 | 3 | | 2 | 2 | 23 |
| Grand Total | | | | | 10 | | | 235 |

# EXHIBIT F



**KELLOGG**
COMMUNITY COLLEGE

450 North Avenue, Battle Creek, MI 49017-3397  PHONE 269.965.3931 WEB www.kellogg.edu

February 8, 2019

Carrie Smith
10464 Wildwood Dr.
Richland, MI 49083

Dear Ms. Carrie Smith,

Thank you for taking the time to speak with me on February 7th, 2019. Prior to our conversation and afterwards, I reviewed several documents that were provided by yourself or accessed in other prior appeals. As I shared with you, this decision is not meant to be punitive but to uphold the policies and processes at Kellogg Community College. During the appeal review, there were two items/questions in particular that required additional attention.

1. You shared that the reasons for the first two clinical attendance occurrences was related and you wondered whether they could be considered as one occurrence. However, as noted in page 11 of your handbook, this is only permissible if the documented illness/childbirth results in two subsequent clinical attendance occurrences. In this case, the first two attendance occurrences were not subsequent, therefore it could not be counted as one occurrence.

2. You provided documentation of a personal medical treatment such that you wondered if any accommodation could be granted for that treatment plan. Upon review of your student record on January 29th 2019, no accommodations are on record for you as a student, nor was there any record of you contacting Support Services to discuss or request accommodations.

Therefore, I must uphold the prior decision by Dr. Karazim.

As I shared with you, I wanted to ensure that I communicate a plan that moves you towards your goals if at all possible. After conversing with Ms. Elizabeth Fluty, Director of Nursing Education, it appears that a possible plan would entail completing the required ENGL 151 in order to sit for LPN Boards. Then, once you have passed your licensed practical nurse board exam, you would be eligible to return through KCC's LPN to RN program, Advanced Placement option. Please communicate with Ms. Fluty directly if you have additional questions about this proposed plan.

Though this outcome and possible future academic plan does not follow your desired timing, please note that it allows you the opportunity to successfully complete your academic and career goals.

Sincerely,

**Dr. Paul R. Watson II**
Kellogg Community College
*Vice President for Instruction*
watsonp@kellogg.edu
269-965-3931 ext. 2250

BOARD OF TRUSTEES
Steven A. Claywell    Jill M. Booth    Jonathan D. Byrd    Matthew A. Davis    Xavier C. McKay    Patrick A. O'Donnell    Carla C. Reynolds    Mark P. O'Connell
Chair                 Vice Chair       Secretary           Treasurer           Trustee            Trustee                 Trustee                 President

# EXHIBIT G

**KELLOGG COMMUNITY COLLEGE**
**NURSING EDUCATION**
**Level 2 Midterm Clinical Progress Report**
**NURSING 281 Complex Physiological Integrity II**

Student Name: ___Carrie Smith___   Clinical Site and Unit: ___Bronson Methodist - GMU___   Start Date: ___09/05/2018___

Semester / Year: ___Fall, 2018___   Dates of Clinical Absences: _____

By the end of the course the student will have demonstrated that all Level II course student learning outcomes (CSLO) have been met consistently throughout the clinical experience, in order for the student to receive a passing clinical grade.

**Student Responsibilities:**

- Each week the student will give examples of how the course student learning outcomes have been met.
- Date and initial the column that corresponds to how well you met the course student learning outcomes using the abbreviations below.
- At mid-term the student will:
  - Formulate an action plan on the bottom of this form for any course student learning outcomes were not met or had no opportunity to demonstrate competence.
  - Submit the mid-term clinical evaluation electronically to the clinical instructor (date provided by clinical instructor).
- **After mid-term, the student will continue to make entries on this form for the rest of the semester and submit it electronically to the clinical instructor on the date requested. The clinical instructor will use this information to create the final clinical evaluation for the student.**

**Clinical Instructor Responsibilities:**

- Review the student's mid-term evaluation and provide written comments.
- Meet with the student and discuss progress and provide feedback.
- Return the mid-term evaluation to the student electronically following the meeting.

**M = Objective Met.**
**NM = Objective has Not been Met.**
**NO = No Opportunity to perform objective during clinical.**

| Level 2, Term 4 Course Student Learning Outcomes: Refer to course syllabus for detailed course specific clinical outcomes that align with each program outcome. | Student Validation of Level 2, Term 4 Course Student Learning Outcomes: Give specific examples of how you met the program outcomes this week. Date each entry. | Instructor Feedback | M | NM | NO |
|---|---|---|---|---|---|
| **1. Human Flourishing: Integrates concepts of nursing advocacy to help patient and families with increasingly complex health care needs achieve desired outcomes.**<br><br>**I. Model caring behaviors.**<br><br>a. Supports the patient and family by advocating for their healthcare needs.<br><br>b. Creates a caring and holistic relationship with patients and families that supports optimum comfort and functioning, promotes dignity, and is respectful of individual uniqueness and diversity. | **09/26/2018 1.I.a.** advocated for a patient's healthcare needs by noticing a lack of urine output into a Foley catheter, verifying that the catheter tubing was patent and that output hadn't been emptied but forgotten to be documented by the PCA and/or Nurse, and ensuring that the Nurse was aware of the lack of urine output in X amount of hours. Advocated for the likely need for I.V. fluids and regular bladder scanning + kidney labs drawn.<br>**09/19/2018 1.I.b.** created a caring and holistic relationship with a patient by responding enthusiastically to his many requests to go for a walk in the halls. Engaged the patient in meaningful conversation and encouraged reflection on his time spent in the Army during WWII. Asked questions about his homelife, and learned about his woodworking, gardening and other hobbies. Promoted dignity by providing a second hospital gown to be worn as a robe over the gusty opening of his first gown during hallway walks. Supported optimum functioning by supporting frequent ambulation and meals out of bed. | 9/26/2018: Excellent work investigating the issue and following up.<br><br>9/19/2018: Great Job. So important for the patient. | | | |
| **2. Spirit of Inquiry: Nursing Judgement: Selects evidence-based nursing actions to improve the quality of care for patients and families with increasingly complex health care needs.**<br><br>**I. Utilize critical thinking in clinical decision making.**<br>a. Justifies clinical decision-making and safe patient centered care by using evidence-based information.<br>b. Critiques nursing practice through reflection and self-evaluation in the pursuit of excellence. | **10/3/2018 2. I. a.** Passed medications with guidance of clinical instructor today. Justified medications being given to patients through careful examination of patient(s)' most recent vital signs, lab values and allergies. Was prepared to answer questions about side effects and contraindications to each medication being administered by self, based on evidence-based information.<br>**10/3/2018 2. I. b.** Reflected on clinical day with another classmate. Explored areas for improvement based on discussion with classmate and double-checking actions of self against recommendations in Iggy textbook. Followed up with researching evidence-based recommendations currently in practice and seeking areas of improvement. | 10/3/2018: You had an excellent, safe medication pass.<br><br>10/3/2018: Good reflection. | | | |

Page 2 of 6

**3. Nursing Judgement: Evaluates rationale for nursing actions in the provision of safe, quality care of patients with increasingly, complex health care needs.**

**I.   Model Safe nursing practice.**

a. Evaluates information identified in the electronic health record in determining expected outcomes and treatment plans.

b. Incorporates effective practice to reduce reliance on personal memory for patient care. (Use of organizational sheet, electronic data bases).

c. Utilizes barcodes correctly, responds promptly to alarms and alerts on pumps etc.

d. Differentiates between urgent and non- urgent responses to safety technology.

e. Validates knowledge, skills and attitudes for safe patient care and performance of nursing skills, tasks, and medication administration in accordance with standard nursing practices.

f. Verifies observations or concerns related to hazards and errors to patients/families and health care team.

g. Evaluates the quality and fiscal impact of care with the patient, family, and members of the healthcare team in maximizing patient outcomes.

**II.   Utilize critical thinking in clinical decision making.**

a.   Evaluates information identified in the electronic health record in determining expected outcomes and treatment plans.

b. Selects assessment and reassessment data to collect throughout the continuum of nursing care.

c. Examines health assessment data to identify the priority nursing needs for two patients and their families.

d. Optimizes effective time management organization skills.

e. Justifies delegation of patient care appropriately utilizing the principles of delegation.

f. Prioritizes nursing care for multiple patients and their families in uncertain and ambiguous situations

**10/3/2018 3. I. a. a.** Utilized in-room computer stations to chart patient's vitals into their electronic health record immediately after obtaining vital signs. Eliminating reliance on personal memory, or risking exposing PHI by jotting down vital signs information onto a scrap piece of paper and carrying it out of the patient's room to chart into the electronic health record from a computer at the nurse's station.

**09/12/2018 3. I. a. b.** Cared for a patient admitted for DKA, patient was confused/impulsive and refused to utilize call light before exiting bed and attempting to ambulate. Utilized bed alarms, and patient's "close to the nurses' station" room placement to respond promptly to the distinct sound of his bed alarm. Utilized pump alarms to alert nurse of her patient's IV piggyback medication being complete, and the pump needing to be switched back to running primary IV fluids. Differentiated between the two different beeps to respond appropriately to each sound (running into a room vs. curiously investigating where the sound is coming from) Responded promptly to promote safety and comfort among patients.

**10/10/2018 3. II. c.** Cared for two patients today, utilized overnight report data and most recent lab data + most recent vital signs date to determine priority nursing needs for each patient. One patient was expecting a morning discharge and would need teaching before leaving, and one patient was leaving the unit for a scan in the morning. Made sure to see patient before they left for the scan, and kept an eye out for the family member of the other patient. Directed family member of patient to patient's room and followed up with patient for teaching before discharge.

10/3/2018: Very professional and timely use of HER.

9/12/2018: It is difficult when you have an impulsive, confused patient. We endeavor to make them as safe as possible with clinical alarms.

10/10/2018: Excellent prioritization.

Page 3 of 6

utilizing creativity and innovation.

g. Maximizes critical thinking and deductive reasoning in the selection of nursing interventions based on accurate collection and analysis of subjective and objective assessment data and health promotion/disease prevention needs.

h. Manages patient care by evaluating the effectiveness of nursing interventions.

**4. Professional Identity: Incorporates professional, ethical and legal responsibility for safe, quality care of patients with increasingly complex health care needs.**

**I. Model Professional behaviors.**

a. Accepts responsibility and accountability for professional conduct within the legal scope of nursing practice

b. Optimize technology to document in the medical record across the continuum of patient care.

c. Supports collaboration within the multidisciplinary team to promote safe quality care for diverse patients and/or families.

**II. Establish and maintain effective communication with the client and all members of the health care team.**

Optimizes effective communication between patients, families, and members of the health care team.

Cultivates optimal team functioning within the role of a nurse leader by developing leadership skills

---

10/17/2018 4. I. a. Passed medications this week, utilized electronic health record to correctly verify medications to be administered. Charted under own EPIC login for accuracy in charting and signed own name to medication administrations for full legal responsibility of medication administration. Utilized instructor co-sign for medication administrations to follow legal policies regarding pre-licensure medication passes.

10/17/2018 4. I. c. Attended rounds with preceptor RN to meet with members of the multidisciplinary care team looking after RN's patients. Listened earnestly to discussion between members to learn how to best meet the needs of my patients for that clinical day. Added thoughtful input to observations of patient during rounds to advocate for patient.

09/12/2018 4. II. b. cared for a patient struggling with some psychosocial issues following the unexpected miscarriage of her baby. During the course of the clinical day, patient expressed thoughts of suicidal ideation. A sitter was ordered to help the patient maintain safety for herself and others, while I was performing care for the patient the assigned sitter stepped out of the room. When care was complete, I signaled for sitter to return to room. She did not immediately return, instead telling me she was "about to" I utilized skills of a nurse leader by continuing to maintain eyesight of my patient, and tactfully explain to sitter that she needed to immediately return to her room assignment and that any lack of supervision of the patient could lead to catastrophic safety issues.

---

10/17/2018: Excellent use of EHR. You were accountable and professional

10/17/2018: I love rounds. A wonderful example of how the different disciplines come together for good patient outcomes.

9/12/2018: excellent leadership to ensure patient safety.

---

Student's Plan of Action for Next Week the remainder of the clinical experience (what program outcome/s will you work on):

Will continue to work on missing program outcomes not covered thus far, and also continue to work on program outcomes that have already been discussed in weekly eval tool. 10/23/2018: An excellent Goal! Give me more.

What did you find most valuable about this week's your clinical experience thus far (date and initial)?

On a weekly basis, I find the "rounds" experience to be incredibly valuable and I have also enjoyed the knowledge and expertise of my nurse preceptors each week. Also, my clinical instructor offers a wealth of knowledge and has been readily available for teaching throughout the clinical day.

10/23/2018: AMU rounds are amazing! I am glad your RN's are knowledgeable and ready to work with. As always, I am at your disposal.

Student's Signature: Carrie S. Smith

The instructor disagrees with the weekly midterm student evaluation on the following dates (please put outcome not met, date and initials).

Learning Contract Prepared (please put the date learning contract initiated).

Instructor's Signature:
Michelle Colyer, MSN, OCN, RN-BC

Page 5 of 6

| | | Students MUST administer ALL medications with direct supervision of clinical instructor! | | |
|---|---|---|---|---|
| Administered Oral Medications | Administered/Removed Ointment/Patch | Administered Ear, Eye, Nasal, Vaginal, Rectal Medications | Administered Medications via Tube | Administered Routine Medications to Multiple Clients Simultaneously |
| Date: 10/3/18 | Date/Type: 10/3/18 | Date/Type: | Date: | Date: # of clients: |
| Date: 10/17/18 | Date/Type: | Date/Type: 10/17/18 | Date: | Date: # of clients: |
| IVPB Medications | Date: 10/3/18, 10/17/18 | | | |
| SubQ, IM | Date: 10/3/18 | | | |
| IVP medications | Date: 10/3/18, 10/17/18 | | | |

Page 6 of 6

# EXHIBIT H

 Neutral

As of: February 19, 2019 8:30 PM Z

## *Peters v. Univ. of Cincinnati College of Med.*

United States District Court for the Southern District of Ohio, Western Division

September 6, 2012, Decided; September 6, 2012, Filed

NO. 1:10-CV-906

**Reporter**
2012 U.S. Dist. LEXIS 126426 *; 2012 WL 3878601

CHAKA PETERS, Plaintiff, v. UNIVERSITY OF CINCINNATI COLLEGE OF MEDICINE, Defendant.

## Core Terms

disability, exam, summary judgment, accommodation, depression, non-movant, terminated, pediatrics, major life activity, material fact, recommended, disorder, entity, retake, substantial limitation, average person, impairment, medication, general population, adduce evidence, genuine dispute, district court, medical school, requirements, psychiatric, curriculum, benefits, courts

**Counsel:** [*1] For Chaka Peters, Plaintiff: Christina Corl, LEAD ATTORNEY, Crabbe Brown & James - 2, Columbus, OH; Marc David Mezibov, Susan Lawrence Butler, LEAD ATTORNEYS, Law Office of Marc Mezibov, Cincinnati, OH.

For University of Cincinnati College of Medicine, Defendant: Christina Corl, LEAD ATTORNEY, Crabbe Brown & James - 2, Columbus, OH; Brian E Hurley, Crabbe Brown & James LLP, Cincinnati, OH.

**Judges:** S. Arthur Spiegel, Senior United States District Judge.

**Opinion by:** S. Arthur Spiegel

## Opinion

### OPINION & ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment (doc. 22), Plaintiff's Response in Opposition (doc. 25), and Defendant's Response in Support (doc. 27). For the following reasons, the Court DENIES Defendant's motion (doc. 22).

### I. BACKGROUND

This case arises out of the University of Cincinnati College of Medicine's decision to dismiss Plaintiff, who was a medical student, from its program. Plaintiff is a Middlebury College alumna, from which she graduated after six years and a number of academic failures with a dual degree in Biology and Psychology. Her grades were not good enough to get her into medical school right away, but after completing a graduate program in Molecular, Cellular and Developmental [*2] Biology, she enrolled in Defendant's medical studies program in the fall of 2004.

Her academic struggles started almost immediately, and she sought out an individual tutor, used Defendant's group tutoring services, and sought help from a cognitive psychologist. She nonetheless did not pass three of the six courses in her first quarter, was placed on academic probation and was referred to the Senior Associate Dean of Student Affairs and Admissions for academic counseling. Laura Wexler, to whom Plaintiff was referred, is not a psychiatrist but nonetheless decided that Plaintiff was clinically depressed, was the victim of "battered woman syndrome," and had "kind of retarded speech." She encouraged her to seek help from a University psychiatrist and from the Assistant Dean for Academic Support. Plaintiff followed these recommendations and was given medication for depression, which helped with some of the depressive symptoms but did not affect her academic abilities. She did, however, complete her first year, after taking a summer course.

Over the course of the next year, Plaintiff continued to seek help but was recommended for dismissal because she did not meet the academic requirements [*3] of the second year. It was suspected that Plaintiff had a non-verbal learning disability and Attention Deficit Disorder ("ADD"), but treatment for the ADD was not

2012 U.S. Dist. LEXIS 126426, *3

recommended because it was determined that her depression should be controlled first. The Appeals Board did not vote to dismiss Plaintiff from the program because it recognized that Plaintiff had only recently begun treatment for her Seasonal Affective Disorder and that ADD and a nonverbal learning disability were both treatable conditions. Dean Stern agreed with the Appeals Board, and Plaintiff re-enrolled as a second year student with certain conditions.

Plaintiff continued therapy and medication for her depression and, although she still had problems focusing and concentrating, she passed each of her second year courses. Her academic struggles continued into her third year; she was very successful in some components of her studies but scored poorly on her exams. Although she continued to seek and receive help for depression, she did not believe that depression was the obstacle to her academic success. After returning from a leave of absence, Plaintiff was informed that she would have to take a Radiology exam (which she [*4] had been unable to take earlier due to illness) and a remedial Surgery exam (because she had failed that exam) during the Winter Break, and, because she was required to earn a certain number of credits within a 12-month time frame, she had to immediately begin a Pediatrics Core Clerkship.

Shortly thereafter, the psychiatrist who had been managing Plaintiff's care retired, and Plaintiff's new psychiatrist immediately suspected that Plaintiff had a learning disorder. She was referred to a Dr. Krikorian, a psychologist at the University, who performed a series of assessments and determined that Plaintiff suffered from ADD. He also believed that the ADD had gone undiagnosed for so long because Plaintiff's depression overshadowed it, but it was his opinion that the depression and anxiety she suffered were actually secondary effects of the ADD. Dr. Krikorian concluded that Plaintiff's ADD had significantly limited her ability to function successfully in medical school but that, with treatment, she should be able to improve satisfactorily. He prescribed Plaintiff medication for her ADD and recommended that she be given extra time for her exams. Defendant, however, required Plaintiff to take [*5] her Pediatrics exam before the end of 2008, and she sat for the exam shortly after beginning her medication regimen. She failed the exam by two points, and she was recommended for dismissal as a result. During the pendency of her appeal of that decision, Plaintiff took four more exams, each of which she passed. Dr. Krikorian attributed her success to her medication regimen, which had stabilized by the time

she sat for those exams. At her appeal, Plaintiff presented evidence that her medication regimen had not been stabilized at the time she took her Pediatrics exam and asked that, now that it had been stabilized—which resulted in improved exam performance-she be allowed to retake the exam. Dr. Krikorian attested to his ADD diagnosis and to the likelihood of Plaintiff succeeding in school if properly treated, and he urged Defendant to "reconceptualize" Plaintiff's issues that had previously been attributed to depression and anxiety.

Despite the evidence before it, the Appeals Board denied her appeal, having decided that Plaintiff's history of depression and "ups and downs and cycling" would prevent her from sticking to a regimen that would allow her to be a good physician. Dean Stern, [*6] who had unfettered discretion to adopt or reject the Appeals Board's decision, affirmed the decision because, he stated, Plaintiff suffered from a "pattern of academic and psychiatric difficulties." Plaintiff was thus finally terminated from Defendant's program.

Plaintiff sued Defendant for discrimination on the basis of disability. Specifically, she claims that Defendant violated *Title II* of the Americans with Disabilities Act and *Section 504* of the Rehabilitation Act when it refused her request to accommodate her ADD by allowing her to retake her pediatrics exam; that Defendant violated Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act when it dismissed Plaintiff from its program because of her ADD; and that Defendant violated Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act when it dismissed Plaintiff from its program because it regarded her as disabled (doc. 1).

Defendant moved for summary judgment, and the matter is ripe for the Court's decision.

## II. STANDARD

A grant of summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the [*7] affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56*; see also, e.g., *Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 82 S. Ct. 486, 7 L. Ed. 2d 458 (1962)*; *LaPointe v. United Autoworkers Local 600, 8 F.3d 376, 378 (6th Cir. 1993)*; *Osborn v. Ashland County Bd. of Alcohol, Drug Addiction and Mental Health Servs., 979*

2012 U.S. Dist. LEXIS 126426, *7

F.2d 1131, 1133 (6th Cir. 1992) (per curiam). In reviewing the instant motion, "this Court must determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Patton v. Bearden, 8 F.3d 343, 346 (6th Cir. 1993), quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242 251-252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (internal quotation marks omitted).

The process of moving for and evaluating a motion for summary judgment and the respective burdens it imposes upon the movant and non-movant are well settled. First, "a party seeking summary judgment ... bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it [*8] believes demonstrate the absence of a genuine issue of material fact [.]" Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); see also LaPointe, 8 F.3d at 378; Guarino v. Brookfield Township Trustees, 980 F.2d 399, 405 (6th Cir. 1982); Street v. J.C. Bradford & Co.., 886 F.2d 1472, 1479 (6th Cir. 1989). The movant may do so by merely identifying that the non-moving party lacks evidence to support an essential element of its case. See Barnhart v. Pickrel, Schaeffer, Ebeling Co., L.P.A.., 12 F.3d 1382, 1389 (6th Cir. 1993).

Faced with such a motion, the non-movant, after completion of sufficient discovery, must submit evidence in support of any material element of a claim or defense at issue in the motion on which it would bear the burden of proof at trial, even if the moving party has not submitted evidence to negate the existence of that material fact. See Celotex, 477 U.S. at 317; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). As the "requirement [of the Rule] is that there be no genuine issue of material fact," an "alleged factual dispute between the parties" as to some ancillary matter "will not defeat an otherwise properly supported motion for summary judgment." Anderson, 477 U.S. at 247-248 [*9] (emphasis added); see generally Booker v. Brown & Williamson Tobacco Co., Inc., 879 F.2d 1304, 1310 (6th Cir. 1989). Furthermore, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 252; see also Gregory v. Hunt, 24 F.3d 781, 784 (6th Cir. 1994). Accordingly, the non-movant must present "significant probative evidence" demonstrating that "there is [more than] some metaphysical doubt as to the material facts" to survive summary judgment and

proceed to trial on the merits. Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 339-340 (6th Cir. 1993); see also Celotex, 477 U.S. at 324; Guarino, 980 F.2d at 405.

Although the non-movant need not cite specific page numbers of the record in support of its claims or defenses, "the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the non-moving party relies." Guarino, 980 F.2d at 405, quoting InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989) (internal quotation marks omitted). [*10] In contrast, mere conclusory allegations are patently insufficient to defeat a motion for summary judgment. See McDonald v. Union Camp Corp., 898 F.2d 1155, 1162 (6th Cir. 1990). The Court must view all submitted evidence, facts, and reasonable inferences in a light most favorable to the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); Adickes v. S.H. Kress & Co.., 398 U.S. 144, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); United States v. Diebold, Inc., 369 U.S. 654, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962). Furthermore, the district court may not weigh evidence or assess the credibility of witnesses in deciding the motion. See Adams v. Metiva, 31 F.3d 375, 378 (6th Cir. 1994).

Ultimately, the movant bears the burden of demonstrating that no material facts are in dispute. See Matsushita, 475 U.S. at 587. The fact that the non-moving party fails to respond to the motion does not lessen the burden on either the moving party or the court to demonstrate that summary judgment is appropriate. See Guarino, 980 F.2d at 410; Carver v. Bunch, 946 F.2d 451, 454-455 (6th Cir. 1991).

### III. The Threshold Issues

Title II of the ADA and Section 504 of the Rehabilitation Act (the "RHA"), under which Plaintiff brings her claims, [*11] prohibit discrimination on the basis of disability. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subject to discrimination by such an entity." 42 U.S.C. § 12132. Similarly, the RHA provides that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or

activity receiving Federal financial assistance." *29 U.S.C. § 794(a)*. Although the RHA and the ADA are not identical, the Sixth Circuit has held that "because the purpose, scope, and governing standards of the acts are largely the same, cases construing one statute are instructive in construing the other." *Doe v. Woodford County Bd. of Educ., 213 F.3d 921, 925 (6th Cir. 2000)*(quoting *McPherson v. Mich. High School Athletic Ass'n, Inc., 119 F.3d 453, 460 (6th Cir. 1997))*(internal quotation marks omitted).

Plaintiff claims that she was discriminated against either because of her **[*12]** disability or because she was regarded as having a disability, in violation of both the ADA and the RHA (doc. 1). Under the ADA and the RHA, the elements of a claim are essentially the same: (1) Plaintiff must be a person with a disability; (2) she must be "otherwise qualified" for participation in the relevant program; and (3) she must be excluded from participation in or denied the benefits of that program or otherwise subjected to discrimination by reason of her disability.[1] However, while the two statutes are similar in scope and purpose and generally subject to the same standards, they differ with respect to the standard used to determine causation. Specifically, to prevail on a claim of disability discrimination under the ADA, Plaintiff must establish that: that (1) she is disabled, (2) she is qualified to perform the requirements of the College of Medicine with or without reasonable accommodation, and (3) she would not have been dismissed but for her disability. See *Lewis v. Humboldt Acquisition Corp., 681 F.3d 312 (6th Cir. 2012)*(en banc)(emphasis added); *Donald v. Sybra, Inc., 667 F.3d 757, 763 (6th Cir. 2012)*. In contrast, to prevail under the RHA, a plaintiff alleging disability **[*13]** discrimination must show that the adverse action was taken solely because of a disability. See *29 U.S.C. § 794(a)*("No otherwise qualified individual with a disability in the United States...shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....."). Plaintiff seeks relief under both statutes, so, as necessary, the Court will address the differing standards in the course of this Opinion.

## A. Plaintiff is Disabled

---

[1] The RHA also requires that the plaintiff show that the defendant is an entity receiving federal funds, which is uncontested here.

In order to determine whether Plaintiff is disabled under the ADA and the RHA, the Court must assess whether Plaintiff has a physical or mental impairment that "substantially limits" her in at least one "major life activity." *DiCarlo v. Potter, 358 F.3d 408, 418 (6th Cir. 2004)* (quoting *Mahon v. Crowell, 295 F.3d 585, 589 (6th Cir. 2002)*, citing to *29 U.S.C. § 705(20)(B)* (RHA definition) and *42 U.S.C. § 12102(2)* (ADA definition).

"Substantially limits" means that an individual is either **[*14]** unable to perform a major life activity that the average person in the general population can perform or is significantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. See *29 C.F.R. § 1630.2(j)(1)*; *Penny v. United Parcel Serv., 128 F.3d 408, 414 (6th Cir. 1997)*.

Relying exclusively on *Brown v. Univ. of Cincinnati, 2005 U.S. Dist. LEXIS 40798, 2005 WL 1324885 (S.D. Ohio June 3, 2005)*, Defendant argues that Plaintiff is not disabled because "it is not reasonable to say that Plaintiff was significantly restricted in her ability to learn as compared to the average person in the general population" (doc. 22, citing *Brown, 2005 U.S. Dist. LEXIS 40798, [WL] at *12*). For support for its position that Plaintiff's level of achievement exceeds that which is attainable by an average, unimpaired person, Defendant points to the facts that Plaintiff earned a dual degree in Psychology and Biology from Middlebury College; that she worked as a chemical technician, clinical specialist and research assistant; that she was admitted to the University **[*15]** through a competitive process that required her to demonstrate academic abilities sufficient to handle the challenging curriculum; and that she was able to successfully complete her first year of medical school and, after treatment for depression, her second year (doc. 27).

In *Brown*, the plaintiff had attended medical school for over five years, and, while he performed average or better than average on his clinicals and oral exams, he had difficulty passing written, multiple choice and essay tests. He was ultimately diagnosed with a reading disorder and a generalized anxiety disorder, and he requested that he be given extra time on exams and be allowed to take them in an environment free from distractions. That request was denied, and he was dismissed from the program. The *Brown* court found that the plaintiff had not adduced evidence from which a

jury could reasonably find that his reading disorder substantially limited his ability to learn. The court found it particularly relevant that the plaintiff had excelled in high school and college and was able to receive average and above-average scores on some of his exams and determined that the plaintiff's "level of achievement greatly exceed[ed] [*16] that which the average, unimpaired individual is able to attain, so that it is not reasonable to say that [the] plaintiff was significantly restricted in the ability to learn as compared to the 'average person in the general population.'" Brown, 2005 U.S. Dist. LEXIS 40798, [WL] at *12.

The Court finds Brown unhelpful in its analysis of the instant matter. As an initial matter, although Defendant implies to the contrary in its filings, Brown was decided by another judge in this district; it therefore has no precedential value, and the Court is not bound by its holding or rationale. See, e.g., Fox v. Acadia State Bank, 937 F.2d 1566, 1570 (11th Cir. 1991)("A district court is not bound by another district court's decision, or even an opinion by another judge of the same district court."). Second, as noted by Plaintiff, Brown was decided prior to Congress' 2008 enactment of the Americans with Disabilities Act Amendments Act (the "ADAAA") and relies on cases that were explicitly abrogated by those amendments. See Brown, 2005 U.S. Dist. LEXIS 40798, [WL] at *9 ("The Supreme Court has stated that the terms 'substantially limits' and 'major life activity' must be 'interpreted strictly to create a demanding standard for qualifying as disabled.' Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, 534 U.S. 184, 197, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002)"). [*17] With the ADAAA, Congress substantially altered how employers and courts are to evaluate ADA claims. Relevant to the case at hand, Congress expressly rejected certain holdings of the Supreme Court in Sutton v. United Air Lines, 527 U.S. 471, 489, 119 S. Ct. 2139, 144 L. Ed. 2d 450 (1999) and Toyota Motor Mfg., 534 U.S. 184, 122 S. Ct. 681, 151 L. Ed. 2d 615, which "narrowed the broad scope of protection intended to be afforded by the ADA, thus eliminating protection for many individuals whom Congress intended to protect" and caused "lower courts [to] incorrectly [find] in individual cases that people with a range of substantially limiting impairments are not people with disabilities." Pub. L. No. 110-325, § 2(a)(4), (5), & (6). Thus, Congress explicitly indicated its disagreement with the Supreme Court's narrowing of the reach of the ADA and reiterated its belief that the concept of "disability" should be read broadly.

Indeed, the regulations implementing the ADAAA expressly note that the term "'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. 'Substantially limits' is not meant to be a demanding standard." 29 C.F.R. § 1630.2(j)(1). While the ADAAA retains the concept [*18] that "[a]n impairment is a disability...if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population," it explicitly admonishes courts that "[t]he primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis." Id. at (j)(1)(ii), (iii). Finally, the regulations instruct that "the term 'substantially limits' shall be interpreted and applied to require a degree of functional limitation that is lower than the standard for 'substantially limits' applied prior to the ADAAA." Id. at (iv). Given the above, the Court has no trouble finding that Plaintiff is disabled under the applicable statutes. Plaintiff has adduced evidence showing that ADD affects the learning processes in such a way that someone with ADD cannot perform at the level that might be otherwise expected and that it causes [*19] problems with focus, attention, organization and inhibitory control. Specific to Plaintiff, the evidence put forth shows that Plaintiff's ADD affected her ability to learn and retain new information and that she struggled more than the average person with organizing her thoughts and registering information. In short, the record supports a finding that Plaintiff is substantially limited in her ability to learn because of her ADD. The facts that she graduated from Middlebury with a dual degree and that she was able to succeed in part in medical school do not change the Court's decision, as these facts merely indicate that she was able to achieve some measure of success despite her disability-they do not speak to her learning ability as compared with the average person. The only evidence in the record that speaks to that is Dr. Krikorian's assessment, which supports a finding of disability. Defendant's rationale-that anyone who has had some modicum of academic success cannot be found to have a disability that affects learning-flies in the face of Congress' directives and the relevant implementing regulations. The Court cannot endorse Defendant's rationale, and Defendant has presented [*20] no compelling or controlling reason why the Court must.

The Court thus finds that Plaintiff is disabled under the

2012 U.S. Dist. LEXIS 126426, *20

ADA and the RHA due to her ADD.

## B. Plaintiff is Otherwise Qualified

A disabled person is "otherwise qualified" to participate in a program if she can meet its necessary requirements with reasonable accommodation. Kaltenberger v. Ohio College of Podiatric Medicine, 162, F.3d 432, 435-36 (Sixth Cir. 1998), citing Sandison v. Michigan High Sch. Athletic Ass'n, Inc., 64 F.3d 1026, 1034 (6th Cir. 1995).

As the Kaltenberger court noted, "discrimination laws do not require 'an educational institution to lower or to effect substantial modifications of standards to accommodate a handicapped person....' '[W]hile a grantee need not be required to make 'fundamental' or 'substantial' modifications to accommodate the handicapped, it may be required to make 'reasonable' ones...." Kaltenberger, 162 F.3d at 436 (internal citations omitted). Defendant argues that Plaintiff is not "otherwise qualified" to participate in its medicine curriculum because her requested accommodation—to retake the pediatrics exam—would require Defendant to fundamentally alter its curriculum.

However, the Court finds [*21] that Plaintiff has demonstrated that a genuine dispute of material fact exists with respect to this issue. Specifically, Plaintiff notes that Dean Stern, who ultimately made the decision to terminate Plaintiff from the program, had full discretion regarding that decision. That is, when assessing whether Plaintiff's requested accommodation-to retake the pediatrics exam and continue in the program—should be granted, he was not bound by rules, policies, procedures or curriculum mandates. As Plaintiff observes, Dean Stern had repeatedly allowed students to continue in the program despite academic challenges that had led to recommendations of dismissal. Indeed, Plaintiff herself had benefitted from Dean Stern's discretion earlier in her career at the University.

Not only was Dean Stern not bound by any curriculum standards or policies when he decided to terminate Plaintiff from the program, nothing in the record supports the notion that he even considered the issue of whether granting her request for accommodation would alter—let alone fundamentally alter-the program or its standards. On the contrary, Dean Stern testified in deposition that he denied Plaintiff's requested accommodation because [*22] of "a pattern of academic and psychiatric difficulties." Consequently, a

rational jury could find that Plaintiff's request to retake the pediatrics exam was reasonable and would not have corrupted Defendant's standards.

In addition, Defendant argues that it is entitled to summary judgment because its decision to terminate Plaintiff from its program is entitled to deference by the Court. The Kaltenberger court explained that

> when reviewing the substance of academic decisions, courts "should show great respect for the faculty's professional judgment...." "University faculties must have the widest range of discretion in making judgments as to the academic performance of students and their entitlement to promotion or graduation...." Courts must also give deference to professional academic judgments when evaluating the reasonable accommodation requirement. Kaltenberger, 162 F.3d at 436 (internal citations omitted).

However, this deference is not absolute, and the Court is tasked with ensuring that the discretion to make academic judgments not be used to mask discrimination. Here, Plaintiff has presented evidence that creates a genuine dispute as to this issue. Specifically, it appears that [*23] Dean Stern did not consider Plaintiff's medical records, Dr. Krikorian's report and associated materials, or Plaintiff's own explanatory letter of appeal when he made his decision to terminate Plaintiff from the program. Similarly, it appears that he did not speak to Plaintiff, to Dr. Krikorian, to the Senior Associate Dean of Student Affairs and Admissions or to the Assistant Dean for Academic Support—both of whom had worked extensively with Plaintiff-prior to making his decision. In his deposition, Dean Stern stated that he could not even recall whether he knew that Plaintiff had been diagnosed with ADD at the time he denied her request for accommodation.

Given the state of the record evidence, the Court cannot pay deference to Dean Stern's decision. Plaintiff has adduced evidence from which a reasonable jury could find that Dean Stern failed to actually consider the effect of Plaintiff's ADD on her academic performance; her request for an accommodation for her disability; whether any alternatives were available that might have allowed Defendant to accommodate Plaintiff's disability; and whether accommodating her request would have allowed her to complete the program without, as noted [*24] above, fundamentally altering the program's standards. See, e.g., Wong v. Regents of Univ. of Cal.,

*192 F.3d 807 (9th Cir. 1999).* Plaintiff has created a genuine dispute as to whether Dean Stern's decision was reached after thoroughly considering Plaintiff's request for accommodation.

Consequently, summary judgment on the issue of whether Plaintiff was otherwise qualified to continue in the program would be inappropriate.

## IV. Plaintiff's Specific Claims

### A. Plaintiff's Failure-to-Accommodate Claims Survive

In Counts 1 & 2 of Plaintiff's Complaint, she claims that Defendant violated Title II of the ADA and Section 504 of the RHA when it refused to allow her to retake the pediatrics exam, which Plaintiff contends was a request for an accommodation for her disability (doc. 1). The failure to provide reasonable accommodations can constitute disability discrimination. *See Alexander v. Choate, 469 U.S. 287, 295, 105 S. Ct. 712, 83 L. Ed. 2d 661 (1985)*; *Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 601, 119 S. Ct. 2176, 144 L. Ed. 2d 540 (1999)*; *Kleiber v. Honda of Am. Mfg., Inc., 485 F.3d 862, 868 (6th Cir. 2007)*.

As discussed above, under the circumstances present here, a rational jury could find that Plaintiff's request to retake the pediatrics exam was a reasonable **[*25]** request to accommodate her ADD. Therefore, these claims survive summary judgment.

### B. Discrimination on Account of Actual Disability

Even if Plaintiff is disabled and otherwise qualified, Defendant argues that it is nonetheless entitled to summary judgment because Plaintiff was not terminated from its program solely because of her disability but, instead, because she failed to meet the minimum academic standards for its program (doc. 22, citing *Monette v. Elec. Data Sys. Corp., 90 F.3d 1173, 1185-86 (6th Cir. 1996)*). Defendant contends that it applied its neutral academic standards to Plaintiff's situation and that she simply failed to meet the requirements.

Whether the Court applies the "solely because of" causation language of the RHA or the "but for" analysis of the ADA, the Court finds that summary judgment is not appropriate here. As discussed above, Plaintiff has

adduced evidence showing a genuine dispute regarding whether she was actually terminated, as Defendant claims, because of her failure to meet the academic standards, given that those standards were flexible and could be overridden based on Dean Stern's discretion. Especially in light of Dean Stern's comment that Plaintiff **[*26]** was dismissed because of "a pattern of academic and psychiatric difficulties," a reasonable jury could find that Defendant's ex post facto assertion that she was dismissed for failure to meet the standards was not the real reason for her dismissal and that, instead, she was dismissed because of—or would not have been dismissed but for-her disability.

### C. Discrimination on Account of Perceived Disability

In addition to prohibiting discrimination based on actual disabilities, both the ADA and the RHA prohibit public entities from discriminating against people because they are perceived—or regarded-as disabled. *See 42 U.S.C. §§ 12102(2)*. Relevant to the instant matter, an individual may fall within the ambit of this "regarded-as disabled" prong of the statutes where a covered entity mistakenly believes that the person has a physical or mental impairment and consequently discriminates against her. *See, e.g., Sutton v. United Air Lines, Inc., 527 U.S. 471, 489, 119 S. Ct. 2139, 144 L. Ed. 2d 450 (1999)*(superseded by statute on other grounds); *42 U.S.C. § 12102(3)(A)*. When evaluating a regarded-as claim, the Court looks not to the individual crying foul but to the state of mind of the entity against whom she makes her claim. **[*27]** This is a question, therefore, of intent. *Ross v. Campbell Soup Co., 237 F.3d 701, 706 (6th Cir. 2001)*. Consequently, such a claim is "rarely susceptible to resolution at the summary judgment stage." *Id.*

This case does not present one of those rare times when summary judgment can properly resolve a question of motive. On the contrary, Plaintiff has adduced evidence showing a genuine dispute over Defendant's motive in terminating Plaintiff's matriculation in its medical studies program. For example, the Senior Associate Dean of Student Affairs and Admissions and the Chair of the Appeal Board that recommended Plaintiff's dismissal both decided that Plaintiff's history of depression was relevant to whether she would make a good physician. And Dean Stern testified that Plaintiff had "a constellation of mental health disorders" and "psychiatric difficulties" that he believed would preclude her from finishing the program and becoming a good physician. Given the evidence in

2012 U.S. Dist. LEXIS 126426, *27

the record, and given that the germane issue here is Defendant's state of mind at the time Plaintiff was terminated from the program, the Court finds that summary judgment on Plaintiff's regarded-as claim is inappropriate **[*28]** because, for example, a reasonable jury could find that Plaintiff was impermissibly terminated from the program because she was mistakenly thought to have "a constellation of psychiatric problems" or to have incapacitating depression.

## V. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (doc. 22) is DENIED, and this matter is set for a final pretrial conference for October 11, 2012, at 11:00 A.M., with trial to begin on November 13, 2012.

SO ORDERED.

Dated: September 6, 2012

/s/ S. Arthur Spiegel

S. Arthur Spiegel

United States Senior District Judge

End of Document

Daniel Boocher

# EXHIBIT I

STATE OF MICHIGAN
IN THE 37th Circuit Court for the County of Calhoun
161 E. Michigan Ave., Battle Creek, MI 49014  (269) 969-6530

_____

CARRIE SMITH,

                                       Case No. 19-       -CZ

      Plaintiff,                           Hon.

v

KELLOGG COMMUNITY COLLEGE,

      Defendant.

---

Mark E. Kreter (P35475)
Daniel W. Boocher (P81550)
Attorney for Plaintiff
1 Michigan Ave
Battle Creek, MI 49017
(269) 966-3000 Phone
(269) 966-3022 Fax

---

## TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE

At a session of said Court held in the Circuit Courtrooms
in the County of Calhoun, State of Michigan,
held on the _____ day of February ___, 2019

Present:     Hon _____
                      Calhoun County Circuit Judge.

This Court has reviewed Plaintiff Carrie Smith's ("**Plaintiff**") *Verified Complaint, Motion for an Ex Parte Temporary Restraining Order, Show Cause Order, Preliminary Injunction*, **and for Expedited Discovery,** *Brief in Support* and other exhibits and has determined the following:

1. Based on Plaintiff's representations she has a likelihood of success on the merits of her claims.

2. Plaintiff will suffer irreparable harm if a Temporary Restraining Order is not issued, including, without limitation: (a) impediment to her educational and career progression, (b) loss of future earnings, (c) loss of her externship with Bronson Methodist Hospital, (d) delay in graduation, (e) inability to catch up in course and clinical work; and (f) loss of standing in her personal and professional capacity.

3. Plaintiff has no adequate remedy at law.

4. Plaintiff will suffer greater injury from the denial of the Temporary Restraining Order than the Defendant will suffer from the granting of such relief.

5. The granting of this temporary restraining order will further the public interest.

6. Notice to Defendant was not required because such notice would precipitate the harm sought to be avoided by Plaintiff.

IT IS ORDERED:

1. A Temporary Restraining Order is issued.

2. No bond or security is required to be posted.

3. This Temporary Restraining Order is binding on the parties to the action, their officers, agents, servants, employees, attorneys and on those persons in active concert or participation with them who receive actual notice of the order by personal service of otherwise.

4. Under the terms of this Temporary Restraining Order:

a) Defendant is restrained from taking any action to prevent Plaintiff from taking the final examination for NURS 281 within 7 days of the date of this Order;

b) Defendant is restrained from taking any action to prevent Plaintiff from enrolling in any subsequent classes to which she is entitled, including NURS 285-05, and from making up any missed lecture or clinical time; and

c) Defendant is restrained from taking any action to prevent Plaintiff from attending clinicals at Bronson Methodist Hospital in conformity with her coursework.

5. This order shall remain in full force and effect until this Court specifically orders otherwise.

6. Discovery is hereby expedited and shall commence immediately until further order of the Court.

7. Defendants shall show cause before this Court on _____ at _____ why a preliminary injunction should not be issued according to the terms and conditions of the temporary restraining order.

8. Plaintiff must serve a copy of all pleadings in this case on or before _____.

9. This order is issued on _____ at _____.


          /s/_____
          Hon.
          Circuit Court Judge